**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------------------X

ALEXANDER BELYA,

                 Plaintiff,

           -against-

HILARION KAPRAL a/k/a METROPOLITAN
HILARION; NICHOLAS OLKHOVSKIY; VICTOR         **DOCKET NO.: 20-cv-6597**
POTAPOV; SERGE LUKIANOV; DAVID STRAUT;
ALEXANDRE ANTCHOUTINE; MARK MANCUSO;
GEORGE TEMIDIS; SERAFIM GAN; PAVEL
LOUKIANOFF; BORIS DMITRIEFF; EASTERN
AMERICAN DIOCESE OF THE RUSSIAN
ORTHODOX CHURCH OUTSIDE OF RUSSIA; THE
SYNOD OF BISHOPS OF THE RUSSIAN
ORTHODOX CHURCH OUTSIDE OF RUSSIA, and
JOHN DOES 1 through 100,

                 Defendants.

--------------------------------------------------------------------------------X

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO STRIKE THE REPORT AND PRECLUDE THE TESTIMONY AT TRIAL OF PLAINTIFF'S PURPORTED DAMAGES EXPERT SAMEER SOMAL

Respectfully submitted,

FEERICK NUGENT MACCARTNEY, PLLC
96 South Broadway
South Nyack, NY 10960

THE BECKET FUND FOR
RELIGIOUS LIBERTY
1919 Pennsylvania Ave NW, Suite 400
Washington, DC 20006

***Attorneys for Defendants***

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................................. ii

INTRODUCTION ......................................................................................................................... 1

NATURE OF THE CASE ............................................................................................................. 2

FACTUAL BACKGROUND ......................................................................................................... 2

    1.  The Church Defendants ..................................................................................................... 2

    2.  Plaintiff ............................................................................................................................. 3

    3.  The Somal Report ............................................................................................................. 4

    4.  Somal's Deposition .......................................................................................................... 8

STANDARDS ............................................................................................................................... 9

ARGUMENT ................................................................................................................................ 11

    1.  Somal is Not Qualified to opine on Legal Conclusions, State of Mind, or Emotional
       Distress ............................................................................................................................. 12

    2.  Because Somal's Methodology is Unreliable and Speculative, the Court Must Exclude
       His Testimony Under its *Daubert* Gatekeeping Function ................................................ 13

       A.  Somal Provides No Methodology for His Ring 1 and 2 Damages ............................. 14

       B.  Somal's Flawed Viewership Model Seeks to Recover Millions of Dollars Based on
          the Total Number of Daily Reddit Visitors ................................................................. 15

          i.     Somal's Damages Must Be Stricken for Failure to Demonstrate Scientifically
              Adequate Methodology for His Views Model ................................................. 15

          ii.    Somal's Impressions Model is Equally Suspicious ......................................... 17

          iii.   Somal's Reputational Recovery opinion is Baseless and Unrecoverable ........ 18

    3.  Somal's Testimony Must Be Excluded Because it Does Not Help the Trier of Fact ......... 19

CONCLUSION ............................................................................................................................. 20

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page(s)**

*Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401 (S.D.N.Y 2016) ......... 9-10

*Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705 (2d Cir. 1989) 2016)..............................19

*Armorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) ...................................10

*Carroll v. Trump*, 22-cv-10016 (LAK), 2023 WL 2652636 (S.D.N.Y. Mar. 27, 2023)................14

*Daniels v. HSN, Inc.*¸ No. 8:18-cv-3088, 2020 WL 533927 (M.D. Fla. Feb. 3, 2020)................18

*Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579 (1993) ................................................ passim

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997)..............................................................................10

*In re Initial Pub. Offering Secs. Litig.*, 174 F. Supp. 2d 61 (S.D.N.Y.2001) ................................19

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, No. 1:00-1898, 2008 WL 1971538
(S.D.N.Y. May 7, 2008) ..................................................................................................................14

*In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396 (S.D.N.Y. 2016)...........................9, 11

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y.2004).........................................19

*Jupiter v. United States*, 05 CV 4449(ILG), 2010 WL 11623400 (E.D.N.Y. Dec. 2, 2010)..........12

*Kozak v. Liberty Mar. Corp.*, 20-CV 3684 (MMH), ---F. Supp. 3d ----, 2024 WL 1558809.........13

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).....................................................................10

*Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299 (S.D.N.Y. 2015) .............................. 15-16

*Ludwin v. Proman*, No. 20-CV-81755-RS, 2023 WL 315909 (S.D. Fla. Jan. 19, 2023) ..... 1, 13-14

*Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435 (2d Dep't 1995) ........................................12

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) .........................................................11, 13

*Scentsational Techs., LLC v. Pepsi, Inc.*, 13-cv-8645 (KBF), 2018 WL 1889763
(S.D.N.Y. Apr. 18, 2018) ................................................................................................................12

*Sec. & Exchange Comm'n v. Aly*, 16 Civ. 3853 (PGG), 2018 WL 1581986
(S.D.N.Y. Mar. 27, 2018) ................................................................................................................11

*TC Sys., Inc. v. Town of Colonie, N.Y.*, 213 F. Supp. 2d 171 (N.D.N.Y. 2002) ...........................12

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) .............................................................11

*United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004) .............................................................11

*Zwillinger v. Garfield Slope Housing Corp.*, No. CV 94-4009, 1998 WL 623589
(E.D.N.Y. Aug. 17, 1998) ...............................................................................................................12

## **Statutes**

FRE 403 ...........................................................................................................................................20

FRE 702 ...........................................................................................................................................20

Defendants move for an order striking the report and precluding the testimony of Sameer Somal, Plaintiff's purported damages expert pursuant to Federal Rule of Evidence ("FRE") 702.

