**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

ALEXANDER BELYA,

              Plaintiff,

   v.

METROPOLITAN HILARION, et al.,

              Defendants.

Case No. 20-cv-6597 (AS)

**DEFENDANTS' MEMORANDUM
IN SUPPORT OF
SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS ...............................................................................................2

    A.  The Russian Orthodox Church Outside of Russia ...............................................2

    B.  Father Alexander's candidacy for bishop ..........................................................3

    C.  The proclamation from Moscow.......................................................................4

    D.  Father Alexander's lawsuit ..............................................................................6

    E.  Procedural history .........................................................................................8

LEGAL STANDARD....................................................................................................8

ARGUMENT .............................................................................................................8

I.  The First Amendment bars Father Alexander's claims. ..........................................8

    A.  The ministerial exception bars Father Alexander's claims....................................8

        1.  Civil claims that interfere in the selection and control of ministers are barred. ...........9

        2.  Father Alexander's claims interfere with the Church's
            selection and supervision of its ministers. ..................................................10

    B.  The church autonomy doctrine bars Father Alexander's claims. .....................13

        1.  The claims here interfere in church disciplinary communications. ...........13

        2.  The neutral principles approach does not apply here................................15

    C.  The Establishment Clause bars Father Alexander's claims..............................18

    D.  The Free Exercise Clause bars Father Alexander's claims...............................19

II.  Father Alexander's claims fail on the merits. .....................................................20

    A.  Father Alexander challenges statements that are true.......................................21

    B.  The statements are not of and concerning Father Alexander.............................22

    C.  The statements are not susceptible to defamatory meaning...............................23

    D.  The Clergy Letter was a privileged communication.........................................23

    E.  Father Alexander cannot show special or general damages from the statements.............24

CONCLUSION...........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aronson v. Wiersma*,
    493 N.Y.S.2d 1006 (N.Y. 1985) ....................................................................23, 25

*Ava v. NYP Holdings*,
    885 N.Y.S.2d 247 (N.Y. App. Div. 2009) .............................................................21

*Belya v. Kapral*,
    45 F.4th 621 (2d Cir. 2022) ......................................... 8, 11-12, 13, 15, 16

*Belya v. Kapral*,
    59 F.4th 570 (2d Cir. 2023) ...................................................................................8

*Berger v. Temple Beth-El of Great Neck*,
    839 N.Y.S.2d 504 (N.Y. App. Div. 2007) .............................................................24

*Billard v. Charlotte Catholic High Sch.*,
    101 F.4th 316 (4th Cir. 2024) ............................................................................9, 10

*Biro v. Condé Nast*,
    883 F. Supp. 2d 441 (S.D.N.Y. 2012)...................................................................22

*Bouldin v. Alexander*,
    82 U.S. (15 Wall.) 131 (1872) .............................................................................13

*Brazauskas v. Fort Wayne-S. Bend Diocese*,
    796 N.E.2d 286 (Ind. 2003) .............................................................................14, 17

*Bryce v. Episcopal Church*,
    289 F.3d 648 (10th Cir. 2002) .......................................................................14, 17, 19

*Byrd v. DeVeaux*,
    No. 17-cv-3251, 2019 WL 1017602 (D. Md. Mar. 4, 2019) ...................................10

*C.L. Westbrook, Jr. v. Penley*,
    231 S.W.3d 389 (Tex. 2007).................................................................................14

*Celle v. Filipino Rep. Enters.*,
    209 F.3d 163 (2d Cir. 2000)........................................................................20-21, 23

*Cha v. Korean Presbyterian Church*,
    553 S.E.2d 511 (Va. 2001)..............................................................................9-10

*Chandok v. Klessig,*
    632 F.3d 803 (2d. Cir. 2011)..........................................................................23, 24

*Demkovich v. St. Andrew the Apostle Parish,*
    3 F.4th 968 (7th Cir. 2021) .................................................................................12

*Dermody v. Presbyterian Church,*
    530 S.W.3d 467 (Ky. Ct. App. 2017) .............................................................. 14-15

*In re Diocese of Lubbock,*
    624 S.W.3d 506 (Tex. 2021)..................................................................14, 17, 23

*El-Farra v. Sayyed,*
    226 S.W.3d 792 (Ark. 2006)................................................................................10

*Employment Division v. Smith,*
    494 U.S. 872 (1990)............................................................................................20

*Episcopal Diocese of S. Va. v. Marshall,*
    No. 1955-23-2, --- S.E.2d ---, 2024 WL 3416968
    (Va. Ct. App. July 16, 2024)...................................................... 10, 12-13, 25

*Farley v. Wis. Evangelical Lutheran Synod,*
    821 F. Supp. 1286 (D. Minn. 1993)....................................................................10

*Fowler v. Rhode Island,*
    345 U.S. 67 (1953)..............................................................................................19

*Fratello v. Archdiocese of N.Y.,*
    863 F.3d 190 (2d Cir. 2017)..................................................................................9

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021)........................................................................................19, 20

*Goldberg v. Levine,*
    949 N.Y.S.2d 692 (N.Y. App. Div. 2012) ..........................................................21

*Goodman v. Temple Shir Ami, Inc.,*
    712 So. 2d 775 (Fla. Dist. Ct. App. 1998) ..........................................................23

*Grayson v. No Labels, Inc.,*
    601 F. Supp. 3d 1251 (M.D. Fla. 2022)..............................................................25

*Hartwig v. Albertus Magnus Coll.,*
    93 F. Supp. 2d 200 (D. Conn. 2000)....................................................................10

*Heard v. Johnson,*
    810 A.2d 871 (D.C. 2002) ...................................................................................10

*Hiles v. Episcopal Diocese of Mass.*,
    773 N.E.2d 929 (Mass. 2002) ................................................................14

*Hosanna-Tabor v. EEOC*,
    565 U.S. 171 (2012) ........................................................................9, 11

*Hubbard v. J Message Group Corp.*,
    325 F. Supp. 3d 1198 (D.N.M. 2018) ....................................................14

*Hutchison v. Thomas*,
    789 F.2d 392 (6th Cir. 1986) ................................................................11

*Hyman v. Rosenbaum Yeshiva of N.J.*,
    No. 08-cv-7994, 2024 WL 3513967 (N.J. July 24, 2024) ......................10

*Idema v. Wager*,
    120 F. Supp. 2d 361 (S.D.N.Y. 2000) ....................................................22

*James v. Gannett Co.*,
    40 N.Y.2d 415 (N.Y. 1976) ................................................................11

*Kamerman v. Kolt*,
    621 N.Y.S.2d 67 (N.Y. App. Div. 1994) ................................................24

*Matter of Kantor v. Pavelchak*,
    134 A.D.2d 352 (N.Y. App. Div. 1987) ...........................................23-24

*Kavanagh v. Zwilling*,
    578 F. App'x 24 (2d Cir. 2014) ......................................................11, 14

*Kavanagh v. Zwilling*,
    997 F. Supp. 2d 241 (S.D.N.Y. 2014) ........................................14, 18, 19

*Kirch v. Liberty Media*,
    449 F.3d 388 (2d Cir. 2006) ...........................................................20, 22

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
    313 U.S. 487 (1941) ............................................................................20

*Klouda v. Sw. Baptist Theological Seminary*,
    543 F. Supp. 2d 594 (N.D. Tex. 2008) ..................................................10

*Kraft v. Rector*,
    No. 01-cv-7871, 2004 WL 540327 (S.D.N.Y. Mar. 17, 2004) ...............11

*Lee v. Sixth Mount Zion Baptist Church*,
    903 F.3d 113 (3d Cir. 2018) ......................................................13, 24-25

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    672 F.3d 155 (2d Cir. 2012)...........................................................................20

*Maize v. Friendship Cmty. Church*,
    No. E2019-00183, 2020 WL 6130918 (Tenn. Ct. App. Oct. 19, 2020) ..................................14

*Natal v. Christian & Missionary All.*,
    878 F.2d 1575 (1st Cir. 1989)........................................................................11

*NLRB v. Catholic Bishop*,
    440 U.S. 490 (1979)................................................................................ 16, 18-19

*Ogle v. Church of God*,
    153 F. App'x 371 (6th Cir. 2005) ..................................................................10

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    591 U.S. 732 (2020)............................................................................... *passim*

*Padula v. Lilarn Props. Corp.*,
    84 N.Y.S.2d 519 (N.Y. 1994) ......................................................................20

