## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

ALEXANDER BELYA,

                Plaintiff,                      Case no.: 1:20-cv-6597 (AS)

          -against-

METROPOLITAN HILARION, *et al.*

                Defendants.

------------------------------------------------------------------- X

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Oleg Rivkin (OR1331)

RIVKIN LAW GROUP PLLC

*Attorneys for Plaintiff Alexander Belya*

48 Wall Street, Suite 1100

New York, New York 10005

201-362-4100

or@rivkinlawgroup.com

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

STATEMENT OF FACTS ....................................................................................................2

    A.  Defendants Do Not Deny Genuineness of Met. Hilarion's Signature and Seal and or of Arch. Gabriel's Signature ...................................................................................2

    B.  Met. Hilarion's Efforts to Elevate Plaintiff to Bishop ...............................................2

    C.  The Four "Corrections"..............................................................................................3

    D.  February 2019 Trip to Moscow ..................................................................................4

    E.  The Purported "Investigation" ...................................................................................5

    F.  Met. Hilarion's Letters to Met. Christophor and Dean Lashek ................................6

    G.  Audience with Patriarch Kirill ...................................................................................6

    H.  August 30 Announcement and its Aftermath.............................................................7

    I.  Dissemination of the Forgery Charge .......................................................................8

ARGUMENT .........................................................................................................................9

I.     THE FIRST AMENDMENT DOES NOT BAR PLAINTIFF'S CLAIMS .......................9

    A.  The ministerial exception does not bar Plaintiff's claims...........................................10

    B.  The ecclesiastical abstention doctrine does not bar Plaintiff's claims.......................13

    C.  The Establishment and Free Exercise Clauses do not bar Plaintiff's claims ..............17

II.    PLAINTIFF DOES NOT CHALLENGE "STATEMENTS THAT ARE TRUE" .......................................................................................................................19

III.   THE STATEMENT WAS "CONCERNING" THE PLAINTIFF....................................20

IV.   THE STATEMENT IS MORE THAN SUSCEPTIBLE TO DEFAMATORY MEANING ..............................................................................................................21

V.    QUALIFIED PRIVILEGE IS NOT AVAILABLE TO DEFENDANTS .........................22

VI.   PLAINTIFF CAN PROVE DAMAGES ........................................................................24

CONCLUSION.......................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*A & E Products Group L.P. v. The Accessory Corp.*, 2001 WL 1568238
(S.D.N.Y. 2001) ...........................................................................................................21

*Alfalo v. Weiner*, 2018 WL 3235529 (S.D. Fla., July 2, 2018) ......................................24

*Belya v. Hilarion*, 20 Civ. 6597, 2021 WL 1997547 (S.D.N.Y. May 19, 2021) ...........14

*Belya v. Kapral*, 45 F.4th 621 2d Cir. 2022) .......................................................1, 13, 14

*Bongino v. The Daily Beast Company, LLC*, 47 F. Supp.3d 1310 (S.D. Fla. 2020) ......21

*Boyd v. Nationwide Mut. Ins. Co.,* 208 F.3d 406 (2d Cir. 2000) ...................................23

*Bryce v. Episcopal Church*, 289 F.3d 648 (10th Cir. 2002) ....................................14, 15

*C.L. Westbrook, Jr. v. Penley*, 231 S.W.3d 389 (Tex. 2007) .........................................15

*Carroll v. Trump*, 683 F. Supp.3d 302 (S.D.N.Y. 2023) ...............................................24

*Carroll v. Trump*, 2024 WL 1786366 (S.D.N.Y., Apr. 25, 2024) .................................25

*Coton v. Televised Visual X-Ography, Inc.*, 740 F. Supp.2d 1299 (M.D. Fla. 2010) ....25

*Chandok v. Klessig*, 632 F.3d 803 (2d Cir. 2011) .........................................................22

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) ..............18

*DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 169-70 (2d Cir. 1993) ........................14

*Dermody v. Presbyterian Church (U.S.A.),* 530 S.W.3d 467 (Ky. Ct. App. 2017) .......15

*Drevlow v. Lutheran Church, Mo. Synod*, 991 F.2d 468 (8th Cir. 1993) ......................14

*Elvig v. Calvin Presbyterian Church*, 375 F.3d 951 (9th Cir. 2004) ............................12

*Episcopal Diocese of S. Va. v. Marshall*, 903 S.E.2d 534 (Va. Ct. App. 2024) .....12, 13

*Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144 (2d Cir. 2000) .............................21

*Fratello v. Archdiocese of N.Y.*, 863 F.3d 190 (2d Cir. 2017) .................................10, 11

*Friedlander v. Port Jewish Ctr.*, 347 F. App'x 654 (2d Cir. 2009) ..............................10

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) ...................................................18

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323 (1974) .........................................................19

*Hiles v. Episcopal Diocese of Mass.*, 773 N.E.2d 929 (Mass. 2002) ...........................15

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012).................................................................................................................10, 11, 17

*Hubbard v. J. Message Grp. Corp.*, 325 F. Supp. 3d 1198 (D.N.M. 2018) .................15

*Hutchinson v. Thomas,* 789 F.2d 392 (6th Cir. 1986).....................................................11

*Kavanagh v. Zwilling*, 997 F. Supp. 2d 241 (S.D.N.Y. 2014).................................15, 17

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94 (1952)...........................................................................................................13

*Kraft v. Rector*, No. 01–CV–7871, 2004 WL 540327 (S.D.N.Y. Mar. 17, 2004).........11

*La Luna Enterprises, Inc. v. CBS Corp.*, 74 F. Supp.2d 384 (S.D.N.Y. 1999) ............20

*Lee v. Bankers Trust Co*., 166 F.3d 540 (2d Cir. 1999)................................................24

*Martinelli v. Bridgeport Roman Cath. Diocesan Corp.*, 196 F.3d 409 (2d Cir. 1999) ..............................................................................................................................16

*McCarthy v. Fuller*, 714 F.3d 971 (7th Cir. 2013) .......................................................14

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, 966 F.3d 346 (5th Cir. 2020).................................................................................................................14

*Moon v. Moon,* 833 F. App'x 876 (2d Cir. 2020)...................................................13, 14

*NLRB v. Cath. Bishop*, 440 U.S. 490 (1979) ...............................................................17

*November v. Time Inc*., 194 N.E.2d 126 (N.Y. 1963) ..................................................21

*Ogle v. Church of God*, 153 F. App'x 371 (6th Cir. 2005)..........................................11

*Ogle v. Hocker*, 279 F. App'x 391 (6th Cir. 2008)......................................................14

*Orenstein v. Figel*, 677 F. Supp.2d 706 (S.D.N.Y. 2009)............................................22

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020)................10, 11

*Paul v. Watchtower Bible and Tract Society of New York, Inc*., 819 F.2d 875
(1987) ................................................................................................................17

*Pisani v. Staten Island Univ. Hosp*., 440 F. Supp.2d 168 (E.D.N.Y. 2006) ..................................20

*Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164 (4th Cir. 1985) ....................12

*Rweyemamu v. Cote,* 520 F.3d 198 (2d Cir. 2008) ........................................................11

*Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976)......................................13, 17

*Sharratt v. Hickey*, 799 N.Y.S.2d 299 (2d Dep't 2005)..................................................25

*Tandon v. Newsom*, 593 U.S. 61 (2021) ....................................................................18

*We The Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev*., 76 F.4th 130
(2d Cir. 2023)................................................................................................19

**INTRODUCTION**

Plaintiff is not asking the Court to make any determination of whether or not he was elected bishop. He is not asking the Court to determine whether he was wrongly defrocked or whether the charges of canonical improprieties leveled against him were justified. He is not asking the Court to determine whether any clerical investigation into the performance of his religious duties was justified. Plaintiff recognizes that these are religious matters which this Court may not address. Plaintiff is only asking the Court to decide whether the publicly disseminated charge that he is a forger—that he had fabricated letters, had forged signatures on them, and had these false and forged letters delivered to the addresses—is false. Plaintiff seeks nothing more than to clear his name from this one accusation.

