UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

ALEXANDER BELYA,

                Plaintiff,                Case no.: 1:20-cv-6597 (AS)

      -against-

METROPOLITAN HILARION, *et al.*

                Defendants.

-----------------------------------------------------------------------X


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO PRECLUDE THE TESTIMONY AT
TRIAL OF PLAINTIFF'S DAMAGES EXPERT**


Oleg Rivkin (OR1331)
RIVKIN LAW GROUP PLLC
*Attorneys for Plaintiff Alexander Belya*
48 Wall Street, Suite 1100
New York, New York 10005
201-362-4100
or@rivkinlawgroup.com

**TABLE OF CONTENTS**

INTRODUCTION ………………………………………………………………………….. 1

RELEVANT FACTS......................................................................................................................2

    A.  Plaintiff's Claims ………………………………………………………………….2

    B.  Mr. Somal's Expert Report ………………………………………………………. 3

ARGUMENT ……………………………………………………………………………… 4

    A.  Mr. Somal is Qualified to Proffer His Opinion Under Rule 702 .........................................4

    B.  Mr. Somal's Opinion Regarding Reputation Repair Campaign is Reliable ……………. 5

    C.  Mr. Somal's Opinion Regarding Plaintiff's Reputational Damages is Reliable………… 7

        1.  Website Visitors Model …………………………………………………….. 7

        2.  Impressions Model …………………………………………………………… 12

    D.  Mr. Somal's Opinion on Plaintiff's Emotional Distress is Appropriate …………………14

    E.  Damages for the First and Second Circles …………….…………………………..  16

CONCLUSION............................................................................................................................17

## TABLE OF AUTHORITIES

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) ……………………... 9

*Carroll v. Trump*, 683 F. Supp.3d 302, 316-317 (S.D.N.Y. 2023) ……………………5, 10, 11, 12

*Cary Oil, Co., Inc., v. MG Ref. & Mktg., Inc.*, 2003 WL 1878246
    (S.D.N.Y. Apr. 11, 2003) ………………………………………………………………….4

*Davis v. Carroll*, 937 F. Supp.2d 390 (S.D.N.Y. 2013) ……………………………………….  11

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 528 F. Supp. 2d 303 (S.D.N.Y. 2007) ..  15

*Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137 (1999) …………………………………11, 15

*Ludwig v. Proman*, 2023 WL 315909 (S.D. Fla. Jan. 19, 2023) …………………………….  16

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005) ……………………………………….4

*Tiffany (NJ) Inc. v. eBay, Inc*., 576 F.Supp.2d 457 (S.D.N.Y. 2007) …………………………….4

*United States v. Tin Yat Chin*, 371 F.3d 31 (2d Cir. 2004) ………..…………………………….. 4

*United States ex rel. Landis v. Tailwind Sports Corp.*, 2017 WL 5905509
    (D.D.C. Nov. 28, 2017) …………………………………………………………….. 12, 13

Plaintiff, ALEXANDER BELYA, by his counsel, hereby submits his memorandum of law in opposition to Defendants' motion to preclude the testimony of Plaintiff's damages expert, Sameer Somal.

## **INTRODUCTION**

"One of the transformative changes created by the Internet and contemporary social media is that the reputation of individuals, corporations, and organizations largely 'resides' on the Internet .... [One] can view and track and permanently document the echo book of comments, posts, tweets, and repetitions of the defamatory story as the falsehood spreads like a virulent virus across digital space." Rodney A. Smolla, 1 Law of Defamation § 1:27.50 (2d ed. Nov. 2023 update).

Plaintiff was labeled a forger, and not just any forger, but one who had fabricated and forged letters from the head of ROCOR to the head of Russian Orthodox Church. This would be roughly the equivalent of a Catholic priest who is accused of forging letters from his Cardinal to the Pope. The charge of forgery spread like wildfire on the Internet and social media, forever destroying Plaintiff's good name, one that he had spent a lifetime of church service building. A person who dedicates his life to the service of God ultimately has only his good name and reputation by which he lives. Everything else he might have pales by comparison to that. As stated by Plaintiff:

> The statement in the September 3 letter that the Metropolitan did not know anything about the letters that he himself had written, signed and delivered to Patriarch Kirill regarding my election, effectively labeled me a forger to the entire Orthodox world. Every Orthodox publication so called me in article after article, post after post. For a man who has dedicated his life to the Church to be publicly accused of forging letters from one of its highest clerics to *the* highest cleric is nothing short of spiritual murder. I saw my reputation turn to ashes

virtually overnight. I can firmly say that but for my faith that God has a reason for everything that happens to us, I would not have survived.

