UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXANDER BELYA,<br><br>                    Plaintiff,<br><br>         -against-<br><br>HILARION KAPRAL a/k/a METROPOLITAN HILARION, NICHOLAS OLKHOVSKIY, VICTOR POTAPOV, SERGE LUKIANOV, DAVID STRAUT, ALEXANDRE ANTCHOUTINE, GEORGE TEMIDIS, SERAFIM GAN, PAVEL LOUKIANOFF, BORIS DMITRIEFF, MARK MANCUSO, EASTERN AMERICAN DIOCESE OF THE RUSSIAN ORTHODOX CHURCH OUTSIDE OF RUSSIA, and THE SYNOD OF BISHOPS OF THE RUSSIAN ORTHODOX CHURCH OUTSIDE OF RUSSIA,<br><br>                    Defendants. | 20-cv-6597 (AS)<br><br>OPINION AND ORDER |

ARUN SUBRAMANIAN, United States District Judge:

Plaintiff Alexander Belya was once a priest in the Russian Orthodox Church Outside of Russia (ROCOR for short). During his time with ROCOR, Belya led one of the order's churches in Miami. In 2019, word came down from Moscow that Belya had been elevated to Bishop of Miami, an announcement that came as a surprise to ROCOR's senior clergy. They hadn't elected Belya, a necessary step in the elevation of any American bishop. Sensing foul play, they investigated and sent a letter to the Synod—the executive committee of ROCOR's highest leadership council—about the situation. The letter informed the Synod that Belya's election never happened and that two prior letters to Moscow, which purported to confirm Belya's election, were "irregular" and lacked the usual markers of sacred church communications.

News of the ROCOR letter got out and went viral in the religious press. The reports accused Belya of old-fashioned forgery. With his reputation ruined, Belya is now suing everyone who drafted and signed the ROCOR letter, as well as ROCOR itself. Belya says the letter defamed him by implying that he forged the two earlier letters about his election to bishop, an allegation that the religious press picked up and ran with.

Long before this case was reassigned to me, it raised a stir at the Second Circuit. After their motion to dismiss was denied, defendants appealed. They argued that Belya's claims were barred by so-called "church autonomy," a doctrine of abstention rooted in the First Amendment's religion

clauses. A panel of the Second Circuit declined the appeal on jurisdictional grounds, noting that at the pleadings stage, it wasn't clear that the case would implicate church-autonomy concerns. *See Belya v. Kapral*, 45 F.4th 621, 634 (2d Cir. 2022) ("Decidedly non-ecclesiastical questions of fact remain … and would not require a fact-finder to delve into matters of faith and doctrine."). The full court denied defendants' petition to rehear the appeal *en banc*. *Belya v. Kapral*, 59 F.4th 570, 572 (2d Cir. 2023). But in dissent, Judge Park—joined by several other circuit judges—contended that Belya's claims were squarely in the church-autonomy doctrine's crosshairs. *Id.* at 581–82 ("[A]ccepting Belya's styling of the case as a defamation claim, and reasoning that such a claim can be decided with neutral principles of law, elevates form over substance . . . ."). The case came back to this Court and the parties completed discovery.

Defendants now move for summary judgment. And with the cards all on the table, a couple things are clear. First, putting aside the constitutional issues that dominate the parties' briefing, Belya's claims fail on routine state-law grounds. Second, even if Belya's claims could otherwise proceed, a trial in this case would drag the Court and jury into matters of faith, spiritual doctrine, and internal church governance—precisely what the church-autonomy doctrine is designed to prevent. For these reasons and those stated below, defendants' motion is GRANTED.

## BACKGROUND

This case involves four letters. The first was sent on December 10, 2018, by defendant Hilarion Kapral, ROCOR's leader, to Patriarch Kirill, leader of the Russian Orthodox Church in Russia. *See* Dkt. 138 ¶ 3. (For the remainder of this opinion, the Court refers to Kapral as "Metropolitan Hilarion," his ROCOR title.) The letter said:

> I am happy to share the joyful news – by a majority vote two Vicar Bishops have been elected to the diocese entrusted to me. They are most worthy candidates.
>
> ....
>
> [Candidates include] Archimandrite Alexander (Belya) ... elected as the Bishop of Miami.

Dkt. 114-6 at 2; Dkt. 159 ¶ 81.

In early January, a second letter was sent by ROCOR Archbishop Gabriel to Metropolitan Hilarion, confirming that Belya met the eligibility criteria to become a ROCOR bishop. Dkt. 138 ¶¶ 110, 137–38. Following that letter, on January 11, 2019, Metropolitan Hilarion wrote to Patriarch Kirill again:

> I hereby ask Your Holiness to approve [Belya's] candidacy at the next meeting of the Holy Synod of the Russian Orthodox Church.