## **INTRODUCTION**

This Court should strike the report and preclude the testimony of Sameer Somal ("Somal"), Plaintiff's purported damages expert, because it is unreliable and wholly speculative. Through a self-serving, circular, and scientifically unsupported "methodology," Somal concocts a baffling damages figure of $5,841,433.71 *ex nihilo*. Somal's report and testimony do not survive *Daubert* scrutiny and this Court cannot permit the jury to hear them.

This Court would not know from Plaintiff or Somal that this is not the first time Somal has attempted to peddle nonsensical defamation damage figures to finders of fact. Just last year, a District Court in the Southern District of Florida excluded nearly all of Somal's expert report in a different defamation matter because of the baselessness of his opinions. *See Ludwin v. Proman*, No. 20-CV-81755-RS, 2023 WL 315909 (S.D. Fla. Jan. 19, 2023).

Putting aside the patent absurdity of Somal's repeat-offense damage figures, Somal proffers purportedly expert opinions on matters far outside his claimed area of expertise and opines on topics within his area of expertise without providing substantiated and scientific calculations.

First, Somal is not qualified to opine on the law, anyone's state of mind, Plaintiff's emotional distress, or religion, as his experience is solely in digital marketing and on-line reputation repair. Despite his admitted lack of competence, Somal's report is replete with opinions on the law, Defendants' states of mind, Plaintiff's emotional distress, and religion.

Second, Somal's methodology is unreliable and wholly speculative, as his suggested damages figures are primarily (if not entirely) based on a website visitor multiplier approach that

is cut out of whole cloth and which he self-validates by means of an equally untethered cost analysis of web impressions.[1] Neither method has been evaluated or approved by industry experts.

Finally, Somal's opinions would not assist the jury in fact, since many of his opinions are upon topics within the ken of the average juror or go to the ultimate issues to be determined.

## NATURE OF THE CASE

Plaintiff Alexander Father Alexander (hereinafter "Father Alexander"), a religious leader, sues religious leaders of his former hierarchical church - the Russian Orthodox Church Outside Russia ("ROCOR" or the "Church") - for damages associated with a loss of parishioners and income, as well as an impaired reputation and standing in the community. [Compl. ¶¶ 77, 88, 99, 106].[2] The crux of Father Alexander's complaint is that religious leaders of his former hierarchical church wrote a letter to other religious leaders in the former church regarding the process by which religious leaders are elected and Father Alexander's moral conduct. Father Alexander's claims raise intractable First Amendment concerns that interfere with the Defendants' exercise of religion and necessarily entangles this Court in the ecclesiastical decision-making of a religious body. Resolving Father Alexander's claims requires the Court to ascertain whether he may sustain cognizable damages due to harm to his reputation within the former church and its community.

## FACTUAL BACKGROUND

### 1.    The Church Defendants

Founded in the wake of the Bolshevik revolution in 1920, ROCOR exists to promote "the overall spiritual nourishment of the Orthodox Russian flock in the diaspora." [ROCOR

---

[1] The *vast* majority of the monthly views in his model come from a single website, Reddit: of the 866,086,742 views identified, 810,316,261 of them—a full 93.5% of the views—come from Reddit. [*See* Pl. Ex. Report at 000061-62 and at 001825-26].

[2] The First Amended Complaint is annexed to the accompanying Feerick Decl. at Ex. A; the Answer is at Ex. B.

Regulations ¶ 3].[3] The Sobor of Bishops (the "Sobor") serves as ROCOR's highest ecclesiastical body. [*Id.* ¶ 7]. The Sobor's membership includes all the bishops in the Church. [*Id.* ¶ 8]. The Sobor meets every two years to elect bishops and take other ecclesiastical actions, and every member is entitled to vote on elevations. Until May of 2022, Defendant Metropolitan Hilarion served as the President of the Sobor and the First Hierarch of the Church. [*Id.*] After his repose, Defendant Nicholas Olhovsky became the Sobor's President and First Hierarch.[4]

The Synod of Bishops (the "Synod") is the Sobor's executive organ. [*Id.* ¶ 16]. As relevant here, the Synod discussed and considered Father Alexander's candidacy for the bishopric, but never elected him and his candidacy was withdrawn before the Moscow Patriarchate's Synod considered the appointment for confirmation. [See Compl. ¶ 26; Answer ¶ 26; Feerick Decl. at Ex. D]. Also, neither the Synod nor Sobor ever communicated with the Moscow Patriarchate's Synod on Father Alexander's election or elevation, before his appointment was considered. [*Id.* at Exs. F and G].