*Paul v. Watchtower Bible & Tract Soc'y of N.Y.*,
    819 F.2d 875 (9th Cir. 1987) ...................................................................14, 19, 20

*Paul v. Zachariah*,
    No. 6509/99, 2001 WL 856405 (N.Y. Sup. Ct. May 21, 2001)............................................24

*Pendleton v. Hawkins*,
    42 N.Y.S. 626 (N.Y. App. Div. 1896) ..............................................................24

*Penn v. N.Y. Methodist Hosp.*,
    884 F.3d 416 (2d Cir. 2018)...........................................................................9

*Petrone v. Turner Publ'g Co.*,
    No. 22-cv-2698, 2023 WL 7302447 (S.D.N.Y. Nov. 6, 2023)...........................................20

*Pfeil v. St. Matthews Evangelical Lutheran Church*,
    877 N.W.2d 528 (Minn. 2016)........................................................................14

*Rayburn v. Gen. Conf. of Seventh-day Adventists*,
    772 F.2d 1164 (4th Cir. 1985) ......................................................................13

*Rubinson v. Rubinson*,
    474 F. Supp. 3d 1270 (S.D. Fla. 2020) ..............................................................22

*Rweyemamu v. Cote*,
    520 F.3d 198 (2d Cir. 2008).........................................................................9

*Satanic Temple v. Newsweek*,
    661 F. Supp. 3d 159 (S.D.N.Y. 2023) ...................................................................22

*Serbian E. Orthodox Diocese v. Milivojevich*,
    426 U.S. 696 (1976) ............................................................................... *passim*

*Sharratt v. Hickey*,
    799 N.Y.S.2d 299 (N.Y. App. Div. 2005) ...............................................................25

*Sieger v. Union of Orthodox Rabbis of U.S. & Can., Inc.*,
    1 A.D.3d 180 (N.Y. App. Div. 2003) .....................................................................24

*Starkey v. Roman Catholic Archdiocese*,
    41 F.4th 931 (7th Cir. 2022) .............................................................................9

*Tandon v. Newsom*,
    593 U.S. 61 (2021) .......................................................................................20

*Watson v. Jones*,
    80 U.S. (13 Wall.) 679 (1872) ..................................................................... 13-14

*Werft v. Desert Sw. Ann. Conf.*,
    377 F.3d 1099 (9th Cir. 2004) ...........................................................................9

*Wolfson v. Kirk*,
    273 So. 2d 774 (Fla. Dist. Ct. App. 1973) .............................................................25

*Yaggie v. Ind.-Ky. Synod, Evangelical Lutheran Church*,
    64 F.3d 664 (6th Cir. 1995) ............................................................................10

**Other Authorities**

*Forgery*, Black's Law Dictionary (12th ed. 2024) ........................................................22

## INTRODUCTION

Father Alexander Belya is a former Russian Orthodox priest who sought to become a bishop—and indeed claims that he was elected to the bishopric. He brought this defamation lawsuit against his former church leadership based solely on a communication between senior clergy. That communication explained that reports of his election were false and that three letters announcing his election had ecclesiastical "irregular[ities]" showing they violated canon law. Father Alexander says the communication hurt his standing in Russian Orthodoxy and claims that the three letters were actually legitimate because they each contained a specific signature. But with the facts all in, the signature is the least important detail in the whole affair.

Among the facts that emerged in discovery: (1) Father Alexander's election *never happened*; (2) it *could not have happened* because the church body he claims elected him doesn't have canonical authority to elect bishops; (3) that church body does have authority to *suspend his candidacy entirely*, which it exercised months before the alleged defamation due to his ecclesiastical misconduct; and (4) before the alleged defamation occurred or could affect his standing in Russian Orthodoxy, he had already *formally started leaving the Russian Orthodox Church* for the Greek Orthodox Church. The facts now tell a story very different from the one Father Alexander told in the complaint. And at bottom, the record confirms that the only way this Court could possibly rule for Father Alexander's claims is by entering a religious thicket, second-guessing religious judgments, and interfering in the Church's choice and governance of its clergy.

The Church thus prevails as a matter of First Amendment law. Allowing a jury to decide Father Alexander's claims would involve violations of church-state law at the heart of the First Amendment. First, it would violate the bedrock principle that courts cannot interfere with a church's "authority to select, supervise, and if necessary, remove a minister without interference by secular authorities." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020). Second, it would interference in a church's right to freely discuss and resolve matters of "internal [church] discipline and government." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 724 (1976). Third, it would independently violate the Establishment Clause's ban on

1

entanglement through "searching inquiries" into ecclesiastical matters. And fourth, it would violate the Free Exercise Clause's protection against burdens on religious exercise.

The merits of Father Alexander's claims also fail. The statements in the letter were true, did not concern or defame Father Alexander, were privileged, and are not responsible for his claimed impaired reputation. Summary judgment for Defendants is warranted.

## STATEMENT OF FACTS

### A. The Russian Orthodox Church Outside of Russia

The Russian Orthodox Church Outside of Russia (ROCOR or the Church) is a semi-autonomous part of the Russian Orthodox Church, founded in the wake of the 1917 Bolshevik Revolution to remain independent of Soviet control. SMF ¶¶1, 4, 7. Defendants are the Synod of Bishops of ROCOR, the Eastern American Diocese (EAD or Diocese) of ROCOR, the First Hierarch Metropolitan Nicholas, and other senior ROCOR clergy. SMF ¶8.

ROCOR's most senior cleric is the First Hierarch of the Church, and his title is Metropolitan. SMF ¶14. At the time of the events in question, the First Hierarch was Metropolitan Hilarion, who reposed in the Lord in May 2022 after a lengthy illness. SMF ¶16. The First Hierarch is now Metropolitan Nicholas, named in this suit as Nicholas Olkhovskiy. SMF ¶15. Today, following the fall of Soviet Russia, ROCOR is in communion with the Russian Orthodox Church in Moscow, also known as the Moscow Patriarchate, which is led by Patriarch Kirill. SMF ¶¶3, 7.

ROCOR's highest ecclesiastical body is the Sobor (or Council) of Bishops, consisting of every ROCOR bishop. SMF ¶9; Synod Decl. Ex. A ¶7. The Synod of Bishops is the Sobor's executive organ and carries out the business of the Sobor. SMF ¶17; Synod Decl. Ex. A ¶16. Certain ecclesiastical functions can only be performed by the full Sobor, including the election of bishops. SMF ¶¶22-25. In a discernment process that can take years, the Synod considers and votes whether to recommend candidates to the full Sobor. SMF ¶¶21-22. But it is the Sobor, and only the Sobor, that elects bishops. SMF ¶¶22-25. The Sobor seeks consensus in episcopal elections, so elections are generally unanimous and never take place over serious objections of several bishops. SMF ¶13.

After the Sobor votes to elect a bishop, the Synod acts on behalf of the Sobor to inform the Moscow Patriarchate. SMF ¶25. This is an ancient canonical custom reflecting the restored communion with Moscow. SMF ¶¶26, 108. But ROCOR's selection of bishops is wholly independent of the Patriarchate, which was a key condition of re-entering ecclesiastical communion in 2007 after almost 90 years apart. *Id*. The custom has a specific form: the ROCOR Synod issues a formal letter on its own letterhead to the Moscow Synod recounting the Sobor's election. SMF ¶25. The Moscow Patriarchate then formally affirms ROCOR's canonical appointment. SMF ¶26; Synod Decl. Ex. B ¶7. After this, the Sobor holds a sacramental consecration. SMF ¶27. Then, and only then, does the candidate become a bishop. SMF ¶27.

ROCOR is organized into dioceses, and the plaintiff, then-Father Alexander Belya, was a priest in the Eastern American Diocese, the largest ROCOR diocese. SMF ¶¶46, 49, 59. Metropolitan Hilarion was the ruling bishop of the Eastern American Diocese, and his second in command was then-Vicar Bishop (now Metropolitan) Nicholas. SMF ¶¶55, 59, 78, 176.