As they have done since this case was filed, Defendants are attempting to inject religious issues into a dispute to which they are wholly inapplicable and irrelevant. This motion adds nothing new to the arguments Defendants had previously made to this Court and to the Second Circuit. This Court had ruled that this suit "may be resolved by appealing to neutral principles of law," recognizing that Plaintiff "does not ask this Court to determine whether his election was proper or whether he should be reinstated to his role as Bishop of Miami." Dkt. 46, p. 11. The Second Circuit had identified the "[d]ecidedly non-ecclesiastical questions"–"did the purported signatories actually sign the letters? [w]ere the December 10 and January 11 letters stamped with Metropolitan Hilarion's seal? … who stamped them? [w]as the early January letter on Archbishop Gavriil's letterhead? … did [Plaintiff] forge the letters at issue?"—none of which would "require a fact-finder to delve into matters of faith and doctrine." *Belya v. Kapral,* 45 F.4th 621, 634 (2d Cir. 2022). Nothing that has occurred in the case since these decisions has altered the fundamental issues before the Court. They remain exactly as they were when last considered by this Court.

## STATEMENT OF FACTS

### A.    Defendants Do Not Deny Genuineness of Met. Hilarion's Signature and Seal or of Arch. Gabriel's Signature.

None of the Defendants deny the genuineness of Met. Hilarion's signature and seal on the December 10 and January 11 letters, or the genuineness of Arch. Gabriel's letter. Counterstatement ¶¶ 1-40, 91-99. Some flat-out admit that the signatures are genuine. *Id.* ¶¶ 4, 11, 14, 16, 18, 34, 38. Others testified they had not even seen the letters at the time they signed the September 3 letter. *Id.* ¶¶ 3, 5, 13, 20, 33, 35, 39.

The genuineness of Met. Hilarion's signature on his letters has been confirmed by Plaintiff's forensic expert. *Id.* ¶¶ 41-45. Defendants have not proffered a forensic expert of their own. *Id.*

### B.    Met. Hilarion's Efforts to Elevate Plaintiff to Bishop

In 2016 Met. Hilarion told Plaintiff that he intended to elevate him to Bishop, but that there were those with ROCOR who opposed the elevation. Counterstatement ¶¶ 54-55. Plaintiff had no ambition beyond his current position and told Met. Hilarion that he did not wish to be elevated. *Id.* ¶¶ 57-58. Met. Hilarion assured Plaintiff that so long as he was the head of ROCOR, Plaintiff would have his full support and would be protected. *Id.* ¶ 58. Met. Hilarion brought up the subject again a year later. *Id.* ¶ 61. He said that there were still within ROCOR those who viewed Plaintiff as an outsider and were opposed to his elevation, naming specifically Defendants Olkhovsky, Antchoutine and Gan. *Id.* ¶¶ 61-64. Plaintiff remained adamant that he did not wish to cause discord and asked Met. Hilarion to reconsider. *Id.* ¶ 65. Met. Hilarion continued to press, assuring Plaintiff that he would guide him through the process and that so long as he was in charge, there would be no adverse consequences to Plaintiff. *Id.* ¶ 66. Plaintiff then agreed for Met. Hilarion to submit his candidacy for the position of Bishop of Miami, relying on Met. Hilarion's guidance and instructions. *Id.* ¶¶ 66-67.

In August 2018, Plaintiff received a "Blessing" from Met. Hilarion, which stated that his candidacy was proposed by at the most recent Synod meeting and was supported by "many

bishops," and instructing Plaintiff to meet with bishops who wanted to know more about him. Plaintiff did so. Counterstatement ¶¶ 68-71. In November 2018, Met. Hilarion told Plaintiff that his candidacy for bishop would be considered by the Synod at the upcoming meeting on December 6, *Id.* ¶¶ 68-72, instructing Plaintiff to attend the meeting and be prepared to make a presentation on the subject of his life, education and work, as well as to answer questions that may be posed by the Synod members. *Id.* ¶¶ 73. Plaintiff attended the Synod meeting as instructed, made a presentation and answered the Synod members' questions. *Id.* ¶ 74. After the meeting, Plaintiff was congratulated on his election by Met. Hilarion and also by Archbishops Mark and Gabriel and Defendant Dmitrieff. *Id.* ¶ 75-76.

Plaintiff then received a letter from Met. Hilarion, dated December 10, formally informing him that his candidacy was considered at the Synod meeting on December 6, and that he was elected "by majority of votes," and also stating that four "corrections" were required from him. Counterstatement ¶¶ 78-79. Included with the letter was another letter from the Met. Hilarion, addressed to Patriarch Kirill, in Moscow, in which Met. Hilarion wrote that he was "happy to share the joyful news" of Plaintiff's and another candidate's election "by majority vote," and that "in the nearest future" he would send a "request for the confirmation of the candidates." *Id.* ¶¶ 80-82.

## C.    The Four "Corrections"

One of the "corrections" required of Plaintiff was registering his church in accordance with "ROCOR's statute." On advice of church's lawyers, the proper and most expeditious process to achieve this was to register a new non-profit corporation, as making changes to the registration of the current corporation was not feasible. Counterstatement ¶ 83. Documents were prepared and presented to Met. Hilarion for his approval. *Id.* ¶¶ 84-85. Met. Hilarion approved the documents and told Plaintiff to proceed with the filing. *Id.* ¶ 86. Plaintiff's lawyers did so on January 17, 2019. *Id.*

Since Archbishop Gabriel had been formally designated by the Synod to report regarding Plaintiff's compliance with the four items, Met. Hilarion needed a written document signed by

Arch. Gabriel so that the file was complete. Counterstatement ¶¶ 89-90.  Met. Hilarion drafted a one-paragraph letter to be signed by Archbishop Gabriel to be given to him for signature. *Id*.  The Metropolitan himself did not consider the "corrections" to be of any real significance, but that these were things on which certain of Plaintiff's detractors at the Synod had insisted, and he saw no reason to make an issue of them. *Id*. ¶ 88.

In late January 2019, Arch. Gabriel signed the draft letter, in which he confirmed that everything has been corrected and that he did not "see any obstacles to approve the date of consecration of Archimandrite Alexander (Belya), elected as the Vicar Bishop for Miami," and which he then delivered to Met. Hilarion. Counterstatement ¶¶ 91-93.

While Defendants argue that Arch. Gabriel did not sign the letter and that the letter is a "fake," (a) at his deposition, Arch. Gabriel testified that "it appears to be my signature;" Counterstatement ¶ 94. Also, Defendant Gan wrote in an email to Defendant Olkhovsky that Arch. Gabriel had "admitted to signing" the letter. *Id.* ¶¶ 95-96. Defendant Lukianov testified that Arch. Gabriel had signed the letter. *Id.* ¶ 97. None of the Defendants denied the genuineness of Arch. Gabriel's signature at their depositions. *Id.* ¶ 99.