Dkt. 140 ¶ 72.

The thrust of Plaintiff's expert report is to explain to the jury the scope of the dissemination of the charge of forgery and to provide a framework for computing the extensive damage to Plaintiff's reputation.  As explained below, Defendants' challenges to the expert's opinion and without merit.

## RELEVANT FACTS

### A.  Plaintiff's Claims

The facts pertaining to Plaintiff's claims are set forth in Plaintiff's opposition to Defendants' motion for summary judgment, Dkt. 138-143, specifically, in the Declaration of Alexander Belya, Dkt. 140, and Plaintiff's Counterstatement of Material Facts, Dkt. 139.

To reiterate the facts directly pertinent to this motion:

Defendants had issued and published a letter in which they falsely accused Plaintiff of fabricating Metropolitan Hilarion's letters to Patriarch Kirill, forging Met. Hilarion's signature on the letters, and delivering the letters to Patr. Kirill.  Defendants disseminated the false charge of forgery online, where it spread massively through publications and social media.

Plaintiff described the resulting situation within his immediate community as follows:

> Over the next two days the situation kept getting worse.  Unknown persons began coming into the church and disseminating leaflets to parishioners and staff which accused me of fraud and forgery. Others verbally told parishioners and staff that I was a forger and a swindler and that they should leave my church. This continued for days afterwards.

Dkt. 140 ¶ 68.

> [In the subsequent weeks] I was under constant and unrelenting attack. Visits by unknown people to the Cathedral distributing leaflets and accosting parishioners and staff accusing me of forgery continued, to a point where we had to hire security.  Phone calls to me cell

phone increased in frequency and stridency. I would even receive phone calls at night, from anonymous persons cursing at me, calling me a forger and criminal.

*Id.* ¶ 71.

The categories of Plaintiff's damages are set forth in Plaintiff's Supplemental Initial Disclosures. Dkt. 143.1. These are as follows:

- Injury to Plaintiff's reputation, including, but not limited to, cost of reputational repair;
- Humiliation and mental anguish in his private and public life;
- Injury to Plaintiff's health, shame, and hurt feelings in the past and to be experienced in the future;
- Aggravation of existing medical condition; and
- Punitive damages.

*Id*. p. 5.

Plaintiff had also identified in the Initial Disclosures damages based on a decline in membership in his church. *Id.* However, this category of damages has been withdrawn by Plaintiff in his response to Defendants' summary judgment motion. Dkt. 143, ¶ 46. It is not a subject of Plaintiff's expert report and Plaintiff has not submitted any expert report on damages based on a decline in church membership.

### B. Mr. Somal's Expert Report ("Report")

The Report [Dkt. 106-12, hereinafter, "Report"] focuses on the following categories of Plaintiff's damages: Reputational damages based on the scope of the proliferation of the defamatory statements online; (Report pp. 58-63); Rehabilitation (Online Reputation Management Campaign) damages., *i.e.*, the cost of conducting a rehabilitation campaign to repair Plaintiff's reputation (*Id*. pp. 64-66); and emotional distress damages (*Id*. pp. 57-58).

**ARGUMENT**

A. **Mr. Somal is Qualified to Proffer his Opinion Under Fed. R. Evid. 702**

The threshold question under Rule 702 is whether the witness is qualified to provide expert testimony on the subject matter at hand. *Nimely v. City of New York*, 414 F.3d 381, 396, n. 11 (2d Cir. 2005). To make this determination, a court must "ascertain whether the proffered expert has the educational background or training in a relevant field." *Cary Oil, Co., Inc., v. MG Ref. & Mktg., Inc.*, 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003) (citations omitted). A witness may be qualified based on any one or more of the qualities listed in Rule 702 – knowledge, skill, expertise, training, or education. *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F.Supp.2d 457, 458 (S.D.N.Y. 2007). The court then "compare[s] the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).

Mr. Somal is a founder and CEO of Blue Ocean Global Technology ("Blue Ocean"), a company that specializes in "repairing, building, and protecting … online reputations." (Report p. 10). The company provides "comprehensive reputation management services," including "Search Engine Optimization," "Social Media Marketing" and "web development." *Id*. "When an individual or organization faces a reputation crisis," Blue Ocean steps to "mitigate[e] the impact of the defamatory content and repairing the negative reputational damages." *Id*.