Dkt. 114-8 at 2. The parties dispute the bona fides of these three letters, including whether Metropolitan Hilarion authored the December and January letters to Patriarch Kirill. On August 30, 2019, Moscow publicly announced Belya's elevation to Bishop of Miami. *See* Dkt. 138 ¶ 94.

That brings us to the fourth and final letter, which is at the heart of this case. This letter, dated September 3, 2019, was from senior ROCOR clergy and addressed to Metropolitan Hilarion and

the Synod. Dkt. 143-3. It was signed by defendants Olkhovskiy, Potapov, Lukianov, Straut, Antchoutine, Temidis, and Mancuso. *Id.* at 3; Dkt. 123 ¶ 59. This letter said (with the key language bolded):

Your Eminences, Your Graces!

The confirmation by the Holy Synod of the Russian Orthodox Church of "the election of Archimandrite Alexander (Belya) as Bishop of Miami, vicar of the Eastern American diocese" and the preliminary study of the latest complaints received from Florida concerning him, resulted in serious discussion at the meeting of the Diocesan Council of the Eastern American Diocese, which was held on Tuesday, September 3rd of this year. With a sense of responsibility for our Church life, we feel we must respectfully and deferentially bring forward this concern and report the following to the Synod of Bishops.

1) **It turns out that Metropolitan Hilarion of Eastern America & New York knew nothing about the written appeals directed to Moscow containing a request for confirmation of the "episcopal election" of the Archimandrite by the Synod of Bishops (which never took place).** The Diocesan Council members have examined the content of these letters, which, as stated by His Eminence, were drawn up in an irregular manner. For example, the "request" does not contain the appropriate citation from the decision of the Synod of Bishops, nor does it contain a biography of the cleric "elected."

2) The letter submitted with the signature of Archbishop Gabriel of Montreal & Canada raises doubts, as well, as it was not issued numbered or dated. In addition, it was not printed on the official letterhead of the Most Reverend Gabriel. Nevertheless, we understand that the Holy Synod, having received the appeal supposedly from our First Hierarch, had no reason to doubt the authenticity of the written request of His Eminence.

3) Unfortunately, in the course of the initial examination of the complaints against Archimandrite Alexander (Belya), facts were confirmed about his breaking of the seal of Confession, and of his use of information obtained during Confession and confidential discussions for the purpose of denigrating parishioners and of controlling them.

4) To date, the members of the Diocesan Council do not have any information regarding the ownership of the property of the Cathedral of Blessed Matrona of Moscow in Miami and St. Nicholas Monastery, both headed by Archimandrite Alexander. Are they organized according to the norms of the Russian Church Abroad and the legal requirements applicable to "non-profit" organizations? Do the cathedral parish and the monastery conform to ROCOR's "Normal Parish Bylaws" and the "Statutes for Monasteries" respectively? We are disturbed by the total lack of financial (and other) accountability. It is known that the commercial activity of the rector of the Cathedral of Blessed Matrona of Moscow in Miami and of its church warden, Fr. Alexander's brother Ivan, has for many years caused many questions to be asked among benefactors and parishioners.

5) Preliminary study of all of the complaints has shown a whole range of unseemly behavior of both the rector and church warden, public criticism of the Hierarchy, and widespread violation of legal norms, regulatory and criminal, requiring specific investigation of their activity.

From all this, it is clear that not only are the above-mentioned petition letters invalid, but the candidacy of Archimandrite Alexander (Belya) for the episcopacy cannot possibly be given serious consideration, due to the current situation in the Florida Deanery and the submission of so many serious complaints against him. Thereby, we humbly appeal to our ruling hierarch to suspend Archimandrite Alexander (Belya) from performing any clerical functions, to temporarily remove him and the warden of the Cathedral of the Blessed Matrona of Moscow in Miami and St. Nicholas Monastery from all duties and church obediences until the completion of the investigation, and, to formally open such an investigation. We ask the eminent members of the Synod of Bishops to remove the candidacy of Archimandrite Alexander (Belya) permanently and to never consider it again in the future. We also ask that the Synod to ascertain the circumstances of the confirmation of the non-existent "election."

We ask for your holy prayers and blessing of our efforts for the glory of God and for the benefit of our Church life. We remain the unworthy and prayerful servants of Your Eminences and Graces[.]

Dkt. 143-3 at 1–3 (emphasis added).

Olkhovskiy (with the blessing of the other defendants) delivered the September 3 letter to the Synod. Dkt. 138 ¶ 170. Defendants say they didn't share it with anyone beyond that. Dkt. 112 ¶ 171. Belya disagrees. Dkt. 138 ¶¶ 171–74.