### 2.   <u>Plaintiff</u>

According to the Complaint, Father Alexander is an "Orthodox Christian archimandrite." [Compl. ¶ 26]. Father Alexander falsely claims he was elected "by a majority of the Bishops" in the Synod to the position of Bishop of Miami on December 6, 2018 [Compl. ¶ 26; Answer ¶ 26] because he was not elected and the Synod withdrew. [See Feerick Decl. at Ex. D]. On August 30, 2019, the Moscow Patriarchate's Synod mistakenly confirmed the appointment of then-noncandidate Father Alexander and caused great concern inside ROCOR's Eastern American Diocese ("EAD"). [Compl. ¶¶ Intro; Answer ¶ Intro Denial]. On September 3, 2019, EAD clergy, including cross-serving Synod members, wrote the letter to the full Synod and Metropolitan

---

[3]The ROCOR Regulations are available online at https://www.russianorthodoxchurch.ws/synod/engdocuments/enov_polozhenierocor.html

[4]The ROCOR Hierarchy is available online at https://www.russianorthodoxchurch.ws/synod/engrocor/enbishops.html

Hilarion raising concerns about "irregular" aspects of Father Alexander's purported election and confirmation as a bishop and asking the full Synod to investigate further. [Compl. ¶¶ Intro and 42; Answer ¶ 42].[5]

Father Alexander sued the following Defendants: the Synod, the EAD, Metropolitan Hilarion, and the bishops and priests who signed the September 3, 2019 letter. Father Alexander alleged defamation, defamation per se, false light, defamation by innuendo, and vicarious liability against Defendants. Father Alexander has since dropped the false light claim. Father Alexander claims the September 3, 2019 letter and its publication led him to leave the Church and join the Greek Orthodox Archdiocese of America ("GOA") [Compl. ¶ 58], notwithstanding his own application to leave for the GOA was acknowledged as having been received by the GOA one day earlier, on September 2, 2019. [See Feerick Decl. at Ex. E]. Father Alexander claims damages for the loss of members of his congregation and of income, as well as a "severely impaired reputation and standing in the community." [Compl. ¶¶ 77, 88, 99, 106].

### 3.    **The Somal Report**

On June 11, 2024, Father Alexander served Somal's Expert Report. [*See* Feerick Decl. at Ex. C- Somal Expert Report].[6] In his report, Somal reached several conclusions, following his review of the allegedly defamatory letter and relevant factual background. The basic findings and conclusions included the following:

1.  Father Alexander "incurred significant damages resulting from the false and defamatory statements made and disseminated by the Defendants." [SSR-000006].
2.  "Given the impact of the forgery allegations and the resultant damage to [Father Alexander], my conservative estimate with respect to the same includes: [a] Emotional Distress], [b] Rehabilitative, and [c] Reputational," [SSR-000006].
3.  "[A] breakdown of all damages total:
    Emotional Distress Damages recommended as the court deems fit.

---

[5] Though Belya quoted the letter, he did not attach it to the complaint.

[6] Although the report contains a table of contents, the pages of the report were not numbered. For the Court's convenience, Defendants have Bates Stamped the Somal Expert Report and cite the applicable pages thereof as "SSR-____." *See* Feerick Decl. at Ex. C.

Rehabilitation Damages: at least in the range of $477,000-$636,000.
Reputational Damages: at least $5,205,433.71" [SSR-000006].

In Section 3, Somal provides statements on defamation and its impact on reputation; the law on traditional defamation; false allegations amounting to defamation; defamatory statements alleging forgery; defamation versus freedom of expression; and malice involved in cases of negative and defamatory statements. [SSR-000012-20]. Somal cites cases from foreign jurisdictions involving non-parties and undisclosed facts. [SSR-000015-16, 18].

In Section 3, Somal offers his opinion on Defendants' states of mind, ascribing malice based on Somal's own lack of understanding of the legal definition of forgery. [SSR-000019-20]. Somal interpreted the definition of forgery as being limited to whether Father Alexander forged letters signed by Metropolitan Hilarion and as excluding whether forgery occurred upon delivery of Father Alexander's letters supporting elevation to the Moscow Patriarchate's Synod without the ROCOR Sobor's or Synod's approval or consent. [SSR-000019]. In drawing conclusions on malice, Somal offered considered discussions with people who were never previously identified as fact witnesses before the date fact discovery closed. [SSR-000020].

In Section 4, Somal offered opinions on internet defamation in the age of social media:

1. Addressing states of mind: "[D]issenters in relation to [Father Alexander's] selection for the position of Bishop of Miami systematically and intentionally propagated and spread the defamatory allegations of forgery of the Letter of Appointment dated September 3, 20219 … made against [Father Alexander] across the internet." [SSR-000022].
2. Addressing recipients without factual support: "Apart from a copy of the letter having been shared with every member of the ROCOR Synod in New York City, it was additionally, also forwarded to other members of the ROCOR, including parishes, churches, monasteries and other institutions within ROCOR, as well as to online media outlets." [SSR-000022].
3. Addressing severity: "I focus . . . on the fact that the letter, which falsely charged [Father Alexander] with forgery, and which was signed by the defendants, made its way into the internet stream to be disseminated further, adding to the *immense* loss of reputation for [Father Alexander]." [SSR-000024] [emphasis added].
4. Addressing religion and severity: "The posting and subsequent dissemination of the letter on the internet added credibility and strength to the false charge of forgery, since everyone could see that the letter was signed by high church officials who are held in

high esteem in the orthodox world. This *increased* damage to [Father Alexander's] reputation and makes it that much more difficult to repair and restore his name." [SSR-000024] [emphasis added].

5. Ascribing misconduct without factual support: Somal comments on the postings of "Olga Feisty", who he asserts "is connected to the defendants" without attribution of source. [SSR-000025].