**B. Father Alexander's candidacy for bishop**

At the September 2018 Synod meeting, Father Alexander was informally raised as a potential candidate for higher office. SMF ¶69. The Synod invited Father Alexander to appear in relation to a potential bishop candidacy at the Synod's December 2018 meeting. SMF ¶71. Father Alexander appeared and was questioned by the Synod. SMF ¶72. In an unbecoming deviation from ROCOR custom, Father Alexander issued a prepared speech outlining his accomplishments and asking the Synod to consider his candidacy. SMF ¶¶74-75. After Father Alexander left, some members of the Synod voiced concerns, but expressed a willingness to consider him further if the concerns were addressed. SMF ¶76. Those concerns included Father Alexander's longstanding failure to ensure church properties were organized according to ROCOR bylaws and not merely treated as his personal possessions. SMF ¶79. The Synod appointed Bishop Nicholas and Archbishop Gabriel to have further conversations with Father Alexander and ensure that the conditions were met. SMF ¶78. The Synod never forwarded Father Alexander's name to the Sobor for consideration. SMF ¶83. The Sobor never voted on Father Alexander's candidacy for bishop. SMF ¶84.

In early 2019, the Synod became aware of additional complaints against Father Alexander, including an unauthorized appearance before the Moscow Patriarchate at which he exhibited highly improper behavior. SMF ¶¶86-102. As a result, at its June 2019 meeting, the Synod voted to temporarily remove Father Alexander from bishopric candidacy. SMF ¶103.

**C. The proclamation from Moscow**

Despite his removal as a candidate for bishop, on August 30, 2019, the Synod was stunned to see that the Moscow Patriarchate had published a proclamation on its official website confirming Father Alexander for elevation to the bishopric. SMF ¶¶94, 105. This threw the ROCOR hierarchy into an uproar. They knew Father Alexander was not even a candidate before the Synod, much less elected by the Sobor. SMF ¶¶103, 106-07. And even the possibility of Moscow asserting control over episcopal selection was shocking and concerning. SMF ¶108.

The Synod and the Eastern American Diocese quickly began investigating this serious problem. SMF ¶108. Father Serafim Gan, a defendant in this action, was the recording secretary of the Synod who normally handles Synodal communications with the Patriarchate and was tasked to contact the Patriarchate. SMF ¶¶33, 109. He received copies of three letters that Moscow had received in support of Father Alexander's promotion: (1) a December 10, 2018 letter purporting to be from Metropolitan Hilarion to Patriarch Kirill in Moscow informing the Patriarch of Father Alexander's "election" by the "Synod"; (2) a January 11, 2019 letter also purporting to be from Metropolitan Hilarion to Patriarch Kirill in Moscow that Father Alexander had corrected conditions to which his election was subject and asking the Patriarch to "approve" the election; and (3) an undated letter purporting to be from Archbishop Gabriel to Metropolitan Hilarion claiming that Father Alexander had met all the conditions necessary to become bishop. SMF ¶110. Each letter references Father Alexander's supposed election to the bishopric. SMF ¶110.

ROCOR clergy, however, immediately recognized that the letters were in violation of canon law and church custom. SMF ¶¶111-59. Under canon law, the Synod *cannot* elect a bishop (only the Sobor can), SMF ¶¶22-25—yet the letters claimed otherwise, though the Sobor had never voted. SMF ¶¶113-47. Even basic details were wrong. For instance, only the Synod can announce

an actual election to Moscow, which it does on Synodal letterhead with a Synodal seal after Synodal authorization. SMF ¶¶24-25. A Metropolitan has no authority to act alone. SMF ¶¶118, 132. And they knew Father Alexander hadn't completed the conditions since he had not placed the church properties in his control under ROCOR bylaws. SMF ¶¶129, 145. Rather, he created a shell corporation in early 2019 and put *that corporation* under ROCOR bylaws—but kept the church properties themselves under a different entity that he controlled. SMF ¶81.

On September 3, 2019, shortly after they saw the letters, senior clergy from the Eastern American Diocese sent a letter to the Synod (the "Clergy Letter") expressing concerns about the documents, which contained false content and irregularities that indicated they had not been authorized by the Synod. SMF ¶¶160-63. The Clergy Letter also described concerns that could disqualify Father Alexander from future consideration for the bishopric, including accusations of religious misconduct such as "breaking of the seal of Confession" and using "information obtained during Confession … for the purpose of denigrating parishioners and of controlling them." EAD Decl. Ex. B; SMF ¶¶93, 164. The Clergy Letter closed by asking the Metropolitan to investigate these "serious complaints" and to suspend Father Alexander "from performing any clerical functions" in the meantime. EAD Decl. Ex. B; SMF ¶169. The Clergy Letter did not speculate about how the "irregular" documents were created, it did not use the word forgery, and it did not mention Father Alexander in relation to the letters sent to Moscow. *See* EAD Decl. Ex. B.

Discovery, however, revealed even more falsities in the letters. Archbishop Gabriel testified that he did not sign the letter bearing his signature. SMF ¶¶148, 158. He was approached by Father Alexander's brother, Ivan, and their father, a ROCOR priest in Brooklyn, who asked him to sign a letter concerning the Synod's conditions for Father Alexander. SMF ¶¶153-54. The letter he signed, however, was handwritten, not the typed letter that appeared in Moscow. SMF ¶158. And the meeting occurred in late January 2019 at the earliest—which was weeks *after* the January 11 letter from Metropolitan Hilarion that allegedly relied on Archbishop Gabriel's letter. SMF ¶¶134, 150. Father Alexander's father was a ROCOR priest in Brooklyn who later left ROCOR with his parish alongside his son. SMF ¶¶64, 191. Father Alexander's brother, Ivan, was a church

5

administrator for both the Brooklyn parish and Father Alexander's Miami parish, and also was known to draft letters for Metropolitan Hilarion for use on his personal letterhead. SMF ¶¶37-38.

On September 3, as the clergy letter requested, Metropolitan Hilarion suspended Father Alexander from his religious duties. SMF ¶175. Unbeknownst to the EAD and the Synod, and in yet another act flatly forbidden by canon law and Church custom, Father Alexander had already petitioned to leave ROCOR for the Greek Orthodox Church without appropriate permission from ROCOR. SMF ¶189. In fact, the Greek Orthodox Church recognized his petition in a letter on September 2, 2019, the day before the EAD's Clergy Letter. SMF ¶190.

Nevertheless, Father Alexander appealed his suspension through the Church. SMF ¶179. In a written appeal dated September 6, 2019, Father Alexander admitted that he knew that the unauthorized, false letters to the Moscow Patriarchate had been delivered outside of the required Synod channels, and that he personally kept signed copies of one of the letters from the Metropolitan to the Patriarch. SMF ¶¶184-85. He claimed Metropolitan Hilarion helped him, apparently unaware that only the Synod may authorize any such ecclesiastical communications. SMF ¶¶118, 132. Tellingly, his appeal says that his suspension "clearly refers to the canons of the Holy Apostles, Local Councils, Nomocanon, and others," and admits that these canon-law accusations were "the basis" for his suspension. Fr. George Decl. Ex. B at 2. His appeal then addresses each canon law deficiency and claims the EAD clergy "exceeded their authority[.]" *Id.* at 5. The spiritual court of the EAD affirmed his suspension, and the Synod later affirmed the spiritual court's decision. SMF ¶¶180, 186.

## D.  Father Alexander's lawsuit

Having lost in spiritual court, Father Alexander chose to bring his dispute in civil court. On September 18, 2020, Father Alexander filed this action alleging that the Clergy Letter's claims constituted defamation, defamation per se, and defamation by innuendo. He seeks over $5 million in damages for "severely impaired reputation and standing" within the Church and for "humiliation, mental anguish and suffering" and loss of income due to diminished church membership. First Amended Complaint (FAC) ¶¶81-82, 85, Dkt. 48.

6

The portion of the Clergy Letter that Father Alexander claims is defamatory is as follows:

The confirmation by the Holy Synod of the Russian Orthodox Church of "the election of Archimandrite Alexander (Belya) as Bishop of Miami, vicar of the Eastern American diocese" and the preliminary study of the latest complaints received from Florida concerning him, resulted in serious discussion at the meeting of the Diocesan Council of the Eastern American Diocese, which was held on Tuesday, September 3rd of this year. With a sense of responsibility for our Church life, we feel we must respectfully and deferentially bring forward this concern and report the following to the Synod of Bishops.

(1) It turns out that Metropolitan Hilarion of Eastern America & New York knew nothing about the written appeals directed to Moscow containing a request for confirmation of the "episcopal election" of the Archimandrite by the Synod of Bishops (which never took place). The Diocesan Council members have examined the content of these letters, which, as stated by His Eminence, were drawn up in an irregular manner. For example, the "request" does not contain the appropriate citation from the decision of the Synod of Bishops, nor does it contain a biography of the cleric "elected."