## D.    February 2019 Trip to Moscow

In January 2019, the Met. Hilarion instructed Plaintiff to travel with him to Moscow on the occasion of the anniversary of the enthronization of Patriarch Kirill, saying that it was important for Plaintiff to serve liturgy together with Patr. Kirill, since his approval for the elevation was required. Counterstatement ¶¶ 100-101. Plaintiff did so. *Id.* ¶ 103.

Met. Hilarion had arranged for Plaintiff to participate in the liturgical service with Patriarch Kirill, an honor which only a few clerics received. Counterstatement ¶¶ 102, 104. While there, Met. Hilarion introduced Plaintiff to Metropolitan Hilarion Alfeyev, the head of the department of external church relations, as well as to other clerics, as the newly elected Bishop of Miami. *Id.* ¶¶ 103, 105-106. While in Moscow, Plaintiff attended several events, all at the invitation of Met. Hilarion and with him in attendance. *Id.* ¶ 105. Throughout the trip, Met. Hilarion acted with a

clear purpose of making Plaintiff known as a newly elected bishop of ROCOR, which is how he introduced Plaintiff to numerous clerics attending the celebration. *Id.* ¶ 106

During the trip, the Metropolitan informed Plaintiff that he had submitted to Patr. Kirill's office a request for approval of Plaintiff's elevation to bishop. *Id.* ¶ 107.

**E.      The Purported "Investigation"**

In April 2019, Plaintiff was informed by Met. Hilarion of a campaign to discredit Plaintiff, involving Defendants Olkhovsky, Antchoutine and Gan, and also former members of Plaintiff's church, Tsibin and Babenko. Counterstatement ¶¶ 108-109. According to Met. Hilarion, Defendant Olkhovsky sought to build a case against Plaintiff for misconduct without Met. Hilarion knowing anything about it. *Id.* ¶¶ 110, 112-115. Defendant Gan wrote at the time that it was "best to keep this out of [Met. Hilarion's] hands," which Defendant Olkhovsky wrote he "want[ed] to try and avoid." Id. ¶¶ 113-115.  The Metropolitan, having learned of the scheme, said he would take control of the process. *Id.* ¶ 110.

Plaintiff told Met. Hilarion that this was concerning and distracting and asked that his elevation be reconsidered and cancelled. Counterstatement ¶ 116. Met. Hilarion assured Plaintiff that everything would be fine. *Id.* The "investigation" proceeded with Met. Hilarion in charge. *Id.* ¶¶ 117.

In July 2019, Met. Hilarion issued his ruling on the investigation, dismissing the complaints against the Plaintiff, and calling them "personal fiction," "aimed at showing discord," by organizing "a public campaign" to discredit the Plaintiff and his church. Counterstatement ¶¶ 119-120. Defendants were very unhappy about Met. Hilarion's ruling. Defendant Antchoutine described the ruling as "that ugly letter" "signed by MH [Metropolitan Hilarion]" and a "killer letter." *Id.* ¶ 121.

Subsequently, Tsibin, who had been arrested and charged with burglarizing Plaintiff's church, confessed to being solicited by Defendants Olkhovsky and Antchoutine to "search for different rumors and gossip and collect negative information" on Plaintiff. Counterstatement

¶¶ 111, 118. In October 2019, Babenko was charged with attempted murder of Tsibin, in a dispute over Olga Tsibin, Tsibin's estranged wife, who, according to Tsibin, was now living with Babenko. *Id.* ¶ 122.

The first time the complete September 3 letter was posted on the internet was in a September 15 Facebook post by the very same Olga Tsibin, the estranged wife of one of the complainers and the current interest of the other, both of whom had been working at the behest of Defendants Olkhovsky and Antchoutine to gather dirt on Plaintiff. Olga Tsibin reposted the letter again in October 2019, this time in a different Facebook page in the name of Olga Feisty, and then again under her own name on October 15, 2019. Counterstatement ¶¶ 123-125.

**F.      Met. Hilarion's Letters to Met. Christophor and Dean Lashek**

When the secret "investigation" was discovered by Met. Hilarion, he told the Plaintiff it would be useful to strengthen Plaintiff's position with character references from respected clerics, especially since Defendant Olkhovsky was questioning Plaintiff's educational credentials. Counterstatement ¶ 126. Plaintiff suggested Professor Yan Lashek, the Dean of the Karlov University in Prague, and Metropolitan Christophor of Czech Lands and Slovakia. *Id.* ¶ 127. In May 2019, the Metropolitan wrote a letter to each, in which he referred to Plaintiff's "election" as bishop, and asked them for a character reference. *Id.* ¶ 128. Metropolitan Christopher and Professor Lashek responded with positive character references. *Id.* ¶ 129.

**G.      Audience with Patriarch Kirill**

On July 14, 2019, Plaintiff was summoned to an audience with Patr. Kirill in Moscow. The subject of the audience was Met. Hilarion's request to confirm Plaintiff's elevation to bishop. At the audience, which took place on July 16, Patr. Kirill said he approved of Plaintiff's elevation and this would be finalized at the next Synod. The Patriarch presented Plaintiff with an Episcopal Panagia, which is worn only by bishops. Counterstatement ¶¶ 130-131.

**H.      August 30 Announcement and its Aftermath**

On August 30, 2019, the Moscow Synod published a notice confirming Plaintiff's elevation. Counterstatement ¶ 133. The same day, Ivan Belya spoke to Met. Hilarion, whose response to the announcement was "Praise the Lord" and "Congratulations." *Id.* ¶ 134. The next day, Plaintiff called Met. Hilarion but received no answer. *Id.* ¶ 135. He called again, but was not able to reach Met. Hilarion. *Id.*

Then Plaintiff began being bombarded with phone calls from various clerics who said things had "blown up" at ROCOR over the announcement of the confirmation. Counterstatement ¶ 136. Plaintiff was told that he was being accused of forging Met. Hilarion's letters. *Id.* Plaintiff began frantically calling Met. Hilarion, and others who could connect him to him, but was unsuccessful. *Id.* ¶ 137.

Over the next two days, the situation deteriorated. Counterstatement ¶ 138. Unknown persons began flooding into the Plaintiff's church, disseminating leaflets which accused Plaintiff of fraud and forgery. *Id.* Others told parishioners and staff that Plaintiff was a forger and a swindler and urging them to leave the church. *Id.* It was obvious to Plaintiff that this was an orchestrated campaign. *Id.* The situation in the church became chaotic and untenable. *Id.* Plaintiff was told by one of the clerics who called him that Met. Hilarion could not or would not speak to him. *Id.* ¶ 139. He was also told that a formal charge was being prepared by Defendant Olkhovsky that would seek Plaintiff's condemnation, or worse. *Id.*

Plaintiff realized that the Metropolitan had abandoned him. Counterstatement ¶ 140. He also realized that he had no more future at ROCOR, and that the concern he had expressed to the Metropolitan when he first learned about detractors within ROCOR—what would happen to him after the Metropolitan was no longer there—became reality. *Id.* ¶ 141.

The purpose of the Order given to Plaintiff by the Metropolitan in September 2016 was to allow Plaintiff to leave ROCOR and join another church if his situation became impossible. Counterstatement ¶ 142. Plaintiff realized that this was the moment. On or about September 2, Plaintiff submitted a request to join the Greek Orthodox Church. *Id.* ¶ 143.