Mr. Somal has published extensively in his area of expertise. Among Mr. Soman's articles are, "*The Complete Guide for Removing Damaging Content from the Internet*," "*Your Online Reputation and the Need for Monitor it*," "*Internet Defamation: How an Expert Witness Can Protect You in Court*;" "*Social Media and Online Defamation – Control the Narrative*," "*Sentiment Analysis to Build and Monitor Your Online Reptation*," "*Internet Defamation and*

4

*Cyberbullying on the Rise,*" "*Cases of Online Defamation and Ways to Handle It,*" "*How to Remove Unwanted Links from Google Search*," "*Online Reputation Management*," "*Personal Reputation Management Service for Individuals Today,*" "*How Much Does Online Reputation Management Cost*," "*All About Online Defamation and Protecting Yourself from it,*" "*Protecting Your Reputation in a post fact-check world,*" "*Be Prepared to respond to Digital Reputation Crisis,*" "*Aiming for a Digital Transformation? Don't forget your online reputation,*" "*Online Reputation Marketing: 7 Solid Tips for Social Media,*" "*Have Controversial Opinions on the Current Crisis? Here's how to Manage You online reputation,*" "*Why Your Online Reputation Matters,*" "*Reverse SEO for Law Firms: How to Protect Yourself and Your Clients Against Negative Content*," and many others.  Exh. A (Appendix A, pp. 78-79, 88-119).

Mr. Somal has been engaged as an expert witness in a number of cases. Ex. A (Appendix A, pp. 81-82, 123-125).  He has also taught CLE courses in his area of expertise:  "*Introduction to Online Reputation Management (ORM) for Attorneys and Clients*," and "*Advanced Online Reputation Management (ORM) for Attorneys and Clients.*" *Id*. p. 85-87. Mr. Somal is a sought-after speaker in his area of expertise. *Id*. p. 80.

Mr. Somal's "knowledge, skill and expertise" in the area of assessing and quantifying reputational damages from online defamation are more than sufficient to satisfy the Rule 702 standard.

B. **Mr. Somal's Opinion Regarding Reputation Repair Campaign is Reliable**

Reputation repair damages are standard in online defamation cases.  *See, Carroll v. Trump*, 683 F. Supp.3d 302, 316-317, 320-321 (S.D.N.Y. 2023).

In Section 5 his Report, Mr. Somal explains in great detail the process of Online Reputation Management (ORM).  Report pp. 36-48.  This includes a detailed explanation of each of the stages

5

of ORM, including suppression and Search Engine Optimization ("SEO").  He also explains what the ORM will entail with respect to the Plaintiff:

> The ORM plan required to rebuild father Alexander's reputation will integrate numerous disciplines which include: SEO, public relations, content marketing, social media marketing and monitoring, community management, web analytics, with psychology and website engineering integrated with relevant content, which is calculated to create a positive impact on a digital presence on social media, online review websites, forums and blogs.

Report p. 38.

> As to suppression and reverse SEO, Mr. Somal opines that:
> Putting this together, suppression and reverse SEO will be particularly difficult and limiting in Father Alexander's case because (1) he had little preexisting web presence of content; (2) the original negative content generated by Defendants' false statements was massive; (3) the negative content has accumulated and remained over more than a three years period, and (4) the key to "fixing" this is generating new content to gradually overtake the old negative content, but as a private individual Father Alexander has little opportunity to do so.

Report p. 41.

In Section 6 of the Report (Assessment of Damages), Mr. Somal further explains why Plaintiff's digital reputation repair campaign would be "complicated and difficult."  Report p. 54-56. Mr. Somal then explains what specifically would be involved in a rehabilitation campaign for the Plaintiff and the costs involved. Report pp. 64-65. He opines that the campaign would need to run between 18 and 24 months, at a cost of $26,500 per month, with the total cost in the range of $477,000 and 636,000.  Report p. 64.[1]

---

[1] Notably, in *Carroll v. Trump, supra*, Plaintiff's expert estimated that the repair campaign would cost in the range of $368,000 and 2.7 million.  683 F. Supp.3d at 317.

Defendants' claim that the 18 to 24 months timeframe is "arbitrary" is wrong. The length of the campaign is based on Mr. Somal's extensive expertise in designing and running precisely these kinds of reputational repair campaigns. That is what his company, Blue Ocean, does. It is well within the purview of an expert on reputational repair campaigns to opine on the scope, length and costs of a given campaign.