What neither side denies is that somehow, on September 15, 2019, the September 3 letter was publicly posted on Facebook by ROCOR church member Olga Tsibin. *See* Dkt. 148 ¶ 123; Dkt. 143-7. Tsibin's post contained a copy of the September 3 letter and her personal commentary on the incident: "Forgery of documents, bribes, disobedience to superiors, money laundering, endless 'charitable' funds, threats, blackmail, nothing will stop [Belya]." *Id.* at 3. Following Tsibin's post, various religious news sites published articles calling the December and January letters "forger[ies]" and stating that Belya "managed to get his name sent to Moscow as a nominee for vicar bishop of Miami in ROCOR despite the fact that he had not been nominated." *See* Dkt. 143-14; Dkt. 159 ¶ 164.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if a reasonable jury could find for either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). And a fact is "material" if it could "affect the outcome." *Id.* at 248. The Court views the record "in the light most favorable to the non-movant." *Williams v. MTA Bus Co.*, 44 F.4th 115, 126 (2d Cir. 2022) (cleaned up). But if the non-movant will bear

4

the burden of proof on an issue at trial, it must point to some evidence supporting the "essential element[s]" of its position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–26 (1986).

## DISCUSSION

### I. New York law applies.

The parties disagree on whether New York or Florida law governs Belya's claims. Because this Court sits in New York, New York's choice-of-law rules apply. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). As to most of the issues raised, there's no conflict between New York and Florida law. *See Kinsey v. New York Times Co.*, 991 F.3d 171, 176 (2d Cir. 2021) ("Under New York choice-of-law rules, the first step in any choice of law inquiry is to determine whether there is an actual conflict between the rules of the relevant jurisdictions." (quotations omitted)).

If there were a conflict, New York law would win out. "In tort actions, New York courts apply the substantive law of the jurisdiction that has the most significant interest in 'the specific issue raised in the litigation.'" *Adelson v. Harris*, 973 F. Supp. 2d 467, 476 (S.D.N.Y. 2013) (quoting *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 683 (N.Y. 1985)). In a defamation action, that jurisdiction is often the one where the plaintiff is domiciled, on the theory that the plaintiff is injured where she lives. *See Lee v. Bankers Tr. Co.*, 166 F.3d 540, 545 (2d Cir. 1999). But in a case where a defamatory statement was published nationally—like this one—New York courts "weigh all the factors that might impact on the interests of various states in the litigation . . . including where the plaintiff suffered the greatest injury; where the statements emanated and were broadcast; where the activities to which the allegedly defamatory statements refer took place; and the policy interests of the states whose law might apply." *Kinsey*, 991 F.3d at 177 (cleaned up).

While Belya lives in Florida, on his own admission he has suffered reputational harm nationally (and internationally). *See* Dkt. 140 ¶ 72 (defamatory statement "effectively labeled me a forger to the entire Orthodox world . . . . I saw my reputation turn to ashes virtually overnight"). The defamatory statement was broadcast just as widely. *See id.* ("Every Orthodox publication so called me [a forger] in article after article, post after post."); Dkt. 148 ¶ 165 ("The charge of forgery spread massively through the internet."); ¶ 167 ("Using an 'impression model,' which estimates the number of web impressions generated by the harmful content, Plaintiff's expert estimated the total number of 'impressions' of Plaintiff's 'forgery' to be 2,922,057,385.").

And the other factors show that New York has the strongest interest in this case. Again in Belya's own words, "New York City was the epicenter" of the events at issue in this case. Dkt. 39 at 2. Most importantly, Metropolitan Hilarion's residence, office, and church seat were in New York. *Id.* at 2. And the church seats of several other defendants are also in New York. *See* Dkt. 143-3 at 3 (noting church seats in Manhattan and "Long Island & the Hudson Valley"). While Florida has an interest in protecting its citizens from tortious conduct, New York has an equal—if not stronger—interest in protecting the First Amendment rights of its citizens. *See Kinsey*, 991

F.3d at 178 (declining to apply law of plaintiff's domicile where New York had greater contacts and "strong policy interests in regulating the conduct of its citizens").

Even if Florida law applied, the result would still be the same: Belya's suit can't proceed to trial. On the basic elements of defamation, the two states' laws are largely in alignment. And under neither state's law can Belya show, for instance, an actionable publication on defendants' part.

## II. Belya's defamation claim fails on the merits.

"Under New York law a defamation plaintiff must establish five elements: (1) a written defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019).[1] Belya can show neither publication nor actionability.