6. Addressing misconduct without factual support: Somal asserts that "[p]eople also feel more comfortable making defamatory remarks on the internet because of the anonymity it offers and the lack of immediate consequences. Compared to traditional forms of defamation where the perpetrator's identity may be known, this anonymity makes it more difficult to identify and hold the perpetrators accountable for their actions." [*Id.* at 000026]. Yet, here, Defendants signed their names to the September 3, 2019 letter and do not proceed anonymously.

7. Addressing religion and severity: "The false accusation of forgery being spread about [Father Alexander] has caused *significant* reputational damage. It is important to note that the charge of forgery did not come from just anyone, it came from high officials in a church with millions of adherents and followers. People are much more likely to believe a false statement if it comes from a person of authority who commands respect and admiration, such as a high church official. This makes the false accusation *much more powerful and effective* against the victim, like [Father Alexander]. It also makes it that much more difficult to undo the falsehood." [SSR-000027] [emphasis added].

8. Ascribing misconduct without factual support: Somal states damage was caused to Father Alexander's local, national, international, and global reputation, because Father Alexander's church operated across geographical boundaries in New York, Florida, and Moscow and the news traveled by word of mouth, communication channels, and the articles were syndicated and distributed widely. [SSR-000028-29].

9. Addressing severity: Somal states suffering "through false allegations of forgery that cause[d Father Alexander] *immense* defamation." [SSR-000030] [emphasis added].

10. Addressing religion: "For many, the church becomes and extension of their family and home. They may attend services regularly as well as church activities, religious and social. Their congregations become a major part of their social lives…." [SSR-000030].

11. Addressing religion and ascribing misconduct without support: "With community members growing distressed and restless, and some even coming to question their faith, the burden falls on the other ministers and clergy to attempt to assuage the fears of devotees. In the present case, in the immediate aftermath of the incident of defamation, parents started pulling their children from the school of the church." [SSR-000030].

12. Addressing religion: "While most may not concern themselves with the ethics surrounding this incident and its aftermath, religious institutions have their own established code of morals and ethics that is stringently adhered to." [SSR-000031].

13. Addressing religion: "Potential congregants seek clergy who have earned trust within the community and institutions that are stable and respected." [SSR-000031].

In Section 4, Somal again includes discussions with previously undisclosed witnesses [SRI-000030-31] and offers opinions on "Heightened Scrutiny & Reputation Sensitivity in case of Religious Leaders and Dignitaries." [SSR-000030-31].

In Section 5, Somal offers opinions on the necessity and costs of an online reputation management plan and the nuances of digital reputation repair:

1. "As a direct consequence of Defendants' actions and false statements, [Father Alexander] will incur substantial costs if he seeks to manage and rehabilitee his online reputation." [SSR-000033].
2. Content removal from the internet is 'impossible" because publications are "loath to respond." [SSR-000044].
3. "Even with the most aggressive campaign, negative internet content featuring [Father Alexander] will likely reappear and affect his reputation in perpetuity." [SSR-000044].

In Section 6, Somal finally offers an assessment of damages, opining on issues far beyond his purported area of expertise:

1. Addressing severity: The "charge of forgery against [Father Alexander] not only tarnished his personal reputation but also inflicted *significant* damages to his professional and religious standing." [SSR-000050] [emphasis added].
2. "The stigma of being labeled a forger and deceiver reverberated through his social circles, causing emotional distress and anguish." [SSR-000050].
3. "Being falsely accused of forgery *undoubtedly* caused [Father Alexander] significant emotional distress and psychological harm." [SSR-000052] [emphasis added].
4. "The false accusation of forgery subjected [Father Alexander] to public humiliation and stigmatization, as they were disseminated widely within the Orthodox Christian community and beyond." [SSR-000052].
5. Commenting without factual support: "The false statements were broadcasted and re-broadcasted to mass audiences, with millions of people hearing, reading, or viewing the false statements." [SSR-000052].
6. Addressing religion: "The publication of the false charge of forgery damaged [Father Alexander's] reputation within the Orthodox Christian community, leading to a loss of trust and confidence among congregants." [SSR-000051].
7. Addressing religion: "The damage was not limited to intangible harm; it also exacted a tangible toll on his livelihood and financial well-being. The erosion of trust and confidence in his leadership abilities led to a diminished support and patronage, further affecting his financial strain." [SSR-000051].
8. Addressing states of mind and law: "The defendants' actions in making and disseminating false accusations against [Father Alexander] *appear to have been willful and malicious*. Their deliberate efforts to undermine his reputation and credibility *demonstrate a reckless disregard for the truth and a clear intent to cause harm*." [SSR-000052] [emphasis added].

In Section 6, Somal defines the extent of Father Alexander's reputational damages as impacting three distinct classifications or rings: [1] close family and friends, whose opinions are well formed about him; [2] neighbors, acquaintances, parishioners, clergy, and his children's

friends and their parents[7], whose opinions are allegedly most influenced by false statements about him; and [3] people who have heard or read about Father Alexander, who are "mostly strangers" and purportedly "number in the millions" and who "never had an opinion of Father Alexander prior to the false statements being published, which opinions of Father Alexander are purportedly "largely forever cemented". [SSR-000058-59]. None of the members of these groups were identified with specificity.

### 4.    Somal's Deposition

At deposition, Somal admitted that he is a non-lawyer and non-legal expert, although he gives CLEs to New York attorneys on topics in his area of specialty. He admitted he had no medical license or training. He also admitted he is not an expert in religion. [See Feerick Decl. at Ex H pp. 63-67 and 70-72].