(2) The letter submitted with the signature of Archbishop Gabriel of Montreal & Canada raises doubts, as well, as it was not issued numbered or dated. In addition, it was not printed on the official letterhead of the Most Reverend Gabriel. Nevertheless, we understand that the Holy Synod, having received the appeal supposedly from our First Hierarch, had no reason to doubt the authenticity of the written request of His Eminence.

EAD Decl. Ex. B; FAC ¶42. Father Alexander claims that the Clergy Letter accused him of "fabricat[ing]" that "he had been elected by the ROCOR Synod to the position of Bishop of Miami," and that it "labeled [him] a forger and a swindler," FAC ¶¶47, 66(b), who "duped Patriarch Kirill and the Moscow Synod into confirming his selection to the position of Bishop of Miami." *Id.* ¶66(h). And he alleged that the underlying purpose of all this was a "scheme to undo Plaintiff's appointment as Bishop of Miami by means of the September 3 Letter." *Id.* ¶70. He also claims that Defendants disseminated the letter to the media, citing a mistaken posting of a media article on Father Serafim's church website as evidence. *Id.* ¶50. But Father Serafim did not make the post and ordered it removed immediately after he learned of it. SMF ¶¶254-58.

### E.  Procedural history

After the Court denied Defendants' motion to dismiss, Defendants filed an interlocutory appeal. The Second Circuit dismissed the appeal for lack of jurisdiction, noting that "[f]or now, it appears that the case can be litigated with neutral principles of law." *Belya v. Kapral*, 45 F.4th 621, 632-33 (2d Cir. 2022). But the Court left open the possibility that "[i]n the end, … further proceedings may uncover that the merits do turn on the church autonomy doctrine." *Id*. The Court explained that the district court had not yet "bar[red] any defenses," "rule[d] on the merits of the church autonomy defense," or denied Defendants the ability "to continue asserting the defense." *Id*. at 631. The Court noted that "[i]t is possible that at some stage Defendants' church autonomy defenses will require … dismissal of the suit in its entirety." *Id*. The Second Circuit split 6-6 over whether en banc review should be granted. *Belya v. Kapral*, 59 F.4th 570 (2d Cir. 2023).

## LEGAL STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## ARGUMENT

### I.  The First Amendment bars Father Alexander's claims.

### A.  The ministerial exception bars Father Alexander's claims.

The ministerial exception protects churches' "authority to select, supervise, and if necessary, remove a minister without interference by secular authorities." *Our Lady*, 591 U.S. at 746-47. After extensive and intrusive merits discovery, it is now clear that this case is all about "interference" in the "remov[al of] a minister." *Id.* at 747. That interference plays itself out in four ways. First, Father Alexander's claims all revolve around church discipline and a religious leadership dispute. Second, resolving elements of his claim requires second-guessing matters of church polity and governance. Third, adjudicating his claims requires civil interference in a church's supervision of its clergy. Fourth, the relief Father Alexander seeks thrusts courts into a religious thicket. The "First Amendment outlaws" further consideration of the merits of this religious dispute. *Id.* at 746.

### 1. Civil claims that interfere in the selection and control of ministers are barred.

The ministerial exception prohibits interference in ministerial relationships. Such interference "infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments"; it "also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions." *Hosanna-Tabor v. EEOC*, 565 U.S. 171, 188-89 (2012). This rule "does not protect the church alone; it also confines the state and its civil courts to their proper roles." *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 325 (4th Cir. 2024). It "operates structurally" to "categorically prohibit[ ] federal and state governments from becoming involved in religious leadership disputes." *Id.* It thus "ensure[s] the separation of church and state." *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 199 (2d Cir. 2017).

There are three main elements to the defense: whether the plaintiff is a minister, the defendant a ministry, and the claim one that will interfere in the ministerial relationship. Most cases turn on the first element. *See*, *e.g.*, *Id.* at 192. Sometimes, they revolve around the second. *See*, *e.g.*, *Penn v. N.Y. Methodist Hosp.*, 884 F.3d 416 (2d Cir. 2018). But this case turns on the third.

Whether a particular claim impermissibly "interferes with the internal governance of the church" doesn't turn on an action's label in tort, contract, or statute. *Hosanna-Tabor*, 565 U.S. at 188. "[A]ny federal or state cause of action" that would "impinge on the Church's prerogative to choose its ministers" is barred by the exception. *Werft v. Desert Sw. Ann. Conf.*, 377 F.3d 1099, 1100 n.1 (9th Cir. 2004). The question isn't a matter of labeling but of substance: whether the claim contests or undermines a church's "select[ion] and control" of its clergy. *Hosanna-Tabor*, 565 U.S. at 195. A slip-and-fall claim doesn't do that. *Rweyemamu v. Cote*, 520 F.3d 198, 208 (2d Cir. 2008). But tort claims that "implicate ecclesiastical matters" by suing over the "relationship between the religious organization and the" minister do. *Starkey v. Roman Catholic Archdiocese*, 41 F.4th 931, 944-45 (7th Cir. 2022).

Courts have repeatedly found that tort claims generally, and defamation claims specifically, can constitute impermissible interference. Indeed, "most courts that have considered the question" have rejected "a pastor's defamation claims against a church and its officials." *Cha v. Korean*

*Presbyterian Church*, 553 S.E.2d 511, 515-16 (Va. 2001) (collecting cases).[1] Courts have barred tort claims in situations where: (1) the claim arises from a dispute over a ministerial position, particularly in the context of church discipline; or (2) elements of the claim require second-guessing the church's policies and beliefs; or (3) adjudicating the claims requires interfering in church supervision of wayward clergy; or (4) adjudicating damages is inextricable from religious matters. Any one of those problems is enough to require dismissal. Here, all four do.

### 2. Father Alexander's claims interfere with the Church's selection and supervision of its ministers.

Here, after months of discovery into ROCOR's ecclesiastical decision-making, including intrusive discovery into internal church deliberations and depositions of its highest leadership on matters of church discipline, it is clear that Father Alexander's claims unconstitutionally interfere in the Church's governance of its own episcopacy.

*First*, the facts show that the heart of Father Alexander's case is about a "religious leadership dispute[ ]," which courts are "categorically prohibit[ed]" to adjudicate as a matter of "constitutional structure." *Billard*, 101 F.4th at 325. *Every single statement* from the Church that Father Alexander claims was defamatory is contained entirely in the September 3 Clergy Letter, FAC ¶66, which was a church disciplinary communication from clergy to clergy about discipline of clergy. Further, the statements all revolve around whether "the ROCOR Synod had elected Plaintiff to the Bishop of Miami." *Id.* at ¶66(b), (e), (h); ¶99(b), (e), (h). And, after full merits discovery, the *sole* reason he claims ROCOR was motivated to defame him was a "scheme to undo Plaintiff's appointment as Bishop of Miami by means of the September 3 Letter." *Id.* ¶70.

---

[1]     *See, e.g.*, *Ogle v. Church of God*, 153 F. App'x 371, 375-76 (6th Cir. 2005); *Yaggie v. Ind.-Ky. Synod*, 64 F.3d 664 (6th Cir. 1995) (table); *Klouda v. Sw. Baptist Theological Seminary*, 543 F. Supp. 2d 594, 613-14 (N.D. Tex. 2008) (rejecting minister's defamation claim at summary judgment); *Hartwig v. Albertus Magnus Coll.*, 93 F. Supp. 2d 200, 218-19 (D. Conn. 2000) (same); *Farley v. Wis. Evangelical Lutheran Synod*, 821 F. Supp. 1286, 1290 (D. Minn. 1993) (same); *Byrd v. DeVeaux*, No. 17-cv-3251, 2019 WL 1017602, at *9 (D. Md. Mar. 4, 2019) (same); *El-Farra v. Sayyed*, 226 S.W.3d 792, 796-97 (Ark. 2006) (same); *Heard v. Johnson*, 810 A.2d 871, 883-86 (D.C. 2002); *see also Hyman v. Rosenbaum Yeshiva of N.J.*, No. 08-cv-7994, 2024 WL 3513967, at *11 n.3 (N.J. July 24, 2024) (collecting cases); *Episcopal Diocese of S. Va. v. Marshall*, No. 1955-23-2, --- S.E.2d ---, 2024 WL 3416968, at *1 (Va. Ct. App. July 16, 2024).