-7-

On September 3, Met. Hilarion wrote to Ivan Belya that the bishops had "recommended" to him not to communicate in person or by phone, and that he would therefore not be able to attend Father Alexander's birthday celebration. Rivkin Decl. Ex. DD.  The email said nothing about any forgery. This was on the very day when the September 3 letter was being signed, stating that Met. Hilarion "knew nothing" about his letters to Patr. Kirill.

## I.    Dissemination of the Forgery Charge

In the ensuing weeks Plaintiff was under unrelenting attack. Counterstatement ¶ 145. Distribution of leaflets, accosting of parishioners and staff, accusations of fraud and forgery all continued to a point where the church had to hire security. *Id.* ¶ 146. Anonymous phone calls increased in frequency and stridency, even at night, cursing the Plaintiff as a forger and criminal. *Id.* ¶ 147. Plaintiff's parents received similar phone calls. *Id.*

Plaintiff was aware that a letter which accused him of forgery had been issued, but he had not seen it until it was posted on September 15, 2019 by Olga Tsibin. Counterstatement ¶ 148. The statement in the September 3 letter that Met. Hilarion did not know anything about the letters that he himself had written, signed and delivered to Patriarch Kirill, effectively labeled Plaintiff a forger to the entire world. *Id.* ¶ 149. Every Orthodox publication so called Plaintiff in article after article, post after post. *Id.* Plaintiff saw his reputation turn to ashes virtually overnight. *Id.* ¶ 150. To Plaintiff this was spiritual death. *Id.*

Defendants' decision to couch Met. Hilarion's letters as "forgeries" was made immediately upon learning of the announcement. Counterstatement ¶¶ 151-155. Within hours of the August 30 announcement, Defendant Antchoutine prepared a draft virtually identical to the final September 3 version, containing verbatim the statement that Met. Hilarion knew nothing of his own letters to Patr. Kirill. *Id.*

On September 2, Gan wrote to Olkhovsky about "forged" letters, using ironic quotation marks to indicate the opposite of forgery. Counterstatement ¶ 157. The same day Olkhovsky, having learned that Plaintiff could prove the authenticity of the signatures, wrote, "Even if there

are signed letters, he [Met. Hilarion] could have been pressured into signing them." *Id.* ¶¶ 158-160.

On September 15, Olga Tsibin posted the full September 3 letter on Facebook, reposting it twice again in October. Counterstatement ¶¶ 123-125. On September 16, 2019, Eastern Russian Orthodox News posted that the letter "informing about [Plaintiff's] nomination sent to Moscow was a forgery." *Id.* ¶ 162. On September 17, Defendant Gan's church posted an article that Met. Hilarion's letter was a forgery. *Id.* ¶ 163. On October 19, Defendant Lukianov reposted on his Facebook page an article published by orthochristian.com which contained the statement that Plaintiff "managed to get his name sent to Moscow as a nominee for vicar bishop of Miami in ROCOR despite the fact that he had not been nominated." *Id.* ¶ 164.

The charge of forgery spread massively through the internet. Counterstatement ¶ 165. Plaintiff's expert analyzed the proliferation of the charges of forgery against the Plaintiff and estimated conservatively that approximately 866 thousand people have been exposed to them. He also estimated a total of almost three billion web "impressions" (an industry term which refers to any time a user opens an app or website and the text in question is visible) of the forgery charge. *Id.* ¶¶ 166-167.

## ARGUMENT

## I.
## THE FIRST AMENDMENT DOES NOT BAR PLAINTIFF'S CLAIMS

Plaintiff, a man of devout faith, appreciates as much as anyone the importance of maintaining strict boundaries between secular government and ecclesiastical matters. But Plaintiff's lawsuit does not, and never has, involved any ecclesiastical issues. This is a suit for defamation, revolving around the baseless claim, published to the world, that Plaintiff forged, fabricated, and transmitted three letters, according to the secular meanings of those terms.

Every step of the way, Defendants have endeavored to muddy the waters, arguing that various religious questions are at issue. They say that Plaintiff is really challenging his election as Bishop, his defrockment, internal church discipline, and myriad other religious matters. Of course,

as this Court and the Second Circuit have already held, none of these religious issues bear any relevance to Plaintiff's defamation claims. But the reality of Plaintiff's suit doesn't help Defendants shirk liability for their smear campaign, and so the parade of mischaracterizations continues.

This Court should once again reject Defendants' attempt to inject religious issues into Plaintiff's secular suit. First, Plaintiff's claims have nothing to do with church employment decisions or discipline, and therefore the ministerial exception is inapplicable. Second, ecclesiastical abstention is inappropriate in this case because there is no need to intervene in doctrinal debates or to answer any religious questions. Third, there is no risk of entanglement because there are no religious controversies at stake. Fourth, and finally, Defendants' Free Exercise rights are not violated by defamation liability because Defendants do not claim any religious motivation for defaming Plaintiff, and defamation law easily satisfies the rational basis review to which it is subject.

## A.    The ministerial exception does not bar Plaintiff's claims

The ministerial exception is a limited departure from the constitutional rule that religious organizations are bound by laws that are neutral with respect to religion and apply generally. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 190 (2012). Because "religious institutions" do not "enjoy a general immunity from secular laws," the exception is narrow: It protects "internal management decisions" regarding the selection of important teachers and preachers of the faith. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 746 (2020). Applications of the exception must be "tailored to this purpose." Hosanna-Tabor, 565 U.S. at 199 (Alito, J., concurring).

With only one exception,[1] the Supreme Court and the Second Circuit have only ever applied the exception to employment-discrimination claims. *See Fratello v. Archdiocese of N.Y.*,

---

[1] *See Friedlander v. Port Jewish Ctr.*, 347 F. App'x 654, 655 (2d Cir. 2009) (unpublished decision holding that ministerial exception barred rabbi's breach-of-contract claim arising from temple's decision to terminate her employment).

863 F.3d 190, 206 (2d Cir. 2017) (applying ministerial exception to employment-discrimination claims); *Hosanna-Tabor,* 565 U.S. at 188 (same); *Morrissey-Berru,* 591 U.S. at 738 (same); *Rweyemamu v. Cote,* 520 F.3d 198, 209-10 (2d Cir. 2008) (same). That is because applying antidiscrimination laws to ministers—employees who are "essential to the performance" of religious functions, *Hosanna-Tabor,* 565 U.S. at 199 (Alito, *J.,* concurring)—would gravely intrude on a religious group's freedom to "shape its own faith and mission," id. at 188 (majority op.).

Where courts have held that the ministerial exception does bar some tort claims, it was because the claims at issue would similarly intrude on religious entities' ability to select ministerial employees. So, for example, courts have barred tort claims that challenge a church's "internal disciplinary proceedings," *Ogle v. Church of God*, 153 F. App'x 371, 376 (6th Cir. 2005), or that are "really seeking civil court review of" a church's employment decisions, *Hutchinson v. Thomas*, 789 F.2d 392, 393 (6th Cir. 1986); *see also Kraft v. Rector,* No. 01–CV–7871, 2004 WL 540327, at *5 (S.D.N.Y. Mar. 17, 2004) (dismissing tort claim "disputing the reasons why a church decided to terminate a minister"). But no intrusion on internal disciplinary and employment matters occurs when a plaintiff "'alleg[es] particular wrongs by the church that are wholly non-religious in nature'—including, for example, certain common-law tort claims." *Fratello,* 863 F.3d at 202 (quoting *Rweyemamu*, 520 F.3d at 208).