### C. Mr. Somal's Opinion Regarding Plaintiff's Reputational Damages is Reliable

To estimate reputational damages suffered by Plaintiff from the false charge of forgery, Mr. Somal analyzed the proliferation the forgery charge on the Internet. Mr. Somal discusses the factors involved in his analysis – subjectivity, context and audience, long-term effects. Report pp. 58-59. He states: "Putting these factors together, though I cannot calculate a precise amount of damages, I can provide a structure for assessing with benchmarks." Report, p. 60.

The structure provided by Mr. Somal includes three rings: The inner circle (family and close friends); the secondary circle (acquaintances, neighbors, community and church members, etc.,) and the third circle (millions of strangers). Report, pp. 60-61. Mr. Somal explains the specifics of each circle and the differences between them.

With respect to the third circle, Mr. Somal uses two models to estimate the damages: "One based on website visitors and the other based on associated cost of impressions." Report, p. 61. Mr. Somal emphasizes that he takes a conservative approach to each. *Id*.

#### 1. Website Visitor Model

Mr. Somal's methodology for analyzing the website visitors involved analyzing the traffic on "7 online news websites, 3 legal case databases, 4 religious news platforms, 1 social media platform, and 6 additional information sources." Report, p. 61. Mr. Somal utilized Semrush data to determined that a significant number of visitors engaged with the content across platforms. *Id*.

7

Semrush is a tool that provides the following data about any website: keyword rankings, keyword analytics, website traffic, backlinks, website visitor engagement, social media engagement and traffic. Semrush databased includes 142 geographic databases, 25 million keywords, 808 million domains, 500TB of raw website traffic data for 190 countries and regions, and 43 trillion backlinks. *www.semrush.com*.

Mr. Somal then conservatively estimated that only a small fraction, specifically 0.1% of these total visitors, were exposed to the "forgery" posts. *Id.* Limiting his analysis to traffic in the U.S. and Russia only, Mr. Somal estimated the total number of website visitors to be 866,086,742. Applying the conservative figure of 0.1% as those who have been exposed to the forgery posts, Mr. Somal arrived at the number 866,086. Report, p. 62. "Adhering to a conservative approach," he applied a "modest $5 value per person affected by the harmful narrative," to arrive at a damages amount of $4,330,433. *Id*.

Defendants argue that a large percentage of the content considered by Mr. Somal came from one website, Reddit. This is not a basis on which to exclude Mr. Somal's testimony. Mr. Somal's decision on which sources to include in his sample was based on his expertise and extensive work in repairing, building and protecting online reputations. It is axiomatic that a specialist in this field is qualified to assess and estimate the proliferation of the harmful online content, as this is part and parcel, indeed, the starting point, of the work he does for his clients: repairing and protecting their online reputations. Any objection that the Defendants may have to the specific websites which were selected by Mr. Somal for his sample goes to the weight of his opinion, not admissibility. Defendants do not challenge that all of the websites, including Reddit, contained defamatory content. The fact that one of them had greater traffic than others is a not a basis on which to exclude Mr. Somal's testimony. "The judge should only exclude the evidence if

8

the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions. This limitation on when evidence should be excluded accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). Mr. Somal's inclusion of Reddit in its sample does not a constitute a "flaw" warranting exclusion of his testimony. Defendants are free to make their argument to the jury, which would go to the weight, not admissibility.

Defendants' further claim that Mr. Somal's multiplier of 0.1% to arrive at a number of people who were exposed to the forgery content is "made up," because it could have been a different, even higher number. The multiplier selected by Mr. Somal is, again, based on his extensive experience in repairing, building and protecting online reputations of his clients. It is well within Mr. Somal's expertise to make assessments and estimates of the number of people who viewed harmful information about his clients. Any campaign to repair a person's online reputation – which is what Mr. Somal does – begins with the assessment of the harmful content's proliferation. One cannot count every person who has read every defamatory post and article. Based on his experience in repairing and protecting online reputations Mr. Somal applied what he deems to be conservative multiplier of 0.1%. It is not a "made up" number, but one that is rooted in Mr. Soma's "knowledge, skill and expertise." Any challenge to this figure goes to the weight of Mr. Somal's opinion, not admissibility. There is no basis to deem this a "flaw" at all, much less one that is "large enough" to warrant precluding Mr. Somal's testimony. *Amorgianos, supra.*