As this case progressed, Belya narrowed the alleged defamatory statements at issue. He did so to dodge defendants' substantial church-autonomy arguments. For instance, Belya has dropped his claim that the September 3 letter accused him of "fabricating" the results of his election as bishop. *Compare* Dkt. 48 ¶ 45 ("The September 3 Letter also accused Alexander of fabricating the results of the ROCOR Synod's election on December 6-10, 2018."), *with* Dkt. 140 ¶ 74 ("I am not asking the Court to make any ruling on whether or not I was elected Bishop."). And Belya has likewise dropped his claim that the September 3 letter accused him of forging the third letter from Archbishop Gabriel about meeting the eligibility criteria for bishop. *Compare* Dkt. 48 ¶ 46 ("The September 3 Letter also accused Alexander of falsifying the letter from Archbishop [Gabriel] of Montreal and Canada to Hilarion, in which he confirmed that all of the questions posed to Alexander have been 'corrected' and stated that he saw 'no obstacles to approve the date of consecration.'"), *with* Dkt. 140 ¶ 74 ("I am only asking the Court to decide whether the publicly disseminated charge that I had forged the Metropolitan's signatures on his letters to the Patriarch (and therefore concocted the contents of the letters), is false.").

Now Belya says he "want[s] . . . to clear [his] name from . . . one accusation": that he forged the December 10 and January 11 letters that purported to be from Metropolitan Hilarion. Dkt. 140 ¶ 74. To that end, he points to just one allegedly defamatory statement from the September 3 letter:

> It turns out that Metropolitan Hilarion of Eastern America & New York knew nothing about the written appeals directed to Moscow containing a request for confirmation of the "episcopal election" of the Archimandrite by the Synod of Bishops.

---

[1] Defamation under Florida law has the same elements, just listed in a different order. *See Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) ("Defamation under Florida law has these five elements: (1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory.").

6

Dkt. 138 ¶ 163 (emphasis removed); *see also* Dkt. 142 at 24 ("The only statement that is challenged is that Met. Hilarion 'knew nothing about the written appeals directed to Moscow containing a request of the episcopal election [of the plaintiff] by the Synod of Bishops.'").

### A. The defamatory statement concerns Belya.

According to Belya, the defamatory statement "de facto accused" him of forging the December 10 and January 11 letters, fabricating their contents, and transmitting both to Patriarch Kirill. Dkt. 138 ¶ 163; *see also* Dkt. 142 at 19 ("By publicly announcing that Met. Hilarion knew nothing of the two letters bearing his own handwritten signature and his seal, the Defendants accused the Plaintiff not only of forging the signature, but of fabricating every statement in the letters and of delivering the fabricated and forged letters to Patr. Kirill, or arranging for someone to do so.").

Defendants say the September 3 letter made no such accusation against Belya. They note that the statement Belya picks out mentions him nowhere; by its own terms, it's discussing what Metropolitan Hilarion knew about the December 10 and January 11 letters. On top of that, defendants point out that the letter doesn't say anything about forgery or fabrication. Instead, it merely notes irregularities—which Belya doesn't deny and doesn't argue are material to his defamation claim. *See, e.g.,* Dkt. 138 ¶ 114 (Belya conceding that "whether Metropolitan Hilarion's letters … were irregular in form or substance" is not a "material issue[] in the case"). So to defendants, the part of the September 3 letter with which Belya takes issue can't be "of and concerning" him, much less be charging him with forgery.

Belya has the better end of this issue. "[I]t is not necessary for the plaintiffs to be named in the publication." *Three Amigos SJL Rest., Inc. v. CBS News Inc.*, 65 N.E.3d 35, 37 (N.Y. 2016). Reading the statement in context—which is required when considering a defamation claim, *see Levin v. McPhee*, 119 F.3d 189, 195 (2d Cir. 1997)—it's hard to see defendants as doing anything other than suggesting that Belya was to blame for the December 10 and January 11 letters. The first sentence of the September 3 letter identifies Belya's surprise election as Bishop of Miami and a "preliminary study of the latest complaints" about him as what motivated defendants to write the letter. Dkt. 143-3 at 1. The rest of the letter keeps its focus on Belya. In the paragraphs following the statement at issue, the letter delves further into the complaints against Belya (which reveal a "whole range of unseemly behavior"). *See id.* at 2. The September 3 letter then culminates in a request that Belya be suspended and formally investigated. *See id.* at 2–3. No member of the "reading public" would think twice before "recogniz[ing Belya]" as the person responsible for Metropolitan Hilarion's supposed appeals to Moscow. *See Elias v. Rolling Stone LLC*, 872 F.3d 97, 104–05 (2d Cir. 2017).

Similarly, defendants try to evade the reasonable meaning of the defamatory statement by claiming it merely discusses irregularities, not forgery. *See Celle v. Filipino Rep. Enterprises Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) ("[C]ourts are not to strain to interpret such writings in their mildest and most inoffensive sense to hold them nonlibelous." (cleaned up)). The September 3 letter says that Metropolitan Hilarion "knew nothing about the written appeals directed to Moscow"—despite those appeals bearing his signature and seal. *See* Dkt. 143-3 at 1. The most

7

obvious implication of this revelation is that the letters were somehow faked. Stopping short to conclude that the September 3 letter is about "irregularit[ies]" alone ignores context, exactly what the Second Circuit and New York Court of Appeals have told courts to avoid. *See Celle*, 209 F.3d at 177; *November v. Time Inc.*, 194 N.E.2d 126, 128 (N.Y. 1963).