At deposition, Somal admitted that he did not know of the number of worshippers or clergy in ROC or ROCOR; that he was not aware that Father Alexander had applied to join GOA one day before the September 3, 2019 letter was written; that he did not know that Defendants contended that the elevation paperwork sent to the Moscow Patriarchate's Synod was forged because it was not delivered with the Sobor's or Synod's authority or consent; or that he did not know Archbishop Gabriel testified that his handwritten letter, which had been sent to Moscow as part of the elevation paperwork, had been transformed in Father Alexander's family's possession into a typed version bearing his signature. [See Feerick Decl. at Ex H pp. 115-116; 122; 84-85; 139-140].

At deposition, Somal admitted that he did not know the number of visitors to any specific page of the websites reviewed, how many read the articles, whether the readers retained knowledge of the article, or whether the readers cared about what was read; that he arbitrarily chose the .01% website visitor multiplier; and that there was no margin of error determined for the website visitor

---

[7] Belya is a monastic who has no children.

monitor or the online reputation repair plan's costs. The multiplier chosen could have been 1%, .1%, .01%, or .001%, as Somal held complete and utter discretion and indicated that he had used higher and lower factors in the past. [See Feerick Decl. at Ex H pp. 140-145].

To justify the propriety of his conclusory statements, Somal pointed to the fact that he now adds disclaimers on the face pages of the different sections of his report, to avoid the conclusion that his opinions do not include statements of law, statements of states of mind, and statements of emotional distress. [See Feerick Decl. at Ex H pp. 48-49]. Yet, the construct of his report, especially in light of his familiarity with prior challenges to his expert opinions, reveals the report is arranged in a fashion that obscures the disclaimers and would lead a reasonable jury to reliance and confusion.

Fully armed with knowledge of Father Alexander's expert opinions, the Church now brings this motion to strike the report and the testimony as failing to satisfy *Daubert* requirements.

## <u>STANDARDS</u>

The admission of expert testimony is governed by FRE 702,[8] which imposes an obligation on District Courts to act as gatekeepers to ensure such testimony is relevant and reliable. *See Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). In the Second Circuit, District Courts undertake a three-step process to determine if expert testimony complies with FRE 702; *see, e.g., Almeciga v. Ctr. for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 415 (S.D.N.Y 2016) (*citing Daubert*, 509 U.S. at 593–94). *First*, "the district court must determine whether an expert is qualified." *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 412 (S.D.N.Y. 2016).

---

[8] FRE 702 provides that, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FRE 702.

*Second*, "the district court must evaluate the reliability of proposed expert testimony." *Id.* To do so, "[t]he District Court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Armorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a District Court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Junk science has no place in a courtroom: "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

The Court's gatekeeping function established in *Daubert* has been extended to experts presenting technical or specialized opinions. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). When applying the *Kumho Tire* doctrine, "it is the Court's role to ensure that a given discipline does not falsely lay claim to the mantle of science, cloaking itself with the aura of unassailability that the imprimatur of "science" confers and thereby distorting the truth-finding process." *Almeciga*, 185 F. Supp. 3d at 415 (citing *Kuhmo Tire*, 526 U.S. at 137). "There have been too many pseudo-scientific disciplines that have since been exposed as profoundly flawed, unreliable, or baseless for any Court to take this role lightly." *Id.* Accordingly, where District Courts different factors than those called for by *Daubert* based on what factors best "fit" the inquiry, "the particular questions that [*Daubert* ] mentioned will often be appropriate for use in determining the reliability of challenged expert testimony." *Id.* at 424 (citing *Kumho Tire*, 526 U.S. at 152).

In *Almeciga,* 185 F. Supp. 3d at 415, the District Court noted that *Daubert* states that courts should ordinarily pay particular attention to whether the expert's methodology has or can be tested, whether it has been subject to peer review and publication, whether it has a known error rate,

whether it is subject to internal controls and standards, and whether it has received general acceptance in the relevant scientific community."

*Third*, "[a]fter determining that a witness is qualified to testify as an expert as to a particular matter and that the opinion is reliable, Rule 702 requires the district court to determine whether the expert's testimony will 'help the trier of fact.'" *In re Mirena*, 169 F. Supp. 3d at 413 (quoting FRE 702).

> By definition, expert testimony that usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it, does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's.

*Id.* (alteration in original) (internal quotations omitted) (citing *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994); *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)).

Finally, FRE 403, under which a court may exclude "evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," must be factored "given the unique weight [expert testimony] evidence may have in a jury's deliberations." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005).

## **ARGUMENT**

Somal's report fails to satisfy the requirement that expert evidence be "properly grounded, well-reasoned, and not speculative before it can be admitted." *See, e.g.*, *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004); *see also Sec. & Exchange Comm'n v. Aly*, 16 Civ. 3853 (PGG), 2018 WL 1581986, at *11 (S.D.N.Y. Mar. 27, 2018). FRE 702 prohibits Somal from offering opinion to the finder of fact about areas outside his specialty. He is not an attorney, a psychologist, or a theologian, and he is incompetent to opine on the law, states of mind, emotional distress, or religious practice. He cannot address the definition of forgery or the meaning of the

words at issue. It does not matter if a disclaimer is contained in his report, because commentary on matters outside his competence is excluded under FRE 403 where, as here, it is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Somal simply offers sophistry and speculation and thus his proposed evidence fails to satisfy the requirement of reliability set forth in *Daubert*.