That's a plain admission that the defamation claims are all about a religious leadership dispute, which is the only way they can be understood in light of the Clergy Letter's context. *Kavanagh v. Zwilling*, 578 F. App'x 24, 25 (2d Cir. 2014) (allegedly defamatory statements must be interpreted in light of their "context"); *James v. Gannett Co.*, 40 N.Y.2d 415, 419 (N.Y. 1976) (courts cannot "pick out and isolate particular phrases" but must "consider the publication as a whole"). Only the Church can determine whether "a wayward minister[ ]" should be appointed or removed. *Our Lady*, 591 U.S. at 747. So when a minister's defamation claim is "really seeking civil court review" of church "discipline," the claim is barred. *Hutchison v. Thomas*, 789 F.2d 392, 393 (6th Cir. 1986); *Natal v. Christian & Missionary All.*, 878 F.2d 1575 (1st Cir. 1989); *Kraft v. Rector*, No. 01-cv-7871, 2004 WL 540327, at *6 (S.D.N.Y. Mar. 17, 2004) (barring "claims of ... defamation … essentially tied to" ministerial dispute).

*Second*, to prove elements of his claims, Father Alexander needs this Court to second-guess final religious decisions reached by the ROCOR Synod, which it cannot do. *Hosanna-Tabor*, 565 U.S. at 185-86 (courts cannot gainsay "questions of discipline … or ecclesiastical rule, custom, or law" which "have been decided" by the church). For example, Father Alexander must prove that it was malicious and false to state that "Plaintiff had [not] been elected by the ROCOR Synod to the position of Bishop of Miami." FAC ¶66(b); *infra* at Section 2(A) & (D) (laying out elements of defamation). But the ministerial exception flatly bars probing a church disciplinary decision for malice. *Hosanna-Tabor*, 565 U.S. at 194-95. And as the record now confirms, the ROCOR Synod has definitively determined: (1) it did not elect him bishop, SMF ¶82; (2) it did not have authority to elect him bishop, SMF ¶24; (3) he was never elected bishop, SMF ¶84; (4) the letters were unauthorized communications with the Moscow Patriarchate (no matter who signed them), SMF ¶¶123, 132; and (5) Father Alexander's role in attempting to seek affirmation of a fake election by the Moscow Patriarchate was unauthorized and in violation of Church policy and custom, SMF ¶¶182-85. Those ecclesiastical determinations are conclusive. Even "inquiring into whether the Church" had in fact elected Plaintiff is unconstitutional, *Hosanna-Tabor*, 565 U.S. at 187. Allowing him to "appeal to the secular courts to have those decisions reversed subverts the

rights" of ROCOR and violates "the First Amendment's prohibition of civil court interference in religious disputes." *Belya*, 45 F.4th at 628 n.4, 630. Because Father Alexander's claims turn on "matters of faith, doctrine, and internal government," *id.*, they are barred.

*Third*, adjudicating Father Alexander's claims requires this Court to interfere in how Church hierarchy supervised its clergy and managed sensitive matters of internal church polity. As the full record now shows, Father Alexander participated in an unauthorized ecclesiastical correspondence delivered through unauthorized ecclesiastical channels for the sole purpose of creating a public ecclesiastical announcement by a senior church leader that ROCOR had elevated him to a bishopric. In response, ROCOR was *of course* entitled to take supervisory steps with Father Alexander as it deemed necessary to protect its flock, its hierarchy, and its relationship with the Moscow Patriarchate. Yet Father Alexander has used civil power to interfere in that supervision, suing and deposing almost a dozen of ROCOR's senior hierarchy and clergy to contest "what one minister sa[id] in supervision of another." *Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968, 981 (7th Cir. 2021) (en banc). Proving up his claim before a jury will repeat and worsen that interference. That is unconstitutional. ROCOR has independence in how to "supervise … a minister" over public deception of the Church, "*without* interference by secular authorities." *Our Lady*, 591 U.S. at 747 (emphasis added).

*Fourth*, a civil jury cannot adjudicate Father Alexander's claims of damages, particularly for his diminished standing in his religious community and lost church membership. FAC ¶¶81-82, 93-94. Discovery has revealed that not only does he have no reliable means to calculate those damages, there are multiple other religious factors that more likely contributed to any lost status or church members—among them that he had already started the process of schismatically leaving his church before the Clergy Letter was even issued, and that there were far more serious religious allegations leveled against him (both in the Clergy Letter and elsewhere) than mere documentary "irregularities." It is impossible to weigh those issues on this record using "exclusively" secular tools, *Belya*, 45 F.4th at 630, or to overcome the "intractable causation questions" inherent in his damages claims that would "ensnare the [jury] in religious matters." *Marshall*, 2024 WL 3416968,

at *10. That's why courts have rejected such claims of "reduced membership in the Church" as "impermissibly entangl[ing] the court in religious governance." *Lee v. Sixth Mount Zion Baptist Church*, 903 F.3d 113, 121 (3d Cir. 2018). So too here.

In sum, Father Alexander's claims require precisely the kind of interference that the Religion Clauses prohibit. And further proof of that is that they are causing exactly the kind of harm the ministerial exception is meant to prevent. After thousands of hours and hundreds of thousands of dollars spent defending against spurious claims, ROCOR and its hierarchy must now make ministerial decisions "with an eye to avoiding litigation … rather than upon the basis of their own personal and doctrinal assessments of who would best serve the pastoral needs of their members." *Rayburn v. Gen. Conf. of Seventh-day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985). That kind of chill on ministerial selection is anathema to the church-state values of the Religion Clauses.

## B.  The church autonomy doctrine bars Father Alexander's claims.

Even outside the context of ministerial disputes, the Religion Clauses bar government intervention in "matters of faith and doctrine and in closely linked matters of internal government." *Belya*, 45 F.4th at 630 (quoting *Our Lady*, 591 U.S. at 747). "[A]ny attempt" to use civil power to "dictate or even to influence such matters" is unconstitutional. *Our Lady*, 591 U.S. at 746.

### 1.  The claims here interfere in church disciplinary communications.

The ministerial exception is a "component of church autonomy," *Belya*, 45 F.4th at 628 n.4, and many of the forms of forbidden interference above—second-guessing church policy or entanglement in reviewing church membership diminution—are just as much church autonomy violations as ministerial exception ones. *See*, *e.g.*, *Milivojevich*, 426 U.S. at 714-15, 720. But two church autonomy protections against defamation bear emphasis here: protecting religious governance over church discipline and protecting internal church communications.

Civil courts "have no power" to "question ordinary acts of church discipline, or of excision from membership." *Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131, 139 (1872). Rather, those who voluntarily "unite themselves to" a church "do so with an implied consent to this government, and are bound to submit to it," "in all cases of ecclesiastical cognizance." *Watson v. Jones*, 80 U.S. (13

Wall.) 679, 729 (1872). And this protection includes freedom in religious deliberations over disciplinary decisions. Otherwise, the "First Amendment's protection of internal religious disciplinary proceedings" would be "meaningless," as accusations "used to initiate those proceedings could be tested in a civil court." *Hiles v. Episcopal Diocese of Mass.*, 773 N.E.2d 929, 937 (Mass. 2002). Thus, "courts generally do not permit tort claims arising from internal processes by which religious organizations discipline their members." *Hubbard v. J Message Group Corp.*, 325 F. Supp. 3d 1198, 1214 (D.N.M. 2018) (barring defamation claim, collecting cases).