The ministerial exception is not applicable here. Plaintiff does not accuse the church of employment discrimination—his claims are for defamation. *Compare* FAC ¶¶ 65-109, with *Hosanna-Tabor*, 565 U.S. at 196. And, even if some defamation claims are barred by the ministerial exception, Plaintiff's claims are not. Plaintiff does not seek civil court review of church employment decisions. *Compare* Belya Decl. ¶ 74, with *Hutchinson*, 789 F.2d 393. Nor does Plaintiff, as Defendants assert (at 10), challenge "church disciplinary communication from clergy to clergy" or any other internal disciplinary proceeding—the defamatory statements contained in the September 3 Letter were publicly disseminated on social media and in news publications. *Compare* Counterstatement ¶¶ 123-125, 148-149, 163-166, with *Ogle*, 153 F. App'x at 376.

Defendants repeatedly mischaracterize the nature of Plaintiff's claims, asserting, without basis, that Plaintiff "needs this Court to second-guess final religious decisions reached by the ROCOR Synod" and that "adjudicating [his] claims requires this Court to interfere in" supervision of clergy and management of "sensitive matters of internal church polity." Defs.' Br. 11-12. None of this is true. Whether, for example, Plaintiff was validly elected as Bishop has no relevance to his defamation claims. *See* Belya Decl. ¶ 74 ("I am not asking the Court to make any ruling on whether or not I was elected Bishop."). Similarly, Plaintiff does not contest that "ROCOR was… entitled to take supervisory steps" with him. Defs.' Br. 12. What Defendants were not entitled to do, however, was publicly proclaim the falsehood that Plaintiff is a forger. *Cf. Rayburn v. Gen. Conf. of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) ("[C]hurches are not—and should not be—above the law. Like any other person or organization, they may be held liable for their torts and upon their valid contracts.").

Finally, the ministerial exception does not bar Plaintiff's claims for damages. The ministerial exception only bars remedies that "implicate…protected ministerial decisions." *Elvig v. Calvin Presbyterian Church,* 375 F.3d 951, 966 (9th Cir. 2004). So, for example, a plaintiff cannot recover for the "lost or reduced pay" or "emotional distress or reputational damages" suffered as a result of employment decisions protected by the ministerial exception. *Id.* at 966; *see also Hosanna-Tabor*, 565 U.S. at 194 (damages for discriminatory firing "would operate as a penalty on the Church for terminating an unwanted minister, and would be no less prohibited by the First Amendment than an order overturning the termination."). A damages claim requiring the court to weigh the reasons for a church's decision to fire a minister would likewise be barred because it "would necessarily snare the trial court in matters involving the discipline and dismissal of a religious leader." *Episcopal Diocese of S. Va. v. Marshall,* 903 S.E.2d 534, 544 (Va. Ct. App. 2024). But a plaintiff can recover damages caused by conduct "the ministerial exception does not protect" and that do not hinge on the reasons for that protected conduct. *Elvig,* 375 F.3d at 966.

Here, the ministerial exception does not bar Plaintiff's damages claims. The underlying conduct—a defamation claim that in no way impinges on the church's ability to choose its

-12-

ministers—is not protected. And evaluation of damages would not "snare the trial court in matters involving the discipline and dismissal of a religious leader," *Marshall,* 903 S.E.2d at 544, as Plaintiff's claims for damages do not turn on the reasons for the church's employment decisions. Rather, the church's reasons for its employment decisions are wholly irrelevant. *See* Belya Decl. ¶ 74. Defendants assert (at 12) that in determining damages, the jury would need to consider "religious factors" that Defendants say contributed to Plaintiff's lost standing in the community.[2] But Defendants cite no authority for the extraordinary argument that a possible religious justification for a community member's actions somehow violates the church's First Amendment rights. Nor could they—the ministerial exception is concerned with protecting religious employers' employment decisions. The exception has no bearing on the non-employment-related decisions of non-employer community members. Plaintiff's damages claims therefore do not implicate the ministerial exception.

**B.      The ecclesiastical abstention doctrine does not bar Plaintiff's claims**

The ecclesiastical abstention doctrine protects religious institutions' "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.,* 344 U.S. 94, 116 (1952). But "[s]imply having a religious association on one side of the 'v' does not automatically mean a district court must dismiss the case." *Belya*, 45 F.4th at 630. "[C]ourts may apply 'neutral principles of law' for the resolution of disputes involving religious matters, so long as the 'neutral principles' allow the court to avoid deciding questions of religious doctrine, polity, and practice." *Moon v. Moon*, 833 F. App'x 876, 879 (2d Cir. 2020).

So, for example, a court cannot decide whether church doctrine requires the defrocking of a bishop. *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 718 (1976). Nor may a court determine which ecclesiastical authority controls a church, *Kedroff,* 344 U.S. at 119, or whether

---

[2] Plaintiff is no longer pursuing damages stemming from decreased church membership and therefore does not address Defendants' argument to that point. *See* Defs.' Br. 12. Rivkin Decl. ¶ 46.

someone is a nun, *McCarthy v. Fuller*, 714 F.3d 971, 979 (7th Cir. 2013). But the prohibition against courts making religious decisions does not preclude adjudication of claims over a religious entity's or its members' secular actions, *Bryce v. Episcopal Church,* 289 F.3d 648, 657 (10th Cir. 2002), or of secular disputes between religious parties, *see DeMarco v. Holy Cross High Sch.,* 4 F.3d 166, 169-70 (2d Cir. 1993).

Courts thus routinely evaluate tort claims against religious entities where the claims can be decided under neutral principles. *See, e.g., Moon,* 833 F. App'x at 880 (declining to dismiss claim for violation of whistleblower protection statute on ecclesiastical abstention grounds because the claim "can be evaluated without reference to any religious doctrine"); *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.,* 966 F.3d 346, 349 (5th Cir. 2020) (allowing defamation claim against religious employer to proceed because plaintiff "is not challenging the termination of his employment" and "is not asking the court to weigh in on issues of faith or doctrine"); *Ogle v. Hocker,* 279 F. App'x 391, 396 (6th Cir. 2008) (allowing pastor's defamation claim against church because allegedly defamatory statements were not part of a sermon, no doctrinal issues were involved, and the defendant did "not claim that defamation is a practice of his church or is otherwise rooted in religious belief"); *Drevlow v. Lutheran Church, Mo. Synod,* 991 F.2d 468, 471 (8th Cir. 1993) (reversing dismissal of minister's tort claims, which required proving that "false information kept him from obtaining employment as a pastor," because the claims could be adjudicated without "an impermissible inquiry into the Synod's bylaws or religious beliefs").

Here, too, as this Court and the Second Circuit has already recognized, *see Belya v. Hilarion,* 20 Civ. 6597, 2021 WL 1997547, at *4 (S.D.N.Y. May 19, 2021); *Belya*, 45 F.4th at 634, Plaintiff's defamation claim can be resolved by reference to neutral principles of law and without "deciding questions of religious doctrine, polity, and practice," *Moon*, 833 F. App'x at 879. Specifically, Plaintiff claims that, in their September 3 Letter, Defendants falsely and defamatorily stated that Plaintiff forged, falsified, and transmitted three letters. *See* Am. Compl. ¶¶ 66–67; Belya Decl. ¶ 74. Plaintiff's' defamation claims depend on "[d]ecidedly non-ecclesiastical questions of fact[,]" namely: "[D]id the purported signatories actually sign the

-14-

letters? Were the December 10 and January 11 letters stamped with Metropolitan Hilarion's seal? If so, who stamped them? Was the early January letter on Archbishop Gavriil's letterhead? More broadly, did Belya forge the letters at issue?" Belya, 45 F.4th at 634. These are secular questions suitable for adjudication according to neutral principles.