Defendants' also challenge the $5 amount that Mr. Somal assigns as damages for each person who was affected by defamatory content. Plaintiff does not dispute that the ultimate

decision as to the amount of the damages to Plaintiff rests with the jury. As the court stated in

*Carroll v. Trump*:

> The question on compensatory damages was broken down into several parts. First, it asked whether Ms. Carroll proved by a preponderance of the evidence that Ms. Carroll was injured as a result of Mr. Trump's publication of the October 12, 2022 statement. If so, it asked that the jury (1) insert a dollar amount for any damages other than the reputation repair program, and (2) insert a dollar amount for any damages for the reputational repair program only. The Court instructed the jury that:
>
> "In the event Mr. Trump is liable for defamation you will award an amount that, in the exercise of your good judgment and common sense, you decide is fair and just compensation for the injury to the plaintiff's reputation and the humiliation and mental anguish in her public and private life which you decide was caused by the defendant's statement. In fixing that amount, if you fix one, you should consider the plaintiff's standing in the community, the nature of Mr. Trump's statement made about Ms. Carroll, the extent to which the statement was circulated, the tendency of the statement to injure a person such as Ms. Carroll, and all of the other facts and circumstances in the case. These damages can't be proved with mathematical certainty. Fair compensation may vary, ranging from one dollar, if you decide that there was no injury, to a substantial sum if you decide that there was substantial injury.
>
> … I have divided the damages determination into two parts .... The first part of Question 9, right at the top, the yes/no question asks you to decide whether Ms. Carroll has proved by a preponderance of the evidence that she was injured in any of the respects I just described.... If the answer is 'yes,' you first will fill in the amount you award for all defamation damages, excluding the reputation repair program. You will leave that out if you put in a figure in the first blank. That was of course the testimony of Professor Humphreys [Plaintiff's damages expert]. Second, you will fill in the amount, if any, that you award for the reputation repair program only."

683 F. Supp.3d 320-321.

While the amount of damages rests with the jury's "good judgment and common sense," there is nothing that bars a qualified expert from stating his opinion as to what constitutes a reasonable amount per person who viewed the defamatory content, particularly in a situation where damages cannot be computed with mathematical certainty. Mr. Somal is an expert in the field of defamation, more specifically, in the detrimental consequences of defamation on people like to the Plaintiff. Mr. Somal has acted as an expert in numerous cases. He has published extensively on the subject and has taught CLE courses on this very topic. Mr. Somal has an extensive amount of

"specialized knowledge" and unique work experience to render him qualified to opine on the amount of damages under Rule 702.

An expert may be qualified on the basis of his or her experience alone. *See* Rule 702 Adv. Comm. Note (2000) ("[T]he text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominate, if not sole basis for a great deal of reliable expert testimony"); *Kumho Tire Co. v. Carmichael*, 526 U.S.137, 156 (1999) ("no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience"); *Davis v. Carroll*, 937 F. Supp.2d 390, 412 (S.D.N.Y. 2013) ("Sometimes, expert testimony does not rest on traditional scientific methods. In such cases, where a proposed expert witness bases her testimony on practical experience rather than scientific analysis, courts recognize that experts of all kinds tie observations to conclusions through … general truths derived from … specialized experience").

Reputational damages in a defamation case are assessed in the light of a number of factors, including, as stated in *Carroll v. Trump,* plaintiff's standing in the community, the nature of the statement, the extent to which the statement was circulated, the tendency of the statement to injure a person such as the Plaintiff, and all of the other facts and circumstances in the case. These are all factors in the assessment and evaluation of which Mr. Somal has unique specialized knowledge and experience, given his extensive work with victims of defamation, including his work on conducting reputational repair programs for his clients. Based on that specialized knowledge, Mr. Somal should be allowed to proffer his opinion as to the appropriate dollar amount for each person who was exposed to the defamatory content.

2. **Impressions Model**

Mr. Somal's alternate approach for assessing Plaintiff's reputational damages is the Impressions Model. Impressions are a metric that counts how many times internet viewers view particular content. The Impression Model calculates every time a user opens an app or website and the text in question is visible.