### B. Belya can't show an actionable publication of the statement.

"Under New York defamation law, 'publication is a term of art.'" *Albert v. Loksen*, 239 F.3d 256, 269 (2d Cir. 2001) (quoting *Ostrowe v. Lee*, 175 N.E. 505, 505 (N.Y. 1931) (Cardozo, C.J.)). Relevant here, "a plaintiff may not recover damages from the original author for … slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002).[2]

Belya no longer contends that the delivery of the September 3 letter to ROCOR leadership constituted an actionable publication of the defamatory statement. *See* Dkt. 165 at 8:15–17. (Even if he did, the First Amendment would bar that claim. *See Pfeil v. St. Matthews Evangelical Lutheran Church of Unaltered Augsburg Confession of Worthington*, 877 N.W.2d 528, 542 (Minn. 2016).) What he's focused on now are four instances of the statement's distribution beyond the church.[3]

Out of these four publications, the first—Olga Tsibin's post—holds together Belya's case. According to Belya, Tsibin's Facebook post was the first time the September 3 letter was posted on the internet and the first time Belya himself read the letter. Dkt. 148 ¶ 123; Dkt. 140 ¶ 71. Once

---

[2] It's not clear Florida law even allows liability for defamation claims based on third-party republication. *See Markle v. Markle*, 2023 WL 2711341, at *7 (M.D. Fla. Mar. 30, 2023) ("Apart from a few outlier cases, Florida law does not recognize defamation claims based on third-party republication."); *see also Johnson v. Darnell*, 781 F. App'x 961, 964 (11th Cir. 2019) ("[A] valid claim for defamation under Florida law would need to allege that the defendants themselves were responsible for publishing the defamatory material … not that something they did indirectly led to the publication of that material."). Belya hasn't provided the Court with *any* cases regarding publication under Florida law, much less ones supporting liability for third-party republication.

[3] At oral argument, Belya also claimed that defendants' distribution of the statement to ROCOR congregations and churchgoers qualified as another publication. *See* Dkt. 165 at 8: 17–24. Belya's biggest problem is on the facts: he doesn't point to any admissible evidence that defendants were the ones who shared the September 3 letter with ROCOR laity. *See* Dkt. 138 ¶¶ 171–74. Belya relies on his own declaration. *See id.* (citing Dkt. 140 ¶¶ 66–68, 71). But the most he says there is that "it was obvious [to him] that [the situation] was all orchestrated"—not that he has any personal knowledge of defendants circulating the statement. Dkt. 140 ¶ 67. And even if Belya could surmount his evidentiary problem, the First Amendment would almost certainly stand in the way of any claim that asked a court to adjudicate what church leadership can and can't say to its parishioners. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 747 (2020) ("[C]hurch autonomy" requires "independence in matters of faith and doctrine and in closely linked matters of internal government."); *see also Pfeil*, 877 N.W.2d at 542 ("[T]he First Amendment prohibits holding an individual or organization liable for statements made in the context of a religious disciplinary proceeding when those statements are disseminated only to members of the church congregation or the organization's membership or hierarchy.").

the letter was public, Belya saw "[his] reputation turn to ashes." *Id.* ¶ 72. Broadcasting the forgery accusation was "nothing short of spiritual murder." *Id.*

Defendants don't deny Tsibin made the post. *See* Dkt. 159 ¶ 123. But they do say that they have no idea how the letter became public or ended up in Tsibin's hands. Dkt. 112 ¶¶ 171–74.

Proving publication is Belya's burden, so he must show there's a genuine issue for trial here. *See Bustamante v. KIND, LLC*, 100 F.4th 419, 432 (2d Cir. 2024). He's a far cry from doing that. Because he didn't include Tsibin in this suit, Belya needs to connect the dots between defendants and Tsibin's Facebook post. *See Fashion Boutique*, 314 F.3d at 59. Belya says that defendants "leaked" the September 3 letter to Tsibin as part of a conspiracy orchestrated by Tsibin's estranged husband (who was arrested for robbing Belya's church), her current boyfriend (who was charged with attempted murder of Tsibin's husband), Olkhovskiy, and Antchoutine. *See* Dkt. 138 ¶ 171; Dkt. 148 ¶¶ 111, 122; Dkt. 142 at 28. This motley crew's goal? To "gather gossip and falsehoods on [Belya] in order to destroy [him]." Dkt. 140 ¶ 57.