### 1.    Somal is Not Qualified to Opine on Legal Conclusions, State of Mind or Emotional Distress

An expert witness must be "qualified as an expert by knowledge, skill, experience, training, or education[.]" FRE 702; *see also Jupiter v. United States*, 05 CV 4449(ILG), 2010 WL 11623400, at *1 (E.D.N.Y. Dec. 2, 2010) ("The initial inquiry is whether the proposed expert is qualified to act as a witness, and if he is, does his area of expertise extend to the particular opinion he is asked to offer."). Although courts within the Second Circuit have "liberally construed expert qualification requirements . . . the court should further compare the expert's area of expertise with the particular opinion the expert seeks to offer [and permit t]he expert . . . to testify only if the expert's particular expertise . . . enables the expert to give an opinion that is capable of assisting the trier of fact." *TC Sys., Inc. v. Town of Colonie, N.Y.*, 213 F. Supp. 2d 171, 174 (N.D.N.Y. 2002) (alterations in original) (internal quotations omitted) (quoting *Zwillinger v. Garfield Slope Housing Corp.*, No. CV 94-4009, 1998 WL 623589, at *7 (E.D.N.Y. Aug. 17, 1998)).

Of course, it is clear that Somal cannot "render[] opinions on subjects outside his field of expertise." *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435, 444 (2d Dep't 1995). He is not an attorney or a psychologist. He has no legal or medical license or training. He has no religious education or experience. He cannot provide competent expert testimony on the legal definition of forgery or other legal matters, and he cannot offer testimony on someone's state of mind, emotional distress or psychological trauma because these areas are outside his area of specialty. *See id.*;

*Scentsational Techs., LLC v. Pepsi, Inc.*, 13-cv-8645 (KBF), 2018 WL 1889763, at *2 (S.D.N.Y. Apr. 18, 2018).

Moreover, this Court cannot allow Somal to testify about the intent of any Defendant. "Opinions concerning state of mind are an inappropriate topic for expert opinion, and [n]o expert can opine on an actor's subjective intent." *Kozak v. Liberty Mar. Corp.*, 20-CV 3684 (MMH), --- F. Supp. 3d ----, 2024 WL 1558809, at *10 (E.D.N.Y. Apr. 10, 2024) (alteration in original) (internal quotations and citations omitted). Each reference must be stricken and precluded.

Just last year, in *Ludwin v. Proman*, Somal was precluded from testifying on these very issues. There, like here, "Somal's expert report contain[ed] numerous legal conclusions and interpretations." *Ludwin v. Proman*, No. 20-CV-81755-RS, 2023 WL 315909, at *1 (S.D. Fla. Jan. 19, 2023). There, like here, he claimed that the alleged defamatory materials were "rooted in malice." *Compare id. with* SSR-000019-20. There, like here, Somal's opinions "are not expert opinions but rather impermissible legal conclusions derived from Somal's own legal interpretations." *Ludwin*, 2023 WL 315909, at *1. Like the *Ludwin* court, this Court must not allow Somal to opine on issues outside of his area of expertise.

### 2.    Because Somal's Methodology Is Unreliable and Speculative, the Court Must Exclude His Testimony Under Its *Daubert* Gatekeeping Function

Assuming Somal is qualified to testify about damages, which he is not, the Court must also ascertain whether his testimony is reliable. *See Nimely*, 414 F.3d at 396 (citing *Daubert*, 509 U.S. at 589). "[R]eliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between [the expert's] methodology and the expert's conclusions." *Id.* "[I]t is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267.

> In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand. A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render

an expert's opinion *per se* inadmissible. "The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions."

*Id.* (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746 (3d Cir. 1994)). As such, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Id.* at 266.

Despite the requirement under *Daubert* and FRE 702 that Somal offer a reliable basis for his conclusions, Somal offers nothing of the sort.[9] He cannot give and cannot support his projections of damages other than by supporting them via another self-created and self-serving method of calculation. Somal's methodology has never been, nor can it be, tested. *Cf. Daubert*, 509 U.S. at 593. His methodology was not subjected to peer review. *Cf. id.* at 593–94. His methodology suggests no known error rate. *Cf. id.* at 594. His methodology is not subject to internal controls and standards. *Cf. id.*

## A.    Somal Provides No Methodology for His Ring 1 and 2 Damages

Somal purports to claim Father Alexander has suffered $750,000-$1,000,000 in damages, but he fails to explain how he came to this conclusion beyond stating his conclusion "is based on my understanding of reputational harm." [SSR-000061]. But "[a]n 'expert must show how his or her experience . . . led to his conclusion.'" *Carroll v. Trump*, 22-cv-10016 (LAK), 2023 WL 2652636, at *4 (S.D.N.Y. Mar. 27, 2023) (second alteration in original) (quoting *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, No. 1:00-1898, 2008 WL 1971538, at *6 (S.D.N.Y. May 7, 2008)) (rejecting purported reputational expert's conclusion because expert failed to connect his conclusion with his experience).

---

[9] To the extent Somal relies on previous defamation awards [SSR-000012-20], the *Ludwin* court rejected Somal's ability to do so. *See Ludwin*, 2023 WL 315909, at *2 ("Somal may not testify as to a suggested damages calculation based on his collection and review of prior defamation cases.").