Civil courts have long refused to "[i]mpos[e] tort liability" when it becomes clear that a case turns on questions of ordinary church discipline, since that "would compel the Church to abandon part of its religious teachings." *Paul v. Watchtower Bible & Tract Soc'y of N.Y.*, 819 F.2d 875, 881 (9th Cir. 1987); *C.L. Westbrook, Jr. v. Penley*, 231 S.W.3d 389, 400 (Tex. 2007) (permitting damages based on the "inherently religious function of church discipline" would "have a 'chilling effect' on churches' ability to discipline members"). Judicial intrusion into church disciplinary proceedings would cause participants to "censor themselves in order to avoid liability or the threat of a lawsuit." *Pfeil v. St. Matthews Evangelical Lutheran Church*, 877 N.W.2d 528, 539 (Minn. 2016). Rather, recognizing that "[t]he church autonomy doctrine is rooted in protection of the First Amendment rights of the church to discuss church doctrine and policy freely," *Bryce v. Episcopal Church*, 289 F.3d 648, 658 (10th Cir. 2002), courts have long applied the church autonomy doctrine to bar claims for defamation, *Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 250 (S.D.N.Y. 2014), *aff'd*, 578 F. App'x 24 (collecting cases).[2]

---

[2]  *See, e.g.*, *In re Diocese of Lubbock*, 624 S.W.3d 506, 517-18 (Tex. 2021) (church "[i]nvestigations that relate to the character and conduct of church leaders are inherently ecclesiastical" and are not subject to defamation claims); *Pfeil*, 877 N.W.2d at 538 (reviewing statements made during church disciplinary proceedings would necessarily "entangle [civil] courts with religion and severely interfere with the ability of religious organizations to govern their own affairs"); *Brazauskas v. Fort Wayne-S. Bend Diocese*, 796 N.E.2d 286, 294 (Ind. 2003) (rejecting defamation claim to "penalize communication and coordination among church officials ... on a matter of internal church policy and administration"); *Maize v. Friendship Cmty. Church*, No. E2019-00183, 2020 WL 6130918, at *7 (Tenn. Ct. App. Oct. 19, 2020) (church autonomy barred suit based on communications "inextricably linked to the termination process" of pastor); *Dermody*

At the motion to dismiss stage, this Court reserved judgment on whether Father Alexander's claims weighed matters of ecclesiastical concern. But now, at summary judgment, it's clear that the claims require more than mere brute facts—they require judgment upon the Church's process of selecting, confirming, investigating, and disciplining its clergy. Father Alexander seeks to penalize the Church for "the incidental effect of an ecclesiastical determination" made in internal church communications. *Milivojevich*, 426 U.S. at 720. That he cannot do.

For instance, in *Milivojevich*, a Serbian Orthodox bishop who was disciplined and removed by his church sued in state court, arguing that control of his diocese was a property matter that could be determined by neutral principles of law. 426 U.S. at 706-07. Even though one of the key disputes was whether the church tribunal had correctly found that the bishop was "validly tried within one year of his indictment"—a fact that would appear to be resolved by a calendar—the Supreme Court held the matter turned on an internal disciplinary "ecclesiastical determination that is not subject to judicial abrogation." *Id.* at 708, 720.

Here, the record evidence shows that the disputed statements in this case arise from a church investigation into two disciplinary issues: whether and how the canonical process for elevating a bishop was circumvented, and whether Father Alexander was eligible for the episcopacy. SMF ¶¶108, 160-69. The Clergy Letter that Father Alexander challenges is a part of both investigations. SMF ¶¶163-68. It is thus now clear that adjudicating the truth of the Clergy Letter would necessarily interfere with a church's prerogative to investigate and discipline its members for misconduct, plunging civil courts into a "religious thicket." *Milivojevich*, 426 U.S. at 719.

**2.  The neutral principles approach does not apply here.**

While the Second Circuit reserved judgment on whether this case could be resolved according to neutral principles of law, it foreshadowed that "further proceedings may uncover that the merits" of Father Alexander's claims "turn on the church autonomy doctrine." *Belya*, 45 F.4th at 632-33. At this stage, it is clear that there are no neutral principles available to adjudicate those claims.

---

*v. Presbyterian Church*, 530 S.W.3d 467, 474 (Ky. Ct. App. 2017) (a civil court "cannot" "review the determinations of an ecclesiastical body applying its own ... rules").

The Second Circuit gave Father Alexander a narrow lane to prove his claims. He could ask "secular fact questions" about signatures, seals, and letterheads. *Id*. at 634. The Court gave him that opportunity in response to his representations that his claims "will stand or fall solely" on such issues, and discovery into "any issues of religious dogma or practice" or related to "the validity of the process of his election as bishop" would "not [be] needed at all." Pl.'s Reply Br. in Support of Mot. to Dismiss the Appeal at 6-8, *Belya v. Kapral*, 45 F. 4th 621 (2d Cir. Aug. 2, 2022) (No. 21-1498). And such limitations were necessary, given that the Supreme Court has long held that "the very process of inquiry" can "impinge on rights guaranteed by the Religion Clauses." *NLRB v. Catholic Bishop*, 440 U.S. 490, 502 n.10, 507-08 (1979) (noting that questions such as "how many liturgies are required at Catholic parochial high schools?" are constitutionally suspect).

But on remand, it quickly became apparent that Father Alexander couldn't make his case without prying into Church governance. He promptly demanded "[a]ll documents and communications concerning" or "relating … to" ROCOR's position that "the episcopal election of the Archimandrite by the Synod of Bishops … never took place." Thomson Decl. Ex. L ¶11 (internal quotation marks omitted). Similarly, he demanded all documents concerning the claim that the letters he helped submit to the Moscow Patriarchate were "drawn up in an irregular manner," *id.* ¶12, as well as all documents showing that he had in fact never been made bishop, that he had participated in unauthorized ecclesiastical communications to the Patriarchate, and that the Synod, Eastern American Diocese, and their defendant clergy had "acted reasonably" and in a "lawful exercise of their discretion." *id.* ¶¶21, 23. These demands required producing substantial internal religious communications, including private ecclesiastical deliberations that even ROCOR clergy are not permitted to see.

And Father Alexander's depositions of ROCOR's hierarchy weren't restricted to questions about signatures and seals. Instead, he inquired into whether some ROCOR clergy understood the process for electing a bishop better than other ROCOR clergy, Fr. George Dep. 45:22-46:20, and were wrong in their understanding of canon law, *id.* He also probed sensitive ecclesiastical relationships about the "unification of ROCOR with the … Russian Church in Moscow," Fr. David

Dep. 16:18-17:23, including whether "some in the EAD … opposed the unification," *id.*; whether ROCOR clergy "co-led services with church officials or priests or Bishops who are from the Russian Church in Russia," Fr. Alexandre Dep. 33:4-7; whether "Patriarch Kirill supports President Putin," Metropolitan Dep. 126:13-16, and whether ROCOR clergy are "responsible for Putin's soul," Abp. Kyrill Dep. 42:13-14. *See generally* SMF ¶¶275-81. And when defense counsel objected to such intrusive lines of inquiry, Father Alexander's counsel asserted that it was necessary because "[i]t goes to the motive and willfulness of the defamatory conduct that we're complaining of." Fr. Alexandre Dep. 112:1-10.

Further, when Father Alexander *did* get around to asking questions about the authenticity of the unauthorized letters, the witnesses explained that the letters' "genuineness" couldn't be determined "based simply on looking at" the signatures, but rather the content and purpose of the letters had to be evaluated against Church law and custom. Synod Dep. 83:19-25, 85:4-87:7. And because Father Alexander's letters claimed he had been elected bishop by the Synod, the witnesses explained that they "fail[ ] any test of authenticity" because they describe "an election being held by the [S]ynod, which is an impossibility according to our canon law," and they fail to "follow the protocols" and practices of the Church. *Id.* at 98:4-25.

Thus, Father Alexander's own prosecution of the case—both the kinds of questions he asked and the answers he received—show this case turns inextricably on "internal [church] discipline and government." *Milivojevich*, 426 U.S. at 709, 724. And numerous courts, including the Supreme Court, have rejected application of neutral principles to such matters. *Id.*; *see also Diocese of Lubbock*, 624 S.W.3d at 515 (neutral principles did not apply to claim that being "credibly accused of sexual abuse of a minor" was defamatory when it turned on the definition of "minor" under canon law); *Bryce*, 289 F.3d at 659 (statements made in church disciplinary proceedings were not "secular matters"); *Brazauskas*, 796 N.E.2d at 294 (rejecting neutral principles to resolve defamation involving "communication" about church procedure).

This Court should as well. Discovery has shown that the merits of Father Alexander's claims turn on questions of internal church practice, custom, and discipline. Defendants consistently

testified that their allegedly defamatory statements were not focused on signatures and seals, but on canon law, church customs, religious beliefs, and hierarchical judgments. Thus, this case can't be resolved by asking questions about pen on paper, but instead turns on judging religious belief, practice, custom, law, and governance. That is unconstitutional.

**C.  The Establishment Clause bars Father Alexander's claims.**

The Establishment Clause independently prohibits civil courts from becoming "entangled in essentially religious controversies." *Milivojevich*, 426 U.S. at 709. Impermissible entanglement can be caused by too much prying into church affairs. Thus, in *Milivojevich,* the claim was rejected because it could not be resolved "without engaging in a searching and therefore impermissible inquiry into church polity." *Id.* at 723. As demonstrated above, Father Alexander's claims require just that, so the Establishment Clause bars his claims.