Defendants repeatedly attempt to inject religious issues into the case. But none of the religious issues raised by Defendants are material to Plaintiff's claims. For example, Defendants' assertion (at 13) that adjudicating Plaintiff's defamation claims would interfere with internal church disciplinary proceedings is incorrect. The defamatory content was shared not only internally, with clergy and church members, but also publicly. *Compare* Counterstatement ¶¶ 123-125, 148-149, 163-166, with, *e.g., Hubbard v. J. Message Grp. Corp.,* 325 F. Supp. 3d 1198, 1214-16 (D.N.M. 2018) (listing cases concerning allegedly defamatory statements *within* church groups).[3]

Moreover, Plaintiff's claims do not require the Court to intervene in church disciplinary matters. Plaintiff does not challenge his expulsion from the Church. *Compare* FAC ¶¶ 59-109, with, *e.g., C.L. Westbrook, Jr. v. Penley,* 231 S.W.3d 389, 399-400 (Tex. 2007). He does not ask the court to opine on his fitness to be a minister or his adherence to ecclesiastical standards. *Compare* FAC ¶¶ 59-109, with, *e.g., Dermody v. Presbyterian Church (U.S.A.),* 530 S.W.3d 467, 474 (Ky. Ct. App. 2017). And Plaintiff's claims are not based on doctrinal disagreements, internal or otherwise. *Compare* FAC ¶¶ 59-109, with, *e.g., Bryce v. Episcopal Church,* 289 F.3d 648, 658 (10th Cir. 2002); *Kavanagh v. Zwilling,* 997 F. Supp. 2d 241, 254 (S.D.N.Y. 2014). The central questions here are purely secular: whether Plaintiff forged the letters, and whether Defendants knew their accusation of forgery was false when they announced it to the world.

---

[3] "The absolute First Amendment protection for statements made by a Church member in an internal church disciplinary proceeding would not apply to statements made or repeated outside that context," such as on social media and in news publications. *Hiles v. Episcopal Diocese of Mass.*, 773 N.E.2d 929, 937 n.12 (Mass. 2002).

Defendants also nitpick requests for information and deposition questions posed by counsel during discovery. See Defs.' Br. at 16-17. But none of the examples proffered by Defendants change the secular nature of Plaintiff's claims. For example, Defendants point out (at 16) that Plaintiff's counsel requested documents pertaining to Defendants' position that Plaintiff's election as Bishop never took place and that there were irregularities in the three letters. Neither of those requests impermissibly veered into topics made off-limits by the ecclesiastical abstention doctrine; they simply sought to clarify the basis—or lack thereof—for Defendants' accusations against Plaintiff. *See Martinelli v. Bridgeport Roman Cath. Diocesan Corp.,* 196 F.3d 409, 431 (2d Cir. 1999) (explaining that factfinders may take religious principles into account if they are accepted as facts, so long as they do not evaluate the truth or falsity of those principles). Similarly, questions about the relationship of the ROCOR with the Russian Church in Moscow, see Defs.' Br. at 17, did not interfere with, or question the validity of, church policies. Even if any discovery went too far, that would be a reason to limit discovery, not to dismiss the case. No improper discovery is needed to resolve Plaintiff's claims.

Also, Defendants had heavily redacted the documents they produced. Rivkin Decl. ¶¶ 33-36. They withheld and redacted documents based on assertions of "First Amendment privilege," "Internal church communications concerning church governance," "Church autonomy doctrine," and "Ministerial Exception." *Id.* Plaintiff s counsel did not challenge these redactions and withholdings. *Id.* ¶ 38. In the course of the Defendants' depositions, their counsel made a number of objections based on church governance and First Amendment privilege, and instructed his clients not to answer. *Id.* ¶ 39. Plaintiff's counsel never challenged any of counsel's objections. *Id.* ¶¶ 40-42. Moreover, Defendants never sought a confidentiality order, or attorneys' eyes only order, either for documents or deposition testimony. *Id.* ¶¶ 43-44. Plaintiff's counsel would have stipulated to one had they asked. *Id.*

Finally, Defendants' assert (at 17) that the genuineness of the three letters can only be determined with reference to "Church law and custom" regarding the election of bishops. That is untrue. As already explained, whether Plaintiff's election was valid according to church law and

custom is irrelevant—even if the election was invalid, that would not mean Plaintiff forged the letters. And there is plenty of secular evidence in the record demonstrating that, in fact, Plaintiff did not forge the letters and that Defendants knew this when they maligned him as a forger. *See, e.g.,* Counterstatement ¶¶ 1-45.

Plaintiff's claims are that he was wrongly, and publicly, denounced for forging, falsifying, and transmitting letters according to the ordinary, secular definitions of those terms. A factfinder can evaluate these claims under neutral principles.

## C.    The Establishment and Free Exercise Clauses do not bar Plaintiff's claims

Ecclesiastical abstention and the ministerial exception, both derived from the Establishment and Free Exercise Clauses, are the principles that restrict governmental interference in ecclesiastical matters. *See Hosanna-Tabor,* 565 U.S. at 181. There is no separate principle under either clause creating further restrictions. The entanglement principle is not a separate restriction from the ecclesiastical abstention doctrine in this context, and even if it was, there is no improper entanglement. Likewise, there is no separate violation of the Free Exercise Clause.

First, for the same reasons outlined above, Plaintiff's claims do not cause any impermissible entanglement in religious controversies. Indeed, there is no religious controversy at issue. Plaintiff does not challenge the authority of the church over ecclesiastical matters, *see Milivojevich,* 426 U.S. at 709; church law and doctrine is irrelevant, *see Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 254 (S.D.N.Y. 2014); and Defendants do not assert that they were religiously mandated to defame Plaintiff, *NLRB v. Cath. Bishop,* 440 U.S. 490, 502 (1979). There is no risk of entanglement in this case, and the Establishment Clause therefore does not bar Plaintiff's claims.

Second, the Free Exercise Clause does not proscribe Plaintiff's claims. Defendants assert (at 19) that defamation law directly burdens their free exercise rights. But defamation law does not impose any burden on Defendants' religious exercise. Defendants cite *Paul v. Watchtower Bible and Tract Society of New York, Inc.,* 819 F.2d 875, 880 (1987), which held that a church could not be held liable in tort for "shunning" a former member. Paul, however, is easily distinguishable. In

that case, the Court explained that "shunning is an actual practice of the Church itself" and "[i]mposing tort liability for shunning on the Church or its members would [therefore] have the same effect as prohibiting the practice and would compel the Church to abandon part of its religious teachings." *Id.* at 881. In other words, imposing tort liability for shunning would directly punish religiously motivated conduct. See id. Here, by contrast, Defendants do not claim to have been motivated by any religious purpose in making the defamatory statements about Plaintiff. Therefore, imposing liability for Defendants' defamation would not directly, or indirectly, burden their religious exercise.