Far from being "specious," as Defendants call it, the Impressions Model has been well accepted by courts in assessing online defamation damages. In *United States ex rel. Landis v. Tailwind Sports Corp.*, 2017 WL 5905509 * 7-8 (D.D.C. Nov. 28, 2017), the court addressed a challenge to the application of the impression model. The court's reasoning is instructive:

> Armstrong complains that Gerbrandt "merely states that his 41,912 Internet articles translate into 154.4 billion impressions ... but provides no meaningful explanation for how he made those calculations." … But Gerbrandt's expert report states that, for Internet articles, he consulted Cision database—which archives traditional print and digital media—with "a series of search terms ... connecting Mr. Armstrong with the use of performance enhancing drugs and blood doping." ... The search was additionally "constrained to only those news items and articles that specifically mentioned or identified the USPS in some fashion." Cision also provided the "reach" of each article, which is simply "the unique visitors per month to the website on which the article is posted" for an online article. Based on this information, Gerbrandt was able to calculate the "media impressions" by summing the number of articles multiplied by the reach of each article. Clearly, Gerbrandt *did* provide an explanation of the method he used in reaching the total impressions for Internet articles and the other forms of media in his report. *His process has an underlying methodology that is sound and reasonable.*

(references to record omitted). The court went on to say that criticisms of the method, "such as that impressions may be of different length, or that different media has different advantages or disadvantages … go to the weight … not admissibility." *Id*. A similar challenge to the impression model was made by the defendant in *Freeman v. Giuliani*, 2024 WL 1616675 *18-20 (D.D.C. Apr. 15, 2024), and was similarly rejected by the court, relying, in part, on *Landis*. The impression model was also unsuccessfully challenged by the defendant and applied by Plaintiff's expert in *Carroll v. Trump, supra.*

Mr. Somal's impression model analysis essentially mirror's the court's description of the analysis in *Landis*. Mr. Somal clearly explains how he applied the impression model approach. He estimated the number of web impressions by using data from Semrush, a company that provides website traffic statistics, including unique monthly visitors. He then transformed this number to daily visitors by dividing unique monthly visitors by 30. Further, to account for people who visit the site but do not perform any other action, Mr. Somal multiplied daily visitors by 1 minus the bounce rate. The resulting equation is *Web Impressions = (Unique Monthly Visitors/30*(1-bounce rate)*.

Further, taking a conservative approach, Mr. Somal excluded Social Media impressions and traditional TV source exposure. The resulting number was calculated by Mr. Somal as 2,922,057,385 total impressions of the defamatory content. Report, p. 62. To arrive at a damages amount, Mr. Somal applied the Cost per Impression number by averaging of $0.001 and $0.002, noting that he was taking a conservative low-end approach. *Id*. The average cost to reach 1,000 people online ranges from $3 to $10, which translates to $0.003 to $0.010 per impression. www.topdraw.com. Mr. Somal's figure of the average of $0.001 and $0.002 (*i.e.*, $0.0015) is well below the average CPI.

Using the cost per impression (CPI) as a measure of damages once the total number of impressions is calculated is amply reasonable. The cost/benefit analysis to a person or company who wants to get its content viewed online is based on a calculus designed to reach and persuade a certain number of people. It is rational and reasonable to apply the same calculus (at least as a baseline) when the content at issue is defamatory, that is when the persons who are reached by the content are being "persuaded" that the plaintiff is a crook and a forger. The damage to Plaintiff's reputation is directly related to the number of people who have been exposed to and persuaded by

the defamatory content.

As is the case with the website visitor model, it would of course be up to the jury to arrive at an amount which would properly compensate Plaintiff for the total impressions of the defamatory content. But it is well within Mr. Somal's expertise to opine that using the CPI as a framework for calculating damages based on impressions is reasonable and appropriate. It would certainly be helpful and relevant to the jury in assessing damages based on the Impressions Model to know what the value of impressions is to someone who pays to generate them. Mr. Somal's opinion is that the cost of generating positive impressions for profit is relevant to the determination of the damage caused by negative impressions, and that, in fact, the multiplier he applies is substantially lower than the average CPI. As is the case with the website visitor model, this opinion is well within Mr. Somal's specialized experience.