To support his theory, Belya relies on a notarized statement by Tsibin's ex-husband describing the scheme. Dkt. 143-4. At the threshold, this exhibit raises a whirlwind of evidentiary issues. Belya doesn't seem to have disclosed Tsibin's ex-husband as a witness to defendants. *See* Dkts. 108-4; 108-5. And his account takes the form of a "notarized statement"—not an affidavit or declaration, which is what Rule 56 contemplates. *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

In addition to these evidentiary questions, the statement's substance is lacking too. It has plenty of evocative details, but it's silent about what really matters: any indication that Tsibin's ex-husband personally knows that defendants shared the letter with Tsibin. *See id.* The other piece of evidence Belya offers up—his own declaration—traffics in aspersions, not personal knowledge. *See* Dkt. 140 ¶ 57 ("One doesn't need to be a detective to understand … how [Tsibin] got the letter and who told her to post it."). Even drawing inferences in Belya's favor, he's staring down an evidentiary lacuna. "Conclusory allegations, conjecture, and speculation are insufficient to create a genuine issue of fact." *Bustamante*, 100 F.4th at 432 (citation and quotation omitted).

Without ratification of Tsibin's post, Belya's case fails against every defendant, save for Gan, Lukianov, and Antchoutine. For the other defendants, he's got no other avenue to show they published the allegedly defamatory statement to a third party. *See McCollum v. Baldwin*, 688 F. Supp. 3d 117, 128 (S.D.N.Y. 2023) ("[P]ublication to a third party is the cornerstone of defamation.").

As to Gan, Lukianov, and Antchoutine, Belya points to Facebook posts each made that link to articles about the September 3 letter. *See* Dkt. 143-15 (Gan post); Dkt. 143-16 (Lukianov post); Dkt. 127-4 at 99:10-100:2 (discussing Antchoutine post). These posts can't shore up Belya's case.

9

First, the Facebook post Belya attributes to Gan wasn't made on Gan's personal profile, but on the institutional account of the church Gan leads. Dkt. 148 ¶ 163. Gan testified that he didn't create the post and that he took it down as soon as he realized it existed. Dkt. 127-10 at 76:18-80:19. Belya says that Gan's testimony is an "after-the-fact fabrication designed to absolve Defendant Gan [of] responsibility." Dkt. 138 ¶ 255. But he cites no evidence in support of his claim. Belya "'must do more than simply show that there is some metaphysical doubt as to the material facts,' and 'may not rely on conclusory allegations or unsubstantiated speculation.'" *See Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (first quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); and then quoting *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

Even granting that Gan could be held responsible for the post, none of the three Facebook posts qualifies as an actionable publication. Courts within this Circuit have held that reposting an article link doesn't suffice as republication for a defamation claim. *See Brimelow v. New York Times Co.*, 2020 WL 7405261, at *7 (S.D.N.Y. Dec. 16, 2020) (collecting cases), *aff'd*, 2021 WL 4901969 (2d Cir. Oct. 21, 2021). "Although one who republishes defamatory content may be liable, a hyperlink . . . does not duplicate the content of a prior publication; rather, it identifies the location of an existing publication." *Mirage Ent., Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26, 39 (S.D.N.Y. 2018) (cleaned up). "Mere hyperlinking to a third-party publication that contains defamatory content is not typically treated as republication because a hyperlink simply references the publication, making it the twenty-first century equivalent of the footnote." SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS § 7:3.1 (5th ed. 2017).

And Belya doesn't say the posts in question did more than link to existing articles that describe the September 3 letter—the defamatory content he identifies is what's in the articles linked, not in the posts themselves. *See* Dkt. 148 ¶ 163 ("On September 17, 2019, Defendant Gan posted an article of Eastern Russian Orthodox News, on the Facebook page of St. Seraphim Russian Orthodox Church, of which he is the Rector, with the opening sentence visible on the page . . . ."); ¶ 164 ("On October 19, 2019, Defendant Lukianov reposted on his Facebook page an article published by orthochristian.com . . . ."); ¶ 168 ("Among the disseminators of the charge of forgery was Defendant Antchoutine, who, on July 6, 2022, reposted on his personal Facebook page an article from orthochristian.com . . . .").

Cases like *Mirage* draw their logic from the statute-of-limitations context. *See In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 174–75 (3d Cir. 2012). Courts' reasoning there makes even more apparent why defendants' links aren't defamatory publications in their own right. As the Sixth Circuit explained, "the test of whether a statement has been republished is if the speaker has affirmatively reiterated it in an attempt to reach a new audience that the statement's prior dissemination did not encompass." *Clark v. Viacom Int'l Inc.*, 617 F. App'x 495, 505 (6th Cir. 2015) (citing *Firth v. State*, 775 N.E.2d 463, 466 (N.Y. 2002)). That's because "a reiterated statement generates new reputational harm only if the statement is repeated with an intent and ability to expand its dissemination beyond its previous limits." *Id.* at 505–06.