Somal utterly fails to do this. He does not demonstrate how he "follow[ed] peer accepted procedures in both the public relations and expert witness professions as to how to analyze and assess situations which negatively impact reputations as well as devise strategies, plans and actions to restore them." *Id.* He does not explain "how his application of those procedures and principles led him to his conclusion." *Id.* Accordingly, "there is no reliable basis" for Somal's conclusion and his estimate for Ring 1 and 2 damages must be stricken and precluded. *Id.*

> ### B.    Somal's Flawed Viewership Model Seeks to Recover Millions of Dollars Based on the Total Number of Daily Reddit Visitors

> #### i.    Somal's Damages Must Be Stricken for Failure to Demonstrate Scientifically Adequate Methodology for His Views Model

Somal's supposed expert opinion is entirely dependent upon two of his own unsupported, unscientific, and *ad hoc* models. For Somal's first model, he takes what he claims is a "set of [seven] online news websites, [three] legal case databases, [four] religious news platforms, [one] social media platform, and [six] additional information sources." [SSR-000061]. He counts the total number of visitors to these sites from the United States and Russia: 866,086,742. [SSR-001826]. Without any scientific basis, he makes up a number by assuming that .1% of visitors to the sites saw material about Father Alexander. [SSR-000061-62]. Then, without any scientific basis, he makes up a number—$5—for damages for each purported view. [SSR-000061-62].

Somal had unfettered discretion about what to include in the base source material, what website visitor multiplier to apply, what bounce rate to apply, and charge per visit or web impression. Each decision about what to include or apply in his *ad hoc* methodology materially affects the equation and the conclusions drawn therefrom, yet Somal provides no basis for any of these decisions. Somal does not demonstrate that these models are peer-reviewed, have a scientifically sound foundation, or provide an accurate estimate of reputational damage.

Unsurprisingly, Somal does not claim a basis for the validity of his model. But "the law is clear: expert opinions are inadmissible if they are not 'based on sufficient facts or data,' or on a reliable application of scientific methods to those facts or data." *Laumann v. Nat'l Hockey League*, 117 F. Supp. 3d 299, 315 (S.D.N.Y. 2015) (quoting FRE 702). Somal must demonstrate that he tethered his model to facts, data, and scientific methods. *See id.* (excluding under Rule 702 damages model because the model "is largely untethered from the actual facts of this case"). He does not, and his model must be excluded.

The lack of scientific validity—and frankly, the absurdity—of Somal's model becomes clear when the Court reviews the data fed into this model. To highlight the absurdity, removing Reddit from Somal's model reduces his damages figure *twenty-fold*. Somal does not explain how he chose his hodgepodge of websites. But what is clear is that the *vast* majority of the monthly views in his model come from a single website, Reddit: of the 866,086,742 views identified, 810,316,261 of them—a full 93.5% of the views—come from Reddit. [SSR-000061-62 and SSR-001825-26].

Then, again without any support, Somal claims that .1% of those *total* Reddit visitors saw defamatory material against Father Alexander. How Somal reaches this figure is a mystery. In 2019, Reddit saw approximately *199 million* posts, and that number rose to *469 million* in 2023.[10] Somal's unsupported claim that .1% of *all* Reddit users saw a defamatory post about Father Alexander amongst the hundreds of millions of total posts is not just scientifically unsupported—it is farcical.[11]

---

[10] Brian Dean, *Reddit User and Growth Stats*, Backlinko (Apr. 8, 2024), *available at* https://backlinko.com/reddit-users.

[11] This is especially the case because the Reddit post Somal cites has a mere eight upvotes, while one of the most-upvoted posts has over 400,000 upvotes. *Compare U.S. Supreme Court Summarily Refuses to Hear ROCOR Appeal for Special Treatment and Expansion of Religious Exemption*, Reddit, https://www.reddit.com/r/exorthodox/comments/14bdq1n/us_supreme_court_summarily_refuses_to_hear_rocor/ (last accessed July 31, 2024), *with*

Because there is no reliable basis for Somal's testimony on damages beyond what an online reputation repair plan would consist of, Somal is falsely laying claim to the mantle of science in assessing and evaluating damages, and thereby distorting the truth-finding process because there is too much discretion and speculation involved. It is simply unreliable.

Somal's suggested damages figures are primarily (if not entirely) based on a website visitor multiplier approach that is cut out of whole cloth. Somal claims to use a model to determine total number of visitors exposed to purportedly defamatory material, but Appendix D to his report, the purported model, is merely Somal spending approximately five-hundred pages regurgitating various links, and what appears to be a spreadsheet of total visits to an arbitrary list of websites. Notably, some of the links Somal includes in Appendix D to his Report are actually favorable to Plaintiff. Somal never actually provides a working model for the Court to determine sufficiency under *Daubert*, and the model must be rejected.