In *Kavanagh*, a defrocked priest sued his church, alleging a press release defamed him by suggesting he was found guilty of multiple counts of sexual abuse. The defrocked priest sued, claiming *per se* libel under New York law. The district court dismissed the libel claim because the "central question"—whether the defendants' statements that the plaintiff was found guilty by a Church court—"[could] not be answered by merely looking at the canonical court decisions to see what the courts said as a matter of fact." *Kavanagh*, 997 F. Supp. 2d at 253. "Instead, it would require the Court or the jury to engage in an inquiry into what constitutes a 'delict' or 'offense' within the meaning of Catholic law, to determine as a matter of canon law how many delicts or offenses Plaintiff was found guilty of, and to construe the contours of the substantive sin of 'sexual abuse of a minor.'" *Id*. This would require "examin[ing] and weigh[ing] competing views of church doctrine," an examination which would itself "violat[e] the Establishment Clause of the First Amendment." *Id*. at 254 (cleaned up).

Just so here. Father Alexander asserts that he can hold Defendants liable for defamation if he proves who signed what. But as shown by how he's litigated his claims, and as ROCOR has shown in its defenses, a dispute about the election of a bishop "cannot be answered by merely looking" at signatures. *Id.* at 253. Rather, the "very process of inquiry" in this case, *Catholic Bishop*, 440

U.S. at 502, has entangled civil authority in the Church law, customs, and facts of an ecclesiastical election and in ROCOR's ecumenical relations with the Moscow Patriarchate. Allowing the case to proceed "would result in the Court entangling itself in a matter of ecclesiastical concern." *Kavanagh*, 997 F. Supp. 2d at 254. In sum, the inquiry here is just as "searching" as the one by the Orthodox bishop in *Milivojevich*, and therefore just as "impermissible." 426 U.S. at 723.

### D.  The Free Exercise Clause bars Father Alexander's claims.

Father Alexander's claims are further barred by the Free Exercise Clause. Just as the Government cannot "approve, disapprove, classify, regulate, or in any manner control sermons delivered at religious meetings," *Fowler v. Rhode Island*, 345 U.S. 67, 70 (1953), it cannot punish internal religious speech and governance without severely restricting the free exercise of religion.

The Ninth Circuit has accordingly held that "state tort law prohibition[s]" on religious conduct "directly restrict the free exercise" of religious groups. *Paul*, 819 F.2d at 881 (barring defamation claim by church member arising from church disciplinary actions). That's because "[i]mposing tort liability" for religious conduct—including discussing internal church processes and a minister's fitness for ministry—"would … have the same effect as prohibiting the practice and would compel the Church to abandon part of its religious teachings." *Id*. Thus, "religious activities which concern only members of the faith are and ought to be free—as nearly absolutely free as anything can be." *Id*. at 883 (cleaned up). *Bryce* likewise held that "a constitutional rule arising out of the Free Exercise Clause" protects a church from liability for "discuss[ing] an internal church personnel matter" and "facilitat[ing] religious communication and religious dialogue between" a church and its members. 289 F.3d at 658. Similarly, permitting liability here for internal church communications would violate Defendants' free exercise rights.

The Free Exercise Clause also bars Father Alexander's defamation claims because they are not generally applicable. *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). That's because defamation law exempts or applies different legal standards to certain categories of speech—such as speech concerning public figures or privileged communications. Thus, defamation law "invites the government to consider the particular reasons for a person's conduct," *id*. (cleaned up), and

treats "comparable secular activity more favorably than religious exercise," *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). Father Alexander must therefore satisfy strict scrutiny. *Id.*[3]

That he cannot do. "The harms suffered by [Father Alexander] are clearly not of the type that would justify the imposition of tort liability for religious conduct" because "[i]ntangible or emotional harms cannot ordinarily" serve as a compelling governmental interest. *Paul*, 819 F.2d at 883. And that is particularly true for "offense to someone's sensibilities resulting from religious conduct," for "[w]ithout society's tolerance of offenses to sensibility, the protection of religious differences mandated by the [F]irst [A]mendment would be meaningless." *Id*.

## II. Father Alexander's claims fail on the merits.

Were this Court to reach the merits, the Church would still be entitled to summary judgment. Father Alexander's defamation claims rely on both New York and Florida law, but New York law applies under longstanding choice-of-law principles.[4] In New York, the elements of a defamation claim are "[1] a false statement, [2] published without privilege or authorization to a third party, [3] constituting fault as judged by, at a minimum, a negligence standard, and [4] it must either cause special harm or constitute defamation per se." *Petrone v. Turner Publ'g Co.*, No. 22-cv-2698, 2023 WL 7302447, at *3 (S.D.N.Y. Nov. 6, 2023) (alterations in original) (quoting *Dillon v. City of New York*, 704 N.Y.S.2d 1, 5 (N.Y. App. Div. 1999)). The statement must also be "of and concerning" the plaintiff. *Kirch v. Liberty Media*, 449 F.3d 388, 398 (2d Cir. 2006). "Challenged statements are not to be read in isolation," but must be assessed "against the whole

---

[3]    The Free Exercise Clause also requires strict scrutiny because Father Alexander's claims "impose[ ] a substantial burden on religious exercise." *Fulton*, 593 U.S. at 614 (Alito, J., concurring). Defendants recognize this argument is currently barred by *Employment Division v. Smith*, 494 U.S. 872 (1990), but preserve the issue for future review.

[4]    As the forum state, New York's choice-of-law rules apply. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). New York applies the law of the state with the "greater interest" in the litigation. *Padula v. Lilarn Props. Corp.*, 84 N.Y.S.2d 519, 521 (N.Y. 1994). Here, "New York has the greatest interest in this litigation" because "the challenged conduct" by Defendants primarily "occurred in New York," even though Father Alexander's injuries occurred in Florida. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 158 (2d Cir. 2012). Indeed, as Father Alexander himself argued when invoking personal jurisdiction here, Dkt. 39 at 2-3, ROCOR's ties and activities relating to the alleged defamation are located in New York.

apparent scope and intent of the writing." *Celle v. Filipino Rep. Enters.*, 209 F.3d 163, 177 (2d Cir. 2000) (quotation marks omitted). For defamation per se, the defamatory statement "appears on the face of the communication"; for defamation by implication, "a defamatory import arises through reference to" extrinsic facts. *Ava v. NYP Holdings*, 885 N.Y.S.2d 247, 251 (2009).

Father Alexander fails to establish each element for his defamation claims. First, the allegedly defamatory statements are true. Second, the statements are not of or concerning him. Third, the statements are not susceptible to defamatory meaning. Fourth, the statements were part of a privileged communication. And finally, Father Alexander cannot show damages.

**A.  Father Alexander challenges statements that are true.**

Discovery has shown that the statements in the Clergy Letter were true. "Truth is an absolute defense to an action based on defamation." *Goldberg v. Levine*, 949 N.Y.S.2d 692, 2 (N.Y. App. Div. 2012). The only statements in the Clergy Letter that Father Alexander challenges amount to three points, all of which—as noted above—revolve around his alleged election: (1) that the "episcopal election" of Father Alexander by the "Synod of Bishops" "never took place"; (2) that "written appeals directed to Moscow containing a request for confirmation" of that election "were drawn up in an irregular manner," and (3) that the letter claiming an election took place "submitted with the signature of Archbishop Gabriel of Montreal & Canada raises doubts, as well." Discovery has proven each point. EAD Decl. Ex. B.

First, it is undisputed that not only did an election "by the Synod of Bishops" "never t[a]ke place," such an election would not have been possible because Church law requires that only the Sobor can elect a bishop. SMF ¶¶21-24. Second, Father Alexander does not dispute—nor can he— that the letters were not merely grossly inconsistent with but in fact entirely violated Church practices and custom, and were therefore highly "irregular." *See* SMF ¶¶110-59. Third, it is not disputed that the letter purportedly signed by Archbishop Gabriel was not dated, not on Archbishop Gabriel's official letterhead, not officially numbered, and not sent to the appropriate recipient (the Synod). SMF ¶¶137-47. Those irregularities, in addition to the letter's reference to an election that had never happened, in fact "raise[d] doubts" for the EAD. EAD Decl. Ex. B; SMF ¶163.