Defendants further argue (at 19) that defamation law is not generally applicable and therefore is subject to strict scrutiny. Defendants are wrong on this point, too. General applicability is the requirement that the "government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 543 (1993). Government thus may not burden religious conduct while affording more favorable treatment to nonreligious conduct that is as detrimental to the underlying governmental interests. *See Tandon v. Newsom,* 593 U.S. 61, 62 (2021) (per curiam). Nor may the government utilize a "formal system of entirely discretionary" and "individualized" exemptions to favor requests for secular exceptions over religious ones. *Fulton v. City of Philadelphia,* 593 U.S. 522, 533, 536 (2021) (quoting *Smith*, 494 U.S. at 884).

Defamation law is generally applicable. Defamation law does not treat nonreligious defamation more favorably than religious defamation, and there is no system of exemptions from defamation liability that favors secular exemptions over religious ones. Defendants point out (at 19) that "defamation law exempts or applies different legal standards for…speech concerning public figures or privileged communications," but neither of those examples show any favor toward secular conduct. For one thing, any speech (religious or not) concerning any public figure (religious or not) would be subject to a higher standard of proof to establish defamation.

Defendants also present no evidence that the law's protection for privileged communications operates to favor secular communications over religious ones.[4]

Defamation law is therefore subject only to rational basis review, *see We The Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev.,* 76 F.4th 130, 156 (2d Cir. 2023), which it easily survives. The law of defamation is rationally related to the "legitimate state interest…[of] compensation of individuals for the harm inflicted on them by defamatory falsehood." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 341 (1974). Defendants' Free Exercise claim therefore fails.

## II.
## PLAINTIFF DOES NOT CHALLENGE "STATEMENTS THAT ARE TRUE"

In claiming that Plaintiff challenges statements that are "true," Defs. Br. 21-22, Defendants again focus on those statements in the September 3 letter which are not being challenged by Plaintiff—whether there was or wasn't an election, whether the letters were drawn in an "irregular manner," etc. These have nothing to do with Plaintiff's claim, as both this Court and the Second Circuit have already made clear.

The only statement that is challenged is that Met. Hilarion "knew nothing about the written appeals directed to Moscow containing a request of the episcopal election [of the plaintiff] by the Synod of Bishops." Rivkin Decl. Ex. C. These "written appeals," were Met. Hilarion's own letters, signed by Met. Hilarion in his own hand, and stamped with his official seal. The September 3 letter thus announced to the world that Met. Hilarion had no knowledge of the two letters bearing his own signature and seal. By publicly announcing that Met. Hilarion knew nothing of the two letters bearing his own handwritten signature and his seal, the Defendants accused the Plaintiff not only of forging the signature, but of fabricating every statement in the letters and of delivering the fabricated and forged letters to Patr. Kirill, or arranging for someone to do so. And that is precisely

---

[4] Overall, there is no precedent for applying *Lukumi*, *Tandon*, or *Fulton* to a set of common-law or judge-made legal principles. Under Defendants' view of the law, any time common-law principles in a case created different legal standards for different types of situations, that would result in strict scrutiny. That would open a wide variety of legal regimes to claims for religious exemptions, resulting in chaos.

the way it was understood by every publication and person who wrote again and again about the subject. Counterstatement ¶¶ 123, 162, 165-168; Rivkin Decl. ¶ 9, Ex. H, Ex. V, pp. 61-63. The people who flooded Plaintiff's church and called Plaintiff nonstop accusing him of forgery and fraud had also understood the statement correctly. Counterstatement ¶¶ 138-139, 145-147. Indeed, this was precisely the way the Defendants had intended for the statement to be understood. *Id.* ¶¶ 157, 161, 163, 164, 168.

Defendants' assertion that Arch. Gabriel's letter is a "fake" is flatly contradicted by the record. Counterstatement ¶¶ 21-30, 89-99, 161.

## III.
## THE STATEMENT WAS "CONCERNING" THE PLAINTIFF

Defendants' argument that the letter did not imply that Plaintiff himself was the forger and therefore was not "concerning" the Plaintiff fails. Defs. Br. 22. "The 'of and concerning' requirement is generally an issue of fact which the jury alone may decide." *Pisani v. Staten Island Univ. Hosp.,* 440 F. Supp.2d 168, 172 (E.D.N.Y. 2006). Only where the statements "are incapable of supporting a jury's finding that the allegedly libelous statements refer to plaintiff" can the issue be decided summarily. *Id.* "In determining whether the 'of and concerning' requirement has been sufficiently pleaded, the Court must consider whether those who know the plaintiff, upon reading the statements, would understand that the plaintiff was the target of the allegedly libelous statement." *Id.* Florida law is the same. *See, La Luna Enterprises, Inc. v. CBS Corp.,* 74 F. Supp.2d 384, 390-91 (S.D.N.Y. 1999) (where a statement is susceptible to two reasonable interpretations, one of which is defamatory, the issue of whether the statement was defamatory is one of fact to be submitted to the jury). A "defamed person need not be named in the defamatory words if the communication as a whole contains sufficient facts or references from which the injured person may be determined by the persons receiving the communication." *Id.* at 391.

There is only reasonable interpretation of the statement here, one that is proven by the massive record of online dissemination: that the Plaintiff, *not someone else*, had fabricated the letters and forged the signatures, or had them forged. The almost three billion web "impressions"

of the forgery charge accumulated over the past five years – including those generated by Defendants themselves – all "concern" the Plaintiff, not some other unidentified forger. Counterstatement ¶ 167.

## IV.
### THE STATEMENT IS MORE THAN SUSCEPTIBLE TO DEFAMATORY MEANING

Defendants' "susceptibility" argument fails. Defs. Br. 23. Both this Court and the Second Circuit have already made this clear. "A defamatory statement is one that is reasonably susceptible to a defamatory connotation in context." *A & E Products Group L.P. v. The Accessory Corp.,* 2001 WL 1568238 * 6 (S.D.N.Y. 2001). Context is key under Florida law as well. *See, Bongino v. The Daily Beast Company, LLC,* 47 F. Supp.3d 1310, 1317 (S.D. Fla. 2020) (whether a statement is susceptible to defamatory interpretation turns on the gist of the alleged defamatory statement and the context in which that statement was made). "The words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed." *Flamm v. Am. Ass'n of Univ. Women,* 201 F.3d 144, 146-48 (2d Cir. 2000). "Courts should not "strain to interpret such writings in their mildest and most inoffensive sense to hold them nonlibelous." *November v. Time Inc.,* 194 N.E.2d 126, 128 (N.Y. 1963).

The record fully supports a finding that the statement in the September 3 letter on which the claim is based is reasonably susceptible to the connotation that the Plaintiff is a forger and fabricator—and that the Defendants had intended the letter to be so understood. This was the very point of the September 3 letter, and it was so "read and understood" by the publications who carried the story, and their readers, posters and reposters as well. Counterstatement ¶¶ 123, 162, 165-168; Rivkin Decl. ¶ 9, Ex. H, Ex. V, pp. 61-63. Which was consistent with the way the Defendants had intended for it to be understood. Counterstatement ¶¶ 157, 161, 163, 164, 168; Rivkin Decl. Ex. N.