### D. **Mr. Somal's Opinion on Plaintiff's Emotional Distress is Appropriate**

Mr. Somal opines that "the false statements and subsequent media storm have inflicted significant and lasting damage to Father Alexander's mental well-being and overall quality of life." Report, p. 57. Mr. Somal bases this opinion, first, on his "work in dozens of defamation cases and helping victims of false statements repair their digital presence; Second, on literature on the subject: "*Defamation itself can be powerful evidence for an emotional distress claim. Some allegations are so heinous that any reasonable person would accept that they are inherently stressful. 'Forger' 'falsifying documents,' and 'deception' are hot-button accusations. Perhaps little more is needed to demonstrate the emotional distress caused by this kind of defamation;*" *Id.*; Third, on interviews with several of Plaintiff's closest church members, who all said that after the accusation of forgery, Plaintiff could not eat, sleep, was withdrawn and depressed, communicated less with people, and would not leave his office; *Id.*; and Fourth, on the evaluation of a psychiatrist

14

who has evaluated the Plaintiff and concluded that he "experiences numerous psychological symptoms, including nightmares and insomnia, detachment from family and friends, etc., all stemming from the false accusation of being a forger, and has been "diagnosed … with post traumatic stress disorder (PTSD) and depression, stemming from the traumatic experience of being labeled a forger by defendants." *Id*., p. 58

Mr. Somal is not a physician or a psychiatrist. However, there is no rule that limits expert testimony as to emotional distress to a person with a medical degree. The standard remains the same as it is with all experts: Whether the expert has specialized experience sufficient to opine on the subject. *Kumho Tire, supra*.

Mr. Somal's opinion is limited to saying that emotional distress damages are "merited and should be considered" given the "highly personal charge of forgery leveled against Father Alexander, and given the conclusion of a psychiatrist that this has caused him to suffer from PTSD and depression for more than four years, and experience devastating and life-altering symptoms."

Ms. Somal's extensive experience is in assisting victims of internet defamation, which includes the deleterious and often devastating emotional effects on people whose lives have been ruined by mass dissemination of falsehoods about them. While Mr. Somal may not be qualified to himself diagnose a person with a specific psychological ailment, "expert testimony on emotional distress is not required" for the jury to consider it and award damages for it. *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig*., 528 F. Supp. 2d 303, 320 (S.D.N.Y. 2007).

"An expert can rely on a whole variety of things, including other experts, fact experts and other facts." *Freeman v. Giuliani, supra* at * 18. Fed. R. Evid. 703 expressly permits experts to base their opinions on "facts or data in the case that the expert has been made aware of or personally observed." Mr. Somal has been made aware of the observations of several people among those

15

closest to the Plaintiff regarding the Plaintiff's condition in the aftermath of the defamation. He has also been made aware of Plaintiff's diagnosis by a psychiatrist. Based on these facts, as well as on his own experience with the effects of online defamation on people, his clients, he has concluded that emotional distress damages are warranted and should be considered. This opinion complies with the requirements of Rule 702.

Defendants make much of *Ludwig v. Proman*, 2023 WL 315909 (S.D. Fla. Jan. 19, 2023). In that case, however, Mr. Somal's methodology, specifically as to emotional distress damages, was deemed "not sufficiently reliable," because it was based on "collecting and analyzing past defamation cases." No such methodology of collecting and analyzing past defamation cases is proffered by Mr. Somal here. Far from it. The *Ludwig* decision does not discuss what other opinions, if any, were included in Mr. Somal's report in that case, or were challenged by the defendants. (Notably, the court allowed Mr. Somal's testimony on reputational repair because he was "qualified to testify on the issue.")

### E. Damages for the First and Second Circles

As stated above, Mr. Somal's structure for analyzing the dissemination of the defamatory charge includes three circles: the inner circle (family and close friends); the secondary circle (acquaintances, neighbors, community and church members, etc.,) and the third circle (millions of strangers), which is discussed above. Report, pp. 60-61. Defendants do not challenge the basic three-circle structure, but do challenge the damage amounts given by Mr. Somal for the first and second circle.

Plaintiff is willing to withdraw the portion of Report that assigns a specific figure of damages for the dissemination of the forgery charge within the first and second circles. Plaintiff is content for Mr. Somal to present to the jury the three-circle analytical structure and let the jury

16

decide what amount of damages would be appropriate for the first and second circles.

## CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

Dated: October 11, 2024

                                          Respectfully submitted,

                                          /s/ *Oleg Rivkin*
                                        Oleg Rivkin (OR1331)
                                        RIVKIN LAW GROUP PLLC
                                        *Attorneys for Plaintiff Alexander Belya*
                                        48 Wall Street, Suite 1100
                                        New York, New York 10005
                                        201-362-4100
                                        or@rivkinlawgroup.com