10

Here, Belya hasn't put forth evidence, or even made any argument, that defendants' Facebook posts evinced "an intent or ability" to disseminate the forgery charge "beyond its previous limits." On Belya's own telling, Tsibin's post is what popped this can of worms open and exposed Belya to ridicule and censure by "the entire Orthodox world." *See* Dkt. 148 ¶¶ 148–49. That version of events makes sense, given that Tsibin's post is addressed to other church members and asks for "[m]aximum likes and reposts." *See* Dkt. 143-7 at 3. Belya claims no distinct injury or harm from the three Facebook posts defendants themselves made, and nothing else about them bears the markers of an actionable republication. *See* SACK ON DEFAMATION § 7:3.1 nn. 35.1–36.

### C. The defamatory implications of the sole statement Belya challenges aren't actionable.

The basic thrust of Belya's case now is that one statement in the September 3 letter, reasonably understood, accused him of forging the previous letters from Metropolitan Hilarion to Moscow. As noted above, the statement is susceptible to that meaning. But there's a separate problem, borne primarily from Belya's tactical decision to limit his suit. Belya doesn't challenge anything else in the September 3 letter, including: the reports of "complaints received from Florida concerning him"; that in the letter the defendants were "bring[ing] forward this concern"; that after an examination of the content of the letters from Metropolitan Hilarion, they were "drawn up in an irregular manner," including that the "request" (in scare quotes) didn't contain "the appropriate citation from the decision of the Synod of Bishops," or a biography of the cleric "elected" (also in scare quotes); and that "it is clear that not only are the above-mentioned petition letters invalid, but the candidacy of Archimandrite Alexander (Belya) for the episcopacy cannot possibly be given serious consideration." *See* Dkt. 143-3. Belya has also dropped his defamation claim based on the letter's alleged accusation that he forged a separate letter from a different church leader, Archbishop Gabriel. And he leaves unchallenged the letter's discussion of a variety of other allegations of misconduct leveled against him.

In *Herbert v. Lando*, the Second Circuit held that otherwise-actionable statements "should not be actionable if they merely imply the same view, and are simply an outgrowth of and subsidiary to those claims upon which … there can be no recovery." 781 F.2d 298, 312 (2d Cir. 1986). That's the case here. Belya has cast aside pieces of his defamation claim since he first filed this suit in what seems to be an effort to steer clear of the First Amendment. In doing so, he's backed himself into a corner. Even if you take out the defamatory statement Belya identifies—that Metropolitan Hilarion wasn't aware of the prior two letters—the remainder of the September 3 letter still plainly implies that Belya forged the December and January letters, exactly the implication Belya challenges.

For instance, Belya says nothing about the letter's statement that "it is clear that not only are the above-mentioned petition letters invalid, but the candidacy of Archimandrite Alexander (Belya) for the episcopacy cannot possibly be given serious consideration." Dkt. 143-3 at 2. That's likely because the statement is about church internal governance—namely whom ROCOR leadership should keep in consideration for elevation. *See Our Lady of Guadalupe*, 591 U.S. at

11

747 (First Amendment protects church's authority "to select, supervise, and if necessary, remove a minister without interference by secular authorities"). And as the Court mentioned earlier, Belya has withdrawn his challenge to the letter's statement that Belya's "episcopal election … never took place." Dkt. 143-3 at 1 (quotations omitted). On top of that, Belya makes clear that he isn't contesting whether the December 10 and January 11 letters were either "irregular[]" or "invalid." *See* Dkt. 138 ¶ 223.

Belya can't stay silent on the lion's share of the letter without falling within *Herbert*'s scope. So much of the letter circles the issue of forgery that taking out its passing mention of what Metropolitan Hilarion "knew" does little to change its meaning. Delete that line and the September 3 letter would still be about two letters that were irregular and invalid, didn't conform to required church protocol, discussed an election that never took place, and established as bishop a member of the clergy who was accused of denigrating church members and violating civil and criminal laws. The beneficiary of all this chicanery, and therefore the person most likely responsible for it? Belya.

### III.   The First Amendment bars Belya's claims.

Since Belya brought his claims, defendants have argued that the church-autonomy doctrine should bar this suit entirely. That was the basis of their previous appeal, *see Belya*, 45 F.4th at 633–34, and the focus of their arguments on summary judgment, *see* Dkts. 111, 150. As defendants see it, the First Amendment's promise of "independence in matters of faith and doctrine and in closely linked matters of internal government" means that they're insulated from liability, even where Belya isn't asking to be reinstated and isn't raising issues that (at least on their face) are about matters of faith or church law. *See Our Lady of Guadalupe*, 591 U.S. at 747.