### ii.        Somal's Impressions Model Is Equally Specious

Somal's second, impressions-based model fares no better. Somal again used the same program that tracked visitors to calculate purported impressions drawn from visitors. [SSR-000062-63]. He applied a subjective bounce rate of 30 inside a self-created equation to reach a conclusion that there were 2,922,057,385 web impressions regarding the articles that are rated at $.001 to $.002 per 1,000 impressions. [SSR-000062-63]. This equation results in web impressions worth between $2,922,057 at $.001 each to $5,844,114 at $.002 each. [SSR-000062-63]. In other words, by applying Somal's arbitrary numbers selected, the damages doubled from approximately $3,000,000 to almost $6,000,000, allowing Somal to affix the midpoint of these two arbitrary numbers at $4,282,086, as the best estimate of web impression value. Magically, the $4,282,086

---

*This is the most upvoted post ever on Reddit* (2024 **update**)
, Reddit, https://blog.oneupapp.io/most-upvoted-post-on-reddit/ (last accessed Aug. 5, 2024) (#wallstreetbets trying to pump Gamestop stock). In 2019, the most upvoted post of the year had about 229,000 upvotes.

is roughly the number attained by the website visitor multiple method (coincidentally, 1.1% apart). The illusion created by two wholly arbitrary methodologies producing value 1.1% apart does not give either method credibility but highlights the hokey nature of each method.

This model assumes that there were 2,922,057,385 total web impressions. [SSR-000062-63]. That that number is nowhere in Appendix D, however, providing a reason alone to reject the model under FRE 702. Perhaps he means the 1,741,715,320 total visits figure, which may take into account bounce rates. [SSR-001824]. But these are *total visits* to the sites, not views of allegedly defamatory material. Somal fails to provide any basis under *Daubert* that these total visits should be multiplied by costs per impression to determine Father Alexander's damages. Instead, Somal applied an arbitrary multiplier that reduced the number of web impressions to a projection of how many web impressions may have been made from the allegedly defamatory publications, and again arbitrarily selected and applied a cost factor that capitalized his secondary assessment.

Somal's methodology was not tested, not subject to peer review, has no known error rate, is not subject to internal controls and standards but arbitrary ones selected by Somal, and has not received general acceptance in the relevant community. Somal's report and testimony should be excluded because his pseudo-scientific discipline is profoundly flawed, unreliable, and baseless.

### iii.    Somal's Reputational Recovery Opinion Is Baseless and Unrecoverable

Somal detailed his estimate of the costs of an online reputation repair plan. [SSR-000064-66]. He calculated the cost of the plan to be $26,500 per month and estimated that between eighteen and twenty-four months was sufficient to wipe the internet of bad impression stories. [SSR-000064]. Again, the basis for the arbitrary choice of eighteen months at $477,000 versus twenty-four months at $636,000 was unexplained. Eighteen months was not even described as being the bare minimum, as opposed to the maximum, for such a plan. [SSR-000064-65]. Finally, because

Plaintiff has no out-of-pocket expenses for reputational recovery, any claimed amount by Somal is unrecoverable. *See Daniels v. HSN, Inc.,* No. 8:18-cv-3088, 2020 WL 533927 (M.D. Fla. Feb. 3, 2020).

**3.**     <u>**Somal's Testimony Must Be Excluded Because It Does Not Help the Trier of Fact**</u>

"[I]n deciding whether the proposed testimony will be helpful to the factfinder, courts in this Circuit analyze the testimony to determine whether it 'usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'" *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 548–49 (S.D.N.Y.2004) (quoting *United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir.1999)). "In fact, every circuit has explicitly held that experts may not invade the court's province by testifying on issues of law." *In re Initial Pub. Offering Secs. Litig.*, 174 F. Supp. 2d 61, 64 (S.D.N.Y.2001) (collecting cases)). Similarly, expert testimony is inadmissible when it addresses "lay matters which [the trier of fact] is capable of understanding and deciding without the expert's help". *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989).

At various points in his report, Somal opines that the Defendants' statements are defamatory or expresses his view on what the statements and publications mean. Somal makes statements regarding causation as though fact. In line with well-established precedent, Somal cannot opine or testify about issues of law that are properly the domain of the trial judge or jury. He cannot testify on whether something is defamatory, an immense defamation, or even a forgery. He cannot address whether someone acted with malice or intent. He cannot state what caused emotional distress or psychological trauma or whether emotional distress or psychological trauma is present. Rather, in every single instance in which Somal's report gives a legal conclusion by stating a matter is defamatory, an immense defamation, a forgery, or mentions that an act was done in malice or any particular intent, or addresses damage causation or anything similar, he ventures

19

outside his expertise and usurps the roles of the trial judge and jury. Every single one of these comments must be stricken from his report and his testimony thereon precluded.

## CONCLUSION

The Court should grant Defendants' motion to strike and preclude, because Somal's opinions are exactly the type of testimony that Daubert was meant to prevent from reaching the jury. He is unqualified, his methodology is unreliable and completely discretionary and speculative, and his opinions are likely to mislead the jury. For all of these reasons, the Court should perform its gatekeeping function by striking Somal's report and preclude him from testifying at trial.

Dated: South Nyack, NY
August 4, 2024

<div style="margin-left:40%">

Respectfully submitted,

/s/ *Donald J. Feerick, Jr.*
Donald J. Feerick, Jr. (DF 3299)
Alak Shah (AS 5301)
Feerick Nugent MacCartney, PLLC
96 South Broadway
South Nyack, New York 10960
Tel: 845-454-2000
*dfeerick@fnmlawfirm.com*
*ashah@fnmlawfirm.com*

Diana Verm Thomson, Esq.
Daniel H. Blomberg, Esq.
THE BECKET FUND FOR
RELIGIOUS LIBERTY
1919 Pennsylvania Ave NW, Suite 400
Washington, DC 20006
Tel: 202-955-0095
*dthomson@becketlaw.org*
*dblomberg@becketlaw.org*

***Attorneys for Defendants***

</div>