Furthermore, to the extent Father Alexander claims the Clergy Letter labels him a "forger," he's wrong. FAC ¶47. The Clergy Letter doesn't use the word "forgery" at all. *See* EAD Decl. Ex. B. Nor does it contain speculation about how the letters were created, signed, sealed, or delivered. *Id.*

But if the word had been used, it would have been legally accurate. The Archbishop Gabriel letter was a fake. *See* SMF ¶¶137-59. And the letters Father Alexander helped to submit to Moscow were unauthorized and used for an unauthorized purpose. SMF ¶¶110-59, 168. Under the Model Penal Code, "forgery" includes "issuing … or transferring a writing *without appropriate authorization.*" *Forgery*, Black's Law Dictionary (12th ed. 2024) (emphasis added). Any association with forgery that could be gleaned from the EAD's statements is thus true. *Biro v. Condé Nast*, 883 F. Supp. 2d 441, 458 (S.D.N.Y. 2012).

Finally, Father Alexander does not point to any facts that would render the Clergy Letter defamatory by implication. *See Idema v. Wage*r, 120 F. Supp. 2d 361, 368 (S.D.N.Y. 2000), *aff'd*, 29 F. App'x 676 (2d Cir. 2002). He does not and cannot contest his violation of ROCOR's ecclesiastical process, or its concerns with his efforts to circumvent it. And raising those concerns was entirely appropriate to address the immediate aftermath of the public confusion caused by his actions. "There is nothing defamatory about accurately reporting signs of smoke even if there is no proof of fire." *Satanic Temple v. Newsweek*, 661 F. Supp. 3d 159, 171 (S.D.N.Y. 2023).

### B. The statements are not of and concerning Father Alexander.

Second, Father Alexander's claims fail because the specific statements at issue are not "of and concerning" him. *Kirch*, 449 F.3d at 398, 399-400 (this requirement is "a significant limitation on the universe of those who may seek a legal remedy" for defamation).[5] The only statements that Father Alexander challenges discuss the process of communication between the Church and Moscow: (1) the existence of an election by the Synod—of which Father Alexander was not a member, (2) irregularities in communication between Metropolitan Hilarion and Patriarch Kirill,

---

[5]   Florida law requires the same result, as an allegedly defamatory statement must be "about the plaintiff." *Rubinson v. Rubinson*, 474 F. Supp. 3d 1270, 1274 (S.D. Fla. 2020).

and (3) irregularities in a letter from Archbishop Gabriel. But even if these statements did imply forgery (which they do not), they do not imply that Father Alexander himself was the forger. To be sure, the Clergy Letter imputes plenty of blame on Father Alexander—just not for the irregular letters, which is all he challenges here. EAD Decl. Ex. B.

### C.  The statements are not susceptible to defamatory meaning.

For similar reasons, the statements are not susceptible to defamatory meaning. In defamation, "[t]he words must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader, and if not reasonably susceptible of a defamatory meaning, they are not actionable and cannot be made so by a strained or artificial construction." *Aronson v. Wiersma*, 493 N.Y.S.2d 1006 (N.Y. 1985). Whether words are defamatory is a legal question. *Celle*, 209 F.3d at 177. As explained in Part I.B, the challenged statements are part of a church investigation into clergy misconduct and clergy elevation. Because, at the summary judgment stage, Father Alexander asks the Court to evaluate the Church's conclusions about whether he was elected to the bishopric and whether religious documents contained religious irregularities, these conclusions are not susceptible to defamatory meaning. *See Diocese of Lubbock*, 624 S.W.3d at 517 ("Investigations that relate to the character and conduct of church leaders are inherently ecclesiastical").

### D.  The Clergy Letter was a privileged communication.

Father Alexander's claims also fail because they seek to hold the Church liable for statements made subject to the common interest privilege for communications within religious bodies. New York defamation law protects "communication[s] made by one person to another upon a subject in which both have an interest" under a form of qualified privilege. *Chandok v. Klessig*, 632 F.3d 803, 815 (2d Cir. 2011).[6] Qualified privilege has been applied specifically to protect communications within a religious organization. *See Matter of Kantor v. Pavelchak*, 134 A.D.2d

---

[6]    Under Florida law, the case would be dismissed on similar grounds, as "[i]nquiring into the adequacy of the religious reasoning behind the dismissal of a spiritual leader" is prohibited. *Goodman v. Temple Shir Ami, Inc*., 712 So. 2d 775, 777 (Fla. Dist. Ct. App. 1998) (dismissing defamation claim).

352, 353 (N.Y. App. Div. 1987); *see also Sieger v. Union of Orthodox Rabbis of U.S. & Can., Inc.*, 1 A.D.3d 180, 182 (N.Y. App. Div. 2003). Privileged communications made in good faith may include statements made to the broader religious community. *Berger v. Temple Beth-El of Great Neck*, 839 N.Y.S.2d 504 (N.Y. App. Div. 2007) (letter from temple's leadership to congregation concerning plaintiff's membership was privileged); *Pendleton v. Hawkins*, 42 N.Y.S. 626 (N.Y. App. Div. 1896) (communications between leader and church members are protected).

The Clergy Letter fits comfortably within this qualified privilege. New York courts have applied the privilege in strikingly similar cases, where leaders of a religious institution with a "common interest 'in the leadership of the institution[ ]'" wrote an allegedly libelous letter calling for the Plaintiff's resignation. *Kamerman v. Kolt*, 621 N.Y.S.2d 67 (N.Y. App. Div. 1994); *Paul v. Zachariah*, No. 6509/99, 2001 WL 856405 (N.Y. Sup. Ct. May 21, 2001) (protecting Archbishop's reading of a letter to members of the church concerning "possible corrupt practices"). Here, it is undisputed that the EAD had supervisory authority over Father Alexander, SMF ¶59, and that the letter was a Church communication from the EAD's Diocesan Council to the Synod, ROCOR's executive body. SMF ¶¶17, 158, 170. They have a common interest in investigating clergy within their overlapping jurisdictions. As a result, their communications fall within the qualified privilege.

This qualified privilege is only overcome where the plaintiff can meet the high bar of showing "actual" malice or common-law malice, meaning "spite or ill will," and that the malice "was the one and only cause for the publication." *Chandok*, 632 F.3d at 815. Father Alexander has provided no evidence that the statements were even untrue, let alone that they were made with the sole purpose of actual malice.

**E.  Father Alexander cannot show special or general damages from the statements.**

Father Alexander asserts that he lost income when congregants left his church because of the Clergy Letter. But as explained above, it would "impermissibly entangle the court in religious governance and doctrine" for a court to consider "decreased giving and reduced membership in

the Church." *Lee*, 903 F.3d at 121; *Marshall*, 2024 WL 3416968, at *10. Father Alexander cannot establish any damages from the Clergy Letter.

Father Alexander's claims for defamation and defamation by implication also fail because there is no "causal connection" between the alleged damages and the alleged defamatory statement in the September 3 Clergy Letter. *Aronson*, 493 N.Y.S.2d 1006. To the contrary, there were numerous other reasons, including that unbeknownst to the Diocese and the Synod, Father Alexander *had already petitioned* to leave ROCOR before September 3. SMF ¶189. The Greek Orthodox Church recognized his petition on September 2, 2019, the day *before* the Clergy Letter was sent. SMF ¶190. Thus, Father Alexander's claim that the Clergy Letter harmed him and forced him out of ROCOR cannot be true. "Causation must be proven," *Sharratt v. Hickey*, 799 N.Y.S.2d 299, 301 (N.Y. App. Div. 2005), and here, any harm from departing ROCOR was self-inflicted.[7]

## CONCLUSION

The Court should grant Defendants' motion for summary judgment.

---

[7] Similarly, Florida law makes it "necessary" to show "special damages proximately resulted from the defamation." *Grayson v. No Labels, Inc.*, 601 F. Supp. 3d 1251, 1257 (M.D. Fla. 2022). Indeed, even the *per se* claim would fail, as all forms of defamation require false statements that "proximately result in injury." *Wolfson v. Kirk*, 273 So. 2d 774, 776 (Fla. Dist. Ct. App. 1973).

Dated: August 5, 2024

Respectfully submitted,

/s/ *Diana Verm Thomson*

Diana Verm Thomson*
Daniel H. Blomberg*
Daniel L. Chen*
Amanda L. Salz**
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW
Suite 400
Washington, DC 20006
202-955-0095
dthomson@becketlaw.org

Donald J. Feerick, Jr., Esq.
Alak Shah, Esq.
FEERICK NUGENT MacCARTNEY
96 South Broadway
South Nyack, New York 10960
Tel: 845-454-2000
Fax: 845-353-2789
dfeerick@fnmlawfirm.com

* Admitted *pro hac vice*
** Application *pro hac vice* pending

*Attorneys for Defendants*