**V.**

**QUALIFIED PRIVILEGE IS NOT AVAILABLE TO DEFENDANTS**

This Court had previously ruled the issue of qualified privilege on Defendants' motion to dismiss. Dkt. 46, p. 14-15. Discovery amplifies the Court's decision. In the context of a defamation claim qualified privilege "may be overcome by a showing of 'actual malice' (i.e., knowledge of the statement's falsity or reckless disregard as to whether it was false) or common law malice." *Chandok v. Klessig,* 632 F.3d 803, 815 (2d Cir. 2011). *See also Orenstein v. Figel,* 677 F. Supp.2d 706, 710 (S.D.N.Y. 2009) (malice in the context of qualified privilege encompasses "knowing or reckless disregard of a statement's falsity"). The record is replete with evidence of reckless disregard.

None of the Defendants denied at their depositions that the signatures of Met. Hilarion and Arch. Gabriel are genuine. Counterstatement ¶¶ 1-40, 91-99. Some admitted it outright. *Id.* ¶¶ 4, 11, 14, 16, 18, 34, 38. Some had not even seen Met. Hilarion's or Arch. Gabriel's letters at the time when they signed the September 3 letter. *Id.* ¶¶ 3, 5, 13, 20, 33, 35, 39. This notwithstanding, Defendants went ahead and signed and issued the letter anyway.

A complete draft of the September 3 letter was written within hours of the August 30 announcement. *Id.* ¶¶ 152-155. This, while Met. Hilarion himself was extending his congratulations and "Praise the Lord" on the August 30 announcement.[5] *Id.* ¶ 135. The day before the September 3 meeting (which was actually a telephone conference) at which the letter was signed, Defendant Gan wrote to Defendant Olkhovsky: "Maybe good to send the EAD council's decision and the 'forged' letters in one chunk right before the call." Rivkin Decl. Ex. N. Apparently, the "forged" letters were not sent to the council, since a number of the signers had not seen them before signing the September 3 letter. Defendant Gan was referring in his email to "forged" letters even though he himself testified that the signatures "looks like" Met. Hilarion's

---

[5] Needless to say, "Praise the Lord" and "congratulations" are not a natural reaction of a man who has just learned that fabricated and forged letters he knew nothing about were sent to Patr. Kirill.  It is, however, a natural reaction of someone who had for over a year been working deliberately and diligently towards that very goal.

and that he did "not know whether he signed it or not."[6] And as to Arch. Gabriel's letter, Gan testified that Arch. Gabriel "had admitted to signing" it. Counterstatement ¶¶ 95-96. A day after the letter was signed, Olkhovsky, responding to the unpleasant (to him) news from Antchoutine that Plaintiff could prove the genuineness of the signatures through forensic analysis, speculated that even if the letters had been signed by Met. Hilarion, he "could have been pressured into signing" them. Rivkin Decl. Ex. M. The obvious inconsistency between saying that Met. Hilarion "knew nothing" about the letters and saying that he was "pressured" into signing these same letters speaks volumes to Defendants' bad faith. And of course, no evidence of any "pressure" exists.

Also, qualified privilege does not apply if "defendant abused the privilege by acting beyond the scope of the privilege," which occurs when "the defendant does not exercise the privilege in a reasonable manner [or] abuses the occasion." *Boyd v. Nationwide Mut. Ins. Co.,* 208 F.3d 406, 410 (2d Cir. 2000). The Defendants' dissemination of the letter went far beyond anything that could be deemed reasonable. The publication of the letter was not limited to the Synod. The people who distributed leaflets in Plaintiff's church were not ROCOR clergy. Counterstatement ¶¶ 138, 146, 147. Neither were the numerous callers who accused Plaintiff of forgery. *Id.* ¶ 147. Defendants then promptly leaked the letter online through Olga Tsibin, most certainly not a member of the clergy. *Id.* ¶¶ 123-125, 148. Defendants Gan, Lukianov and Antchoutine posted the forgery charge on their FaceBook pages. *Id.* ¶¶ 163, 164, 168. This is not a "reasonable manner" of exercising the privilege. Moreover, by accusing Plaintiff of fabricating and forging documents which Defendants knew had not been forged – and in some cases had not even seen – Defendants "abused the occasion."

---

[6] Gan's use of quotation marks around the word "forged" is almost certainly ironic, indicating that he knew full well that the letters were genuine.

# VI.
## PLAINTIFF CAN PROVE DAMAGES

First, Defendants' argument that Plaintiff cannot prove damages based on the loss of parishioners in his church is moot. This category of damages has been withdrawn. Rivkin Decl. ¶46.

Defendants' second argument of lack of causation is based on the erroneous assertion that Plaintiff's damages are based on him being forced to leave ROCOR and join the Greek Orthodox Church. Plaintiff is not claiming that he was damaged by having to leave ROCOR.

"Under New York choice-of-law rules in defamation cases the state of the plaintiff's domicile will usually have the most significant relationship to the case, and its law will therefore govern." *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir. 1999). Plaintiff's domicile is Florida, so Florida law applies.

Under Florida law, defamation *per se,* pled by Plaintiff, applies to "(1) charges that a person has committed an infamous crime[7]; (2) tends to subject one to hatred, distrust, ridicule, contempt, or disgrace; or (3) tends to injure one in his trade or profession." *Alfalo v. Weiner*, 2018 WL 3235529 * 2 (S.D. Fla., July 2, 2018). Defamation per se does not require any special damages because per se defamatory statements are "so obviously defamatory and damaging to [one's] reputation that they give rise to an absolute presumption both of malice and damage." *Id.* * 1.

With the damages to Plaintiff deemed presumed (as the charge of forgery, aside from amounting a charge of an "infamous crime," *Alfalo* at * 2, has subjected Plaintiff to hatred, distrust, ridicule, contempt and disgrace, and has injured him in his profession), the specific categories of damages claimed by Plaintiff include: "injury to Plaintiff's reputation, including … [the] cost of reputational repair;" "humiliation and mental anguish;" "injury to Plaintiff's health, shame, and hurt feelings;" and "punitive damages." Rivkin Decl. ¶ 46, Ex. A. All of these can be properly considered and compensated by the jury. *See*, *Carroll v. Trump*, 683 F. Supp.3d 302, 319-323,

---

[7] Forgery is deemed an "infamous crime" for defamation per se purposes. *Alfalo,* * 2.

328-334 (S.D.N.Y. 2023).  *See also Carroll v. Trump*, 2024 WL 1786366 (S.D.N.Y., Apr. 25, 2024).

Special damages are also not required for defamation by implication, pleaded by Plaintiff under Florida law. *Coton v. Televised Visual X-Ography, Inc.*, 740 F. Supp.2d 1299, 1313-14 (M.D. Fla. 2010) (awarding compensatory damages for humiliation and mental anguish to a plaintiff who prevailed on a defamation by implication claim). Defendants' error is, again, in focusing on Plaintiff's departure from ROCOR as the basis for his damages, not the damages that he actually claims.

Finally, the general principle is that causation is a question of fact for the jury.  In the only case cited by Defendants on this point, *Sharratt v. Hickey*, 799 N.Y.S.2d 299 (2d Dep't 2005), the court's ruling was on a motion for a directed verdict at the closing of a jury trial.

## CONCLUSION

For the reasons set forth herein, Defendants' motion for summary judgment should be denied in all respects.

Dated: October 1, 2024

Respectfully submitted,

/s/ *Oleg Rivkin*
Oleg Rivkin (OR1331)
RIVKIN LAW GROUP PLLC
*Attorneys for Plaintiff Alexander Belya*
48 Wall Street, Suite 1100
New York, New York 10005
201-362-4100
or@rivkinlawgroup.com