The Second Circuit didn't accept defendants' sweeping interpretation of the First Amendment when it heard their appeal. *See Belya*, 45 F.4th at 633–34. But factual developments have swayed things their way. Two facts conspire to prevent judicial resolution of this case without running afoul of the First Amendment. First, Belya has considerably pared back his claims—the only defamatory statement still at issue concerns Metropolitan Hilarion's knowledge of the two written appeals. Second, Metropolitan Hilarion died in 2022, before being deposed in this case. *See* Dkt. 138 ¶ 16.

Given these circumstances, trying this case would be impossible without violating the church's autonomy. Imagine what trial would look like. The figure Belya has placed at this dispute's center—Metropolitan Hilarion—can't speak for himself. The remaining defendants—all senior ROCOR clergy—would have to take the stand and testify, their credibility to be examined by a jury. To get at what Metropolitan Hilarion knew and when, defendants' testimony would invariably cross over into core church functions: the proper election procedures of ROCOR bishops; what was said among senior church leaders about church disciplinary procedures; and communications among senior clergy about internal church governance, to name a few. Oral argument gave the Court just a hint of the jockeying into church affairs that might happen should this case proceed. *See* Dkt. 165 at 57:2–59:3.

Asking a jury to weigh in on this would be exactly the sort of interference the First Amendment forbids. *See Our Lady of Guadalupe*, 591 U.S. at 746. For Belya to succeed on his claims, a jury would need to find that the letter's accusations of forgery weren't substantially true—but doing that would require divining what ROCOR doctrine requires of such letters, a task fit for no secular factfinder. *See Huntsman v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 127 F.4th 784, 796–800 (9th Cir. 2025) (Bress, J., concurring) ("[A]ny effort to limit the Church to 'secular' defenses would implicitly deem illegitimate the very system of beliefs and governance that define the Church as a religious institution and that lie at the heart of the First Amendment's protections for religion.").

What's more, a jury would also need to decide Belya's claim for damages. Even if Belya purports to disavow any damages based on his departure from ROCOR or his reputation within the church, the Court can't blind itself to reality. *See* Dkt. 143-21 at 50–51 (Belya's expert damages report noting that "[t]he false accusations of forgery dealt a devastating blow to Father Alexander's professional and religious reputation, undermining the trust and confidence placed in him by his peers and other people of the church" and that "Father Alexander's professional standing as a clergyman was irrevocably tarnished by the cloud of suspicion cast upon him, hindering his ability to fulfill his duties and responsibilities effectively"). Belya is and was a priest, this case is about allegations of forgery in connection with his election as bishop, and Belya himself points to the "spiritual murder" he endured due to the onslaught of negative publicity in the religious press. *See* Dkt. 140 ¶ 72; Dkt. 143-21 at 52 ("The false accusations of forging documents directly impugned Father Alexander's reputation and personal integrity within the Orthodox Christian community. As a church leader, his reputation is paramount, and the false accusations severely damaged his standing within the church and broader society."). It's hard to imagine how an assessment of Belya's damages in this context wouldn't raise serious First Amendment concerns. *See Cha v. Korean Presbyterian Church of Washington*, 553 S.E.2d 511, 516 (Va. 2001) (church autonomy doctrine bars defamation claim where "the court would be compelled to consider the church's doctrine and beliefs because such matters would undoubtedly affect … whether the plaintiff had been prejudiced in his profession [as a pastor]").

Belya has done his best to keep this suit about squarely secular questions; perhaps if events hadn't unfolded as they did, he might have succeeded. But what the Second Circuit foreshadowed has come true: "further proceedings [have uncovered] that the merits do turn on the church autonomy doctrine." *Belya*, 45 F.4th at 632–33.

## CONCLUSION

Despite the dismissal of this case, there is some consolation to Belya: throughout their papers and at oral argument, defendants have disavowed that they ever said or intended to suggest that Belya forged the December 10 and January 11 letters. *See, e.g.*, Dkt. 111 at 29–30 ("[The statements] do not imply that Father Alexander himself was the forger. To be sure, the Clergy Letter imputes plenty of blame on Father Alexander—just not for the irregular letters."). Belya has repeatedly made clear that what matters to him is clearing his name from the charge of forgery.

13

Defendants confirm that they made no such charge. While Belya isn't entitled to further relief in the courts of law, defendants' assurance may provide him solace in the court of public opinion.

For the reasons above, defendants' motion for summary judgment is GRANTED. Defendants' motions to preclude plaintiffs' expert witnesses are DENIED as moot.

The Clerk of Court is directed to terminate Dkts. 105, 106, 107, 108, and 110 and close this case.

SO ORDERED.

Dated: March 31, 2025
New York, New York

                                        ARUN SUBRAMANIAN
                                        United States